JAMES A. QUADRA, State Bar No. 131084
REBECCA COLL, State Bar No. 184468
ROBERT D. SANFORD, State Bar No. 129790
MACHAELA M. MINGARDI, State Bar No. 194400
QUADRA & COLL, LLP
649 Mission Street, Fifth Floor
San Francisco, CA  94105
Telephone: (415) 426-3502
Facsimile: (415) 625-9936

Attorneys for Plaintiffs Carl Kelley and Michael McElligott

**FILED UNDER SEAL**

SEALED BY ORDER OF THE COURT

FILED AUG 08 2019 SUSAN Y. SOONG CLERK, U.S. DISTRICT COURT NORTH DISTRICT OF CALIFORNIA OAKLAND OFFICE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CARL KELLEY and MICHAEL MCELLIGOTT,<br><br>Plaintiffs;<br><br>v.<br><br>MCKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | Case No.: CV19-2233-DMR<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF FALSE CLAIM ACT (31 U.S.C. §§3729 *et seq.*)**<br><br>Filed Under Seal Pursuant to 31 U.S.C. §3730(b)(2) and Local Rule 79-5<br><br>**Jury Trial Demanded** |

Plaintiffs Carl Kelley and Michael McElligott respectfully allege:

## I. INTRODUCTION

1. Plaintiffs and relators Carl Kelley ("Kelley") and Michael McElligott ("McElligott") respectfully file this First Amended Complaint on behalf of the United States of America and individually against McKesson Corporation, a Delaware corporation doing business in this District ("McKesson"), pursuant to the False Claims Act, codified at 31 U.S.C. §§3729 *et seq.* ("FCA").

2. McKesson is one of the largest distributors of drugs throughout the United States, including narcotic opioids listed by the United States Drug Enforcement Administration

("DEA") as Schedule II drugs. (*See* www.dea.gov/drug-scheduling) Schedule II opioids such as morphine, hydrocodone, oxycodone and fentanyl are described by the DEA as "dangerous" and have "a high potential for abuse, with use potentially leading to severe psychological or physical dependence." (*Id.*) As described in detail below, McKesson has distributed and continues to distribute Schedule II opioids throughout the United States with the knowledge that its supply chain is riddled with security flaws that allow for the diversion of extraordinary quantities of opiates for purposes other than the lawful medical use of these drugs as prescribed by physicians. McKesson has intentionally concealed the extent of its security flaws from the federal government for over at least a decade, while deceiving the federal government into settling two legal proceedings and falsely representing to the federal government that McKesson will comply with the law. As a result, McKesson is knowingly and directly contributing to the pandemic of opioid abuse in the United States described by the National Institutes of Health ("NIH") as a "public health crisis with devastating consequences." (*See* www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis) The NIH reports that over 47,000 people died from opioid overdose in this country in 2017 and that, as of January 2019, more than 130 people die every day from opioid overdose. (*Id.*) The "total 'economic burden' of prescription opioid misuse alone in the United States is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement." (*Id.*) McKesson is directly responsible for this public health crisis because McKesson is essentially operating a nationwide illegal opioid distribution system, while intentionally deceiving federal, state and local law enforcement agencies about known lapses in the security of McKesson's distribution system. McKesson could easily tighten security to significantly reduce the illegal diversion of opioids, but McKesson refuses to take these necessary measures because doing so would adversely impact McKesson's profitability.

**JURISDICTION AND VENUE**

3. This Court has federal question jurisdiction pursuant to 21 U.S.C. §1331 because this action is a case or controversy under Article III of the United States Constitution that arises under 31 U.S.C. §§3730 and 3732.

4. Venue is proper in this District under 31 U.S.C. §3732(a) and 28 U.S.C. §1391(c) because McKesson does business and is headquartered in San Francisco, California.

## PARTIES

5. Plaintiff and Relator Carl Kelley worked for McKesson from 2001 until May 2017. He was a senior IT Distribution manager at McKesson from 2006 until 2017 for all national pharmaceutical distribution centers. His staff was part of the team that supported servers, workstations, customer and employee interaction. Kelley managed a group of up to 12 technicians for 35 distribution centers and worked at the Distribution Center ("DC") in Olive Branch, Mississippi from 2013 to 2017. He traveled with McKesson's Chief Executive Officer, John H. Hammergren ("Hammergren") Hammergren and senior members of McKesson to work on their technology needs. He also worked on personal IT for all senior officers of McKesson and their family members.

6. Plaintiff and Relator Michael McElligott worked for McKesson from 1999 to 2009. While at McKesson, McElligott provided personal security for Hammergren.

7. In connection with their work at McKesson, Kelley and McElligott personally witnessed evidence of lack of security at DCs, and other corporate facilities. Kelley and McElligott also witnessed activities that indicated the presence of a corporate culture that flouted the law. In addition, Kelley and McElligott have spoken with numerous former and current McKesson employees regarding some of the matters alleged below. The factual allegations in this Complaint are based on facts personally known by Kelley and McElligott, and information obtained by Kelley and McElligott from communications with former or current McKesson employees which they are informed and believe to be true.

8. Defendant McKesson is a corporation duly organized and existing under the laws of the State of Delaware, is qualified to do business in the State of California, and is doing business in the City and County of San Francisco, California where McKesson maintains its corporate headquarters.

# FACTUAL ALLEGATIONS

9. McKesson states on its website:

> McKesson is the oldest and largest healthcare company in the nation, serving more than 50% of U.S. hospitals and 20% of physicians. We deliver one-third of all medications used daily in North America.

(See www.mckesson.com)

10. McKesson distributes medications, including Schedule II opiates, through 35 DCs located throughout the United States. McKesson's executive management has long known of significant security flaws in its DCs which allow for the easy theft of products in the supply chain, including Schedule II opiates, euphemistically known as "shrinkage" at McKesson.[1] A huge amount of product, including Schedule II opiates, pass through McKesson's 35 DCs on a daily basis. As Hammergren once stated to McElligott: "it comes in and goes out so fast, we don't know where it is."

11. In or about 2006, McKesson retained a security expert and ASIS Certified Protection Professional, John Tippit ("Tippit"), to conduct a security review of McKesson's operations, which identified numerous security lapses at McKesson's DCs, many of which remain today as discussed below. Hammergren expressly told Tippit not to investigate inventory of Schedule II drugs, which would have created evidence that McKesson knew that Schedule II drugs were being stolen from McKesson's DCs. During his investigation, Tippit was able to easily access secured areas within McKesson DCs, including areas where Schedule II opiates were stored. Tippit made several recommendations to improve security at McKesson's DCs, but most of the recommendations were never implemented due to the expense. No full-time internal DC security staff were hired to ensure that the rate of shrinkage decreased. Implementation of a reporting mechanism for shrinkage did not occur. Known weaknesses in McKesson's

---

[1] McKesson has also suffered loss of inventory in its distribution chain of: (i) Schedule III drugs, which have a "moderate to low potential for physical and psychological dependence," such as acetaminophen with codeine, ketamine, and anabolic steroids; and (ii) Schedule IV drugs, which have a "low potential for abuse," such as Xanax, Darvocet, Valium, Ativan, and Ambien. (See www.dea.gov/drug-scheduling)

information technology system allowed for external access to corporate financial accounts as well as the failure to properly account for drug inventory.

12. McKesson has a long history of failing to ensure that the Schedule II opiates that pass through its DCs are not diverted for unlawful use. In 2008 and again in 2017, McKesson entered into settlement agreements with the United States Department of Justice ("DOJ") and DEA regarding McKesson's failure to prevent the diversion of opiates, particularly by failing to identify and report suspicious opioid orders but instead simply filling those orders. At the time McKesson entered into both the 2008 and 2017 settlement agreements, McKesson was aware of numerous flaws in security at its DCs which allowed for the diversion of opiates by means other than filling suspicious opioid orders, including security flaws identified by Tippit, but McKesson intentionally concealed those security lapses from the DOJ and DEA. Most of these security flaws continue to the present. Opportunities to divert opioids and high value drugs existed at the truck loading dock, before drugs are scanned into the DC inventory and while drugs are stored before distribution to McKesson customers. Positive control was not maintained in DCs, allowing staff to remove drugs from the conveyor and throw them in trash bins for later removal.

On its website, McKesson touts that it has "strong programs designed to detect and prevent opioid diversion within the pharmaceutical supply chain," known as a Controlled Substance Monitoring Program ("CSMP"). (*See* www.mckesson.com/about-mckesson/fighting-opioid-abuse/controlled-substance-monitoring-program) A copy of McKesson's webpage regarding its CSMP is attached as **Exhibit A** and incorporated herein by reference. McKesson is required to maintain the CSMP pursuant to the 2017 settlement agreement with the DOJ. McKesson's misrepresentations regarding the effectiveness of its CSMP differ markedly from the day-to-day reality of operations in McKesson's distribution centers:

    a. McKesson claims that it has an "[e]xperienced compliance team" "comprised of more than 40 diversion experts with more than 240 years of cumulative DEA enforcement experience." (Exhibit A.) McKesson's "internal compliance team" is designed simply to create the false impression for the public and federal and state regulators that McKesson maintains robust security to prevent the diversion of opioids.

In reality, each of McKesson's DCs is separately managed by a DC manager with the primary responsibility to operate the DC as profitably as possible, which leads the DC manager to conceal security breaches at the DC in order to minimize the disruption of the distribution of product and the consequent reduction in profits. Each McKesson DC manager is allowed a limited and inadequate budget for security at the DC and is expected to keep operations running efficiently within that limited budget, which creates an incentive for DC managers to conceal security issues from McKesson's "internal compliance team." To cite just one example of inadequate security at McKesson's DCs, as recently as 2017 the entire on-duty security staff at one of McKesson's largest DCs located in Olive Branch, Mississippi consisted of one absentee manager who traveled extensively, borrowed assistance from the facilities team who are not trained or qualified to perform security work, a small contingency of contracted security workers instructed only to check badges, and a single security guard at the entrance to the DC. McKesson's DC in Olive Branch is approximately 647,000 square feet; the total floor area of the Superdome is 269,000 square feet. McKesson DC managers are under substantial pressure to maintain efficient operations with an insufficient security budget, despite the well-known problem of ongoing diversion of Schedule II opioids and other "high value products." In short, McKesson's "internal compliance team" is a fig leaf designed to placate government regulators and to promote McKesson's false public relations campaign that it takes the diversion of opioids at its DCs seriously.

    b.    McKesson claims that it has "thorough customer due diligence and ongoing oversight," which includes "monitor[ing] its customers' orders of controlled substances for potential diversion throughout the customer relationship." (Exhibit A.) In reality, McKesson does not monitor customer orders for potential diversion of opioids. For example, if one of McKesson's largest and most valued customers reports that a delivery of controlled substances was not received, McKesson's practice is to simply reship a second delivery of the controlled substances without questioning the

customer, investigating the missing delivery, or advising DEA or government regulators that shipments of controlled substances are going missing. Instead, if customers begin to regularly complain to McKesson that orders of controlled substances or other high value product are not being delivered, McKesson institutes a "secondary check" on a distribution line so that product on that line is allegedly inspected a second time before being shipped. The diversion of controlled substances that customers claim were never delivered recently became so prevalent at one McKesson DC that up to ten distribution lines had secondary checks. The secondary checks are not sufficient to stop diversion of controlled substances that McKesson customers purportedly do not receive and that McKesson covers up by simply sending a second shipment.

  c. McKesson touts that it has a "cutting-edge controlled substances threshold management program [with] ongoing refinements to reflect the most up-to-date information and trends." (Exhibit A.) While McKesson does not state clearly what its "threshold management program" even does, the reality is that McKesson does not have an accurate record of how or how much Schedule 2 controlled substances are diverted from its mammoth distribution system, although the technology is available that could track precisely the location of controlled substances within McKesson's distribution system. As alleged above, Hammergren admitted to McElligott that the flow of product through McKesson's DCs is so rapid and large, McKesson does not keep track of the product. However, Hammergren co-authored a book published in 2008, entitled "Skin in the Game: How Putting Yourself First Today Will Revolutionize Health Care Tomorrow," which describes on page 14 how radio-frequency identification ("RFID") tags can be used to track and monitor any prescription drug. McKesson does not use RFIDs to track the Schedule 2 controlled substances within its distribution system. McKesson has intentionally refused to install cutting edge RFID technology to track and monitor controlled substances in its DCs. The absence of an effective "management program" to monitor and track opioids is

apparent in McKesson's after-the-fact implementation of secondary checks to try to detect the ongoing diversion of controlled substances that McKesson only learns about when customers report that orders have not been delivered.

        d.      McKesson claims that it "reports controlled substances transactions, including orders deemed suspicious and blocked by our CSMP … via the automated ARCOS drug reporting system, which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or pharmaceutical distribution." (Exhibit A.) McKesson's claim essentially repeats verbatim the DEA's description of the ARCOS (Automation of Reports and Consolidated Orders System). (*See* https://www.deadiversion.usdoj.gov/arcos/index.html.) In reality, McKesson does not accurately report controlled substances transactions to the DEA or government regulators, including failing to report to the DEA incidents when McKesson customers complain that opioid orders are not delivered and McKesson ships a replacement order. McKesson actively conceals from the DEA and law enforcement the occurrence and details of specific incidents of diversion of opioids, including the identity of McKesson employees or independent contractors who are discharged for opioid theft. Diversion of opioids from McKesson's DCs typically is discovered by outside sources, such as customers who report receipt of empty opioid bottles like the Rite-Aid pharmacy located in Milford, Michigan as discussed in the warning letter sent to Hammergren by the Food & Drug Administration ("FDA"), dated February 7, 2019, a copy of which is attached as **Exhibit B**. In another incident, local law enforcement discovered in or about 2016 that high value product, including opioids, stolen from McKesson's DC in Olive Branch, Mississippi was being sold online via Facebook. In sum, while McKesson fails to properly track the extent of the diversion Schedule II controlled substances, McKesson often does not report even known incidents of diversion to federal regulators.

e.  McKesson touts that it operates a "[t]ightly controlled physical supply chain," where allegedly: (i) "[c]ontrolled substances are locked, monitored and stored in two DEA-regulated spaces;" (ii) "[s]chedule 2 narcotics go in a high-security 'vault' and inventory checks of controlled substances are conducted frequently;" (iii) "[f]ormal background checks are given to all employees who handle Schedule 2 narcotics;" and (iv) "[c]ontrolled substances are packaged under video cameras, where they're packed in specially sealed plastic bags." (Exhibit A.) The reality of McKesson's physical supply chain is far different than McKesson's misleading description.

First, McKesson knowingly has numerous unmonitored or poorly monitored locations within its DCs where Schedule 2 drugs are "diverted," *i.e.* stolen, yet McKesson takes no or inadequate steps to tighten security. The unmonitored or poorly monitored locations include: (i) the parking lots where trucks wait to deliver incoming opioids to the DCs; (ii) the loading docks where the opioids are transferred to and from delivery trucks; (iii) areas within the DCs through which the opioids transit before or after reaching the "DEA-regulated spaces," where distribution lines operate behind a chain-link fence within the DC; and (iv) the opioid distribution lines within the fenced areas.

Second, McKesson does not strictly control access to the fenced-off areas where the distribution lines for Schedule 2 controlled substances operate. Access is controlled by a badge system, but those with badges are able to allow access to others. Moreover, those with badges are often not properly screened when hired as alleged below. A McKesson employee has witnessed the theft of high value product within the allegedly secured areas. A "code of silence" pervades the distribution systems at McKesson DCs, so that known incidents of opioid theft are not reported.

Third, the security cameras in McKesson DCs are typically not monitored in real time and the presence of the cameras is not a particularly effective deterrent. McKesson employees or independent contractors are able to easily conceal the theft of

opioids from the view of the cameras. McKesson does not have roving security guards in its DCs, including in the allegedly "DEA-regulated" spaces.

<u>Fourth</u>, McKesson's allegedly "formal background checks" are inadequate to screen out employees or independent contractors who pose a risk of diverting Schedule 2 controlled substances. McKesson does not actually perform the background check on many employees or independent contractors, but instead relies on employment agencies to conduct background checks. If an independent contractor is caught stealing product or suspected of stealing product, McKesson will often advise the employment agency simply that the independent contractor is no longer needed, which is part of McKesson's pattern and practice of concealing the extent of its problem with the diversion of high value products, including opioids. At the Tennessee and New Jersey DCs, an estimated fifteen percent of the employees or independent contractors discharged by McKesson had access to the purportedly secure areas in McKesson's DCs and were either caught or suspected of stealing high value product including opioids. This unlawful concealment of product theft is rampant at McKesson DCs

  f.  McKesson claims that it is engaged in "[o]going state and federal collaboration efforts." (Exhibit A.) In reality, McKesson actively conceals the extent of the diversion of opioids from local, state and federal governmental agencies, as well as the gaps in McKesson's security system. McKesson regularly and intentionally fails to report known incidents of opioid theft and to identify employees or independent contractors suspected of opioid theft. Since these security flaws have been noted, many senior corporate leaders have chosen to leave the company to avoid scrutiny. Hammergren has moved to Change Healthcare, a company that compiles information about doctor's prescriptions and patient identification, to avoid being associated with the distribution problems at McKesson.

**First Claim For Relief**
**Violation of False Claim Act (31 U.S.C. §3729(a)(1))**

13.  Kelley and McElligott incorporate by reference all allegations in the preceding

paragraphs as if fully set forth here.

14. Under the "implied false certification theory," a violation of the False Claims Act can occur when "a defendant makes representations in submitting a claim but <u>omits its violations of statutory, regulatory, or contractual requirements</u> … if they render the defendant's representations misleading with respect to the goods or services provided." *See, e.g., Universal Health Servs. v. United States ex rel. Escobar*, ___U.S.___, 136 S.Ct. 1989, 1999, 195 L.Ed.2d 348, 361 (2016) (emphasis added). McKesson violated the False Claims Act, codified at 31 U.S.C. §§3729 *et seq.*, by: (i) knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval (31 U.S.C. §3729(a)(1)(A)); (ii) knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim (31 U.S.C. §3729(a)(1)(B)); and/or (iii) conspiring to commit a violation of 31 U.S.C. §3729(a) (31 U.S.C. §3729(a)(1)(C)), through, inter alia, omitting its violations of statutory, regulatory, and contractual requirements.

15. McKesson violated the False Claim Act in connection with false or fraudulent claims, records or statements submitted for payment or approval under various federal programs, including but not limited to the Medicare program (42 U.S.C. §§1395 *et. seq.*). Other relevant federal programs potentially impacted by McKesson's violation of the False Claims Act include: (i) TRICARE, a health care program administered by the United State Department of Defense (10 U.S.C. §§1071 *et seq.*); (ii) CHAMPVA, a health care program administered by the United States Department of Veteran Affairs (38 U.S.C. §§1781 *et seq.*); and (iii) FEHBP (Federal Employee Health Benefit Program), a health insurance program administered by the United States Office of Personnel Management (5 U.S.C. §§8901 *et seq.*).

16. McKesson's claims, records or statement were false or fraudulent because McKesson has failed and continues to fail to disclose to the federal government that McKesson is not operating its DCs in compliance with the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§801 *et. seq.* ("CSA"), and the regulations promulgated

thereunder, 21 C.F.R. Part 1300 *et seq.*[2] Such noncompliance renders McKesson's representations in its claims misleading because such noncompliance would disqualify McKesson from operating and receiving payment or approval from the aforementioned federal programs. For example, McKesson has violated various CSA regulations, including but not limited to: (i) 21 C.F.R. §1301.71(a) by failing to "provide effective controls and procedures to guard against theft and diversion of controlled substances;" (ii) 21 C.F.R. §1301.72 (d) by failing to limit access to controlled substance storage areas "to an absolute minimum number of specifically authorized employees;" (iii) 21 C.F.R. §1301.74(c) by failing to notify the DEA "in writing, of any theft or significant loss of any controlled substances within one business day of discovery of the theft or loss;" and (iv) 21 C.F.R. §1301.77(b) by failing to limit access to controlled substances "to an absolute minimum number of specifically authorized employees." McKesson has also failed to maintain a proper inventory that is a "complete and accurate record of all controlled substances on had on the date the inventory is taken," as required by 21 C.F.R. §1304.11(a) and (e).

17. In addition, McKesson also failed to disclose to the federal government it is out of compliance with the 2008 and 2017 settlement agreements with the DOJ – which would have disqualified McKesson from continuing to be eligible to receive payments under Medicare and other aforementioned federal programs.

18. The United States paid money to McKesson based on the claims, records or statements by McKesson or caused to be made by McKesson, without the United States being aware of the falsity or fraudulent nature of the claims, records or statements and in reliance on the accuracy of those claims, records or statements.

19. As a proximate result of McKesson's violation of the False Claims Act, the United States has suffered monetary damages by paying amounts to McKesson based on the false or fraudulent claims, records or statements submitted by McKesson or caused to be

---

[2] McKesson is a distributor under the CSA as defined by 21 U.S.C. §802(11) and a registrant under 21 C.F.R. §1301.11(a), which operates "freight forwarding facilities" as defined by 21 C.F.R. §1300.01.

submitted by McKesson. In addition to its actual damages, the United States is entitled to penalties and other relief as deemed appropriate by the Court.

**PRAYER FOR RELIEF**

Plaintiffs and Relators Carl Kelley and Michael McElligott, acting on behalf of the United States and in their individual capacities, pray as follows:

1. For treble damages pursuant to 31 U.S.C. §3729(a)(1) or other applicable law in an amount to be proven at trial;

2. For penalties pursuant to 31 U.S.C. §3729(a)(1) or other applicable law

3. For attorney fees and costs pursuant to 31 U.S.C. §3729(a)(3) or other applicable law; and

4. For such other and further relief as the Court deems just.

Respectfully submitted,

DATED: August 8, 2019            QUADRA & COLL, LLP

By: _/s/ James A. Quadra_____
JAMES A. QUADRA
REBECCA COLL
ROBERT D. SANFORD

Attorneys for Plaintiffs and Relators
CARL KELLEY and MICHAEL MCELLIGOTT

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: August 8, 2019

QUADRA & COLL, LLP

By: _____
JAMES A. QUADRA
REBECCA COLL
ROBERT D. SANFORD
MACHAELA MINGARDI

Attorneys for Plaintiffs and Relators
CARL KELLEY and MICHAEL MCELLIGOTT