JAMES A. QUADRA, State Bar No. 131084
REBECCA COLL, State Bar No. 184468
ROBERT D. SANFORD, State Bar No. 129790
KARA SATRA PINETTI, Admitted Pro Hac Vice
QUADRA & COLL, LLP
649 Mission Street, Fifth Floor
San Francisco, CA  94105
Telephone: (415) 426-3502
Facsimile: (415) 625-9936

Attorneys for Plaintiffs and Relators
Carl Kelley and Michael McElligott

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CARL KELLEY and MICHAEL MCELLIGOTT, <br><br> Plaintiffs; <br><br> v. <br><br> MCKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | Case No.:  CV19-2233-DMR <br><br> **SECOND AMENDED COMPLAINT FOR VIOLATION OF FALSE CLAIM ACT (31 U.S.C. §§3729 *et seq.*)** <br><br> **Jury Trial Demanded** |

Plaintiffs and Relators Carl Kelley and Michael McElligott respectfully allege:

## I.    INTRODUCTION

1.    Plaintiffs and Relators Carl Kelley ("Kelley") and Michael McElligott ("McElligott") respectfully file this Second Amended Complaint on behalf of the United States of America and individually against McKesson Corporation, a Delaware corporation doing business in this District ("McKesson"), pursuant to the False Claims Act, codified at 31 U.S.C. §§3729 *et seq.* ("FCA").

2.    McKesson is one of the largest distributors of drugs throughout the United States, including narcotic opioids listed by the United States Drug Enforcement Administration ("DEA") as Schedule II drugs. (*See* www.dea.gov/drug-scheduling.)  Schedule II opioids such as

1

morphine, hydrocodone, oxycodone and fentanyl are described by the DEA as "dangerous" and have "a high potential for abuse, with use potentially leading to severe psychological or physical dependence." (*Id.*)  As described in detail below, McKesson has distributed and continues to distribute Schedule II opioids throughout the United States with the knowledge that its distribution centers are riddled with security flaws that allow for the diversion of extraordinary quantities of opioids for purposes other than the lawful medical use of these drugs as prescribed by physicians.  McKesson has intentionally concealed the extent of its security flaws from the federal government for over a decade, while deceiving the federal government into settling two legal proceedings and falsely representing to the federal government that McKesson will comply with the law.  As a result, McKesson is knowingly and directly contributing to the pandemic of opioid abuse in the United States described by the National Institutes of Health ("NIH") as a "public health crisis with devastating consequences." (*See* www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis.)  The NIH reports that over 47,000 people died from opioid overdose in this country in 2017 and that, as of January 2019, more than 130 people die every day from opioid overdose.  (*Id.*)  The "total 'economic burden' of prescription opioid misuse alone in the United States is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement." (*Id.*)

      3.     McKesson is directly responsible for this public health crisis because McKesson is essentially operating a nationwide illegal opioid distribution system, because it is cheaper to allow drugs to be stolen from its facilities than to comply with mandatory legal requirements securing them.  McKesson intentionally deceives federal, state and local law enforcement agencies about known lapses in the security of McKesson's distribution system.  McKesson could easily tighten its security to significantly reduce the theft of opioids, but McKesson instead conceals its security flaws from the federal government in order to avoid implementing necessary security measures because doing so would adversely impact McKesson's profitability.

## II.     JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction pursuant to 21 U.S.C. §1331 because this action is a case or controversy under Article III of the United States Constitution that arises under 31 U.S.C. §§3730 and 3732.

5.      Venue is proper in this District under 31 U.S.C. §3732(a) and 28 U.S.C. §1391(c) because McKesson does business and is headquartered in San Francisco, California.

## III.     PARTIES

6.      Plaintiff and Relator Carl Kelley worked for McKesson from 2001 until May 2017.  He was a senior IT Distribution manager at McKesson from 2006 until 2017 for all national pharmaceutical distribution centers.  His staff was part of the team that supported servers, workstations, customer and employee interaction.  Kelley managed a group of up to 12 technicians for 35 distribution centers and worked at the Distribution Center ("DC") in Olive Branch, Mississippi from 2013 to 2017.  He traveled to virtually every distribution center, and frequently traveled with McKesson's former Chief Executive Officer, John H. Hammergren ("Hammergren") and senior executives of McKesson to work on their technology needs.  He also worked on personal IT for all senior officers of McKesson and their family members.

7.      Plaintiff and Relator Michael McElligott worked for McKesson from 1999 to 2009.  While at McKesson, McElligott provided personal security for Hammergren.

8.      In connection with their work at McKesson, Kelley and McElligott personally witnessed evidence of lack of security at DCs and other corporate facilities.  Kelley and McElligott also witnessed activities that indicated the presence of a corporate culture that flouted the law.  In addition, Kelley and McElligott have spoken with numerous former and current McKesson employees regarding some of the matters alleged below.  The factual allegations in this pleading are based on facts personally known by Kelley and McElligott, and information obtained by Kelley and McElligott from communications with former or current McKesson employees which they are informed and believe to be true.

Second Amended Complaint                                    Case No. CV19-2233-DMR

9.      Defendant McKesson is a corporation duly organized and existing under the laws of the State of Delaware, is qualified to do business in the State of California, and is doing business in the City and County of San Francisco, California where McKesson maintained its corporate headquarters before moving to Texas in April 2019.

## IV.   FACTUAL BACKGROUND

**A.   McKesson Engages in Extensive Business with the Federal Government for which McKesson Is Paid Significant Sums of Money**

10.      McKesson claims on its website that:

> McKesson is the oldest and largest healthcare company in the nation, serving more than 50% of U.S. hospitals and 20% of physicians. We deliver one-third of all medications used daily in North America.

(*See* www.mckesson.com)

Schedule II opioids are among the "one-third of all medications used daily in North America" which McKesson claims it delivers.

11.      McKesson and affiliated entities engage in extensive business with the federal government, including distributing medical supplies and pharmaceutical drugs such as Schedule II opioids, through 35 DCs located throughout the United States.

12.      As just one example of McKesson's numerous contractual obligations with the federal government, since 2004 McKesson has been the prime pharmaceutical supplier for the United States Department of Veterans Affairs ("VA"). In a news release dated December 12, 2019, McKesson announced that its award of an additional two-year contract by the VA, which "runs the nation's largest integrated healthcare system."  Under the contract, McKesson "continue[s] to supply pharmaceuticals to more than 750 locations, including more than 270 medical centers, as well as the VA's seven CMOPs [Consolidated Mail Outpatient Pharmacies]." (*Id.*) In the press release, McKesson touted that it "is the largest non-defense vendor serving the U.S. Department of Veterans Affairs, Department of Defense, and other government branches." (*Id.*)

Second Amended Complaint                         Case No. CV19-2233-DMR

13.     A true and correct copy of a "Pharmaceutical Prime Vender Contract VA797P-12-D-0001" ("VA PPV Contract") between the VA and McKesson is attached hereto as **Exhibit A** and incorporated herein by reference. The VA PPV Contract provides for a contract term in two-year increments, commencing August 10, 2012, with three two-year options. (Ex. A, p. 1.) The VA PPV Contract is or is materially similar to the VA contract publicized by McKesson in its December 12, 2019 press release.  The VA PPV Contract explicitly provides for sales not only to the VA, which provides medical services to military veterans who served in the United States armed forces, but multiple other federal departments or agencies, including: Department of Health and Human Services ("HHS") Program Support Center, Supply Service Center ("HHS PSC"); Department of Health and Human Services Indian Health Service ("HHS IHS"); Immigration Health Service Corps ("IHSC"); Department of Homeland Security ("DHS"); Bureau of Prisons ("BOP"); Public Health Service for the Commonwealth of Northern Mariana Island ("Mariana PHS"); Federal Health Care Centers ("FHCC"); and Peace Corps ("PC").  The HHS PSC is a multi-function shared service provider to the federal government administered by HHS. The HHS IHS is an HHS agency which provides health services to Native Americans. The IHSC provides medical care to persons in the custody of United States Immigration and Customs Enforcement ("ICE"). The DHS provides security for the United States homeland. The BOP operates federal prisons. The Mariana PHS provides medical services to residents of the Commonwealth of the Northern Mariana Islands, a United States territory. Plaintiffs and Relators are informed and believe, and on that basis allege, that the FHCC is comprised of federal health centers administered by the VA and federally-qualified health centers which receive federal aid from the federal Health Resources & Services Administration, an HHS agency. The Peace Corps is federal agency which places and assists community service volunteers in countries throughout the world. In short, pursuant to the VA PPV Contract McKesson supplies far more entities and agencies of the federal government than the VA, for which McKesson is paid significant sums of money by the federal government.

14.     The VA PPV Contract requires McKesson "to comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under" the VA PPV Contract. Ex. A, §52.212-4(q), p. 76.

15.     The VA PPV Contract specifically prohibits the diversion of "pharmaceutical products," which are:

> intended solely for the use of authorized ordering activities in carrying out their governmental missions; they are not intended for resale or barter.

Ex. A, §AS3023, p. 79.

16.     Under the PPV VA Contract, McKesson must manage any order of Schedule II drugs "in accordance with Controlled Substances Ordering System" ("CSOS"), which is a DEA regulatory control system" designed to prevent the diversion of legitimate pharmaceutical drugs in to illegal channels."

17.     Section 52.212-5 of the VA PPV Contract incorporates by reference several relevant clauses of the Federal Acquisition Regulations ("FAR"), including the Contractor Code of Business Ethics and Conduct ("FAR Ethics Code"). Ex. A, §n52.212-5(b)(2), p. 87.

18.     In addition to direct sales to the federal government, Plaintiffs and Relators are informed and believe, and on that basis allege, that McKesson also has contractual obligations with the federal government to distribute medical supplies and medication, including Schedule II opioids, under a variety of federal programs, including but not limited to: (i) Medicare (42 U.S.C. §§1395 *et. seq.*); (ii) TRICARE, a health care program administered by the United State Department of Defense (10 U.S.C. §§1071 *et seq.*); (iii) CHAMPVA, a health care program administered by the United States Department of Veteran Affairs (38 U.S.C. §§1781 *et seq.*); and (iv) FEHBP (Federal Employee Health Benefit Program), a health insurance program administered by the United States Office of Personnel Management (5 U.S.C. §§8901 *et seq.*).

19.     In addition to the foregoing direct sales to the federal government and sales pursuant to the foregoing programs, McKesson has knowledge of the existence and terms of other relevant contracts between McKesson and the federal government pursuant to which McKesson is paid considerable sums of money by the federal government in reliance on

representations by McKesson. McKesson has yet to comply with the initial disclosure requirement under Federal Rule of Civil Procedure ("FRCP") 26(a), which Plaintiffs and Relators are informed and believe, and on that bases allege, would disclose such relevant contracts. To the extent McKesson fails to identify and produce relevant contracts as part of its initial disclosure, Plaintiffs and Relators will propound discovery on McKesson, including requests for production of such relevant contracts. Finally, pursuant to the Freedom of Information Act, codified at 5 U.S.C. §552, Plaintiffs and Relators requested from the federal government additional relevant contracts between McKesson and the federal government, which the government has not yet produced, but which Plaintiffs and Relators are informed and believe, and on that basis allege, will disclose additional contracts between McKesson and the federal government which require McKesson to maintain adequate security at its DCs.

**B.    Contracts with the Government Require McKesson to Comply With Extensive Federal Laws Regarding McKesson's Possession, Distribution and Sale of Opioids.**

20.    McKesson's contracts with the government subject it to numerous federal statutes and regulations regarding McKesson's possession, distribution and sale of Schedule II drugs, including opioids which, as alleged above, the DEA recognizes to be dangerous, susceptible to drug abuse and a high risk of severe psychological and physical dependence. In addition, the extensive business that McKesson conducts with the federal government is subject to numerous federal statutes and regulations. The relevant federal statutes and regulations applicable to McKesson include but are not limited to the following.

**1.    Comprehensive Drug Abuse Prevention and Control Act of 1970**

21.    The United States Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970, codified at 21 U.S.C. §§801 *et. seq.* ("CSA"), based in part on the express congressional finding that "the illegal … distribution, possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. §801(2).

22.     McKesson is a "distributor" under the CSA, as defined by 21 U.S.C. §802(11) and a "regulated person," defined by 21 U.S.C. §802(32), which engages in numerous "regulated transactions" as defined by 21 U.S.C. §802(39), including but not limited to regulated transactions with the federal government pursuant to the VA PPV Contract and other federal contracts. Furthermore, McKesson is a registrant under 21 C.F.R. §1301.11(a), which operates "freight forwarding facilities" as defined by 21 C.F.R. §1300.01. As to certain facilities, McKesson is also a repackager under 21 U.S.C. §360eee.

23.     As a registrant and distributor of controlled Schedule II drugs, McKesson must operate its DCs in compliance with the CSA and the regulations promulgated thereunder by the United States Attorney General ("USAG"), codified at 21 C.F.R. Part 1300 *et seq.*  21 U.S.C. §§821, 822. The CSA and its regulations create an extensive framework focused on security of regulated narcotics, including regulations controlling the movement of narcotics (see, e.g., 21 C.F.R.§1301.71-1301.77) and regulations allowing intrusion into the private information of, and strict discipline of, employees who come into contact with them (see, e.g., 21 CFR §1301.90-1301.93) , which together demonstrate the importance and materiality to the federal government of the tight regulation of the movement of controlled substances in the United States.

24.     McKesson is required to "provide effective controls and procedures to guard against theft and diversion of controlled substances," as determined by the DEA Administrator. 21 C.F.R. §§1300.01, 1301.71(a). The CSA regulations set forth several factors that are material to a determination whether McKesson's DCs have effective controls and procedures against the theft of Schedule II drugs such as opioids. For example:

> [i]n evaluating the overall security system of a registrant or applicant, the [DEA] Administrator may consider any of the following factors as he [or she] may deem relevant to the need for strict compliance with security requirements:
>
> (1) The type of activity conducted (e.g., processing of bulk chemicals, preparing dosage forms, packaging, labeling, cooperative buying, etc.);
>
> (2) The type and form of controlled substances handled (e.g., bulk liquids or dosage units, usable powders or nonusable powders);
>
> (3) The quantity of controlled substances handled;

Second Amended Complaint                          Case No. CV19-2233-DMR

(4) The location of the premises and the relationship such location bears on security needs;

(5) The type of building construction comprising the facility and the general characteristics of the building or buildings;

(6) The type of vault, safe, and secure enclosures or other storage system (e.g., automatic storage and retrieval system) used;

(7) The type of closures on vaults, safes, and secure enclosures;

(8) The adequacy of key control systems and/or combination lock control systems;

(9) The adequacy of electric detection and alarm systems, if any including use of supervised transmittal lines and standby power sources;

(10) The extent of unsupervised public access to the facility, including the presence and characteristics of perimeter fencing, if any;

(11) The adequacy of supervision over employees having access to manufacturing and storage areas;

(12) The procedures for handling business guests, visitors, maintenance personnel, and nonemployee service personnel;

(13) The availability of local police protection or of the registrant's or applicant's security personnel;

(14) The adequacy of the registrant's or applicant's system for monitoring the receipt, manufacture, distribution, and disposition of controlled substances in its operations; and

(15) The applicability of the security requirements contained in all Federal, State, and local laws and regulations governing the management of waste.

21 C.F.R. §1301.71(b).  As set forth below, McKesson McKesson's DCs have effective controls and procedures against the theft of Schedule II drugs under the foregoing regulation.

25.     CSA regulations specifically require Schedule II bulk materials awaiting further processing and finished products, or products being temporarily stored to forward to customers, to be stored in a vault equipped with a monitored alarm system.  21 C.F.R. §1301.72; 21 C.F.R. 1301.77. As set forth below, McKesson regularly violated this regulation.

26.     CSA regulations specifically require that McKesson notify the government in writing, and submit to the government specified forms, where there is any theft or significant

loss of any controlled substances, within one business day of discovery of the theft or loss. 21 C.F.R. §1301.74. As set forth below, McKesson regularly and deliberately violated this regulation.

27. As a distributor of controlled substances, McKesson is required to register annually with the United States Attorney General ("USAG"). 21 U.S.C. §§822(a)(1), 823(b); 21 C.F.R. §§1301.11-1301.52. The USAG registers Schedule II drug distributors such as McKesson "unless he [or she] determines that the issuance of such registration is inconsistent with the public interest, considering the several factors, including but not limited to "(1) maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels; [and] 2) compliance with applicable State and local law." 21 U.S.C. §823(b). As set forth below, McKesson regularly and deliberately violated this law.

28. McKesson is obligated to accurately record all regulated transactions which must be made available to the USAG for inspection and copying. 21 U.S.C. §830(a). Furthermore, McKesson must report to the USAG certain information including but not limited to "any unusual or excessive loss or disappearance of a listed chemical under the control of the regulated person." 21 U.S.C. §830(b)(1)(C). As set forth below, McKesson regularly and deliberately violated this law.

**2. Drug Supply Chain Security Act.**

29. McKesson must operate its DCs in compliance with the Drug Supply Chain Security Act ("DSCSA"), codified at 21 U.S.C. §§360eee *et. seq.,* as it is a "Federal law" for which compliance is mandatory under its government contracts. The DSCSA requires McKesson to sell its product only to licensed companies and to capture the transaction information for every transfer of product, including lot level information and transaction history. 21 U.S.C.A. § 360eee-1. As set forth below, McKesson regularly and deliberately violated this law.

**3.    Federal Acquisition Regulations**

30.    McKesson is subject to the Federal Acquisition Regulations ("FAR") in part because, as alleged above, the VA PPV Contract incorporates by reference certain provisions of the FAR including the FAR Ethics Code. Ex. A, VA PPV Contract, §n52.212-5(b)(2), p. 87.

31.    Among other requirements, the FAR Ethics Code requires McKesson to: (i) "[e]xercise due diligence to prevent and detect criminal conduct;" (ii) "promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law;" (iii) establish "an internal control system [to] [e]stablish standards and procedures to facilitate timely discovery of improper conduct in connection with Government contracts [and] monitoring and auditing to detect criminal conduct." 48 C.F.R. §52.203-13(b)(2)(ii), (ii); §§52.203-13(c)(2)(i)(A), (ii)(C)(1).

32.    The "internal control system" required of McKesson must "[e]stablish standards and procedures to facilitate timely discovery of improper conduct in connection with Government contracts;" and "[e]nsure corrective measures are promptly instituted and carried out." 48 C.F.R. §52.203-13(c)(2)(i). Among other requirements, "at a minimum" McKesson's internal control system requires: (i) "[m]onitoring and auditing to detect criminal conduct; (ii) "[p]eriodic assessment of the risk of criminal conduct, with appropriate steps to design, implement, or modify the business ethics awareness and compliance program and the internal control system as necessary to reduce the risk of criminal conduct identified through this process;" (iii) "[a]n internal reporting mechanism, such as a hotline, which allows for anonymity or confidentiality, by which employees may report suspected instances of improper conduct, and instructions that encourage employees to make such reports; (iv) "[d]isciplinary action for improper conduct or for failing to take reasonable steps to prevent or detect improper conduct; (v) timely written disclosure to the federal government of "credible evidence" of certain federal crimes or violation of the FCA; and (vi) "[f]ull cooperation with any Government agencies responsible for audits, investigations, or corrective actions.. 48 C.F.R. §52.203-13(c); *see also* 48 C.F.R. §52.203-13(b)(3)(i)(B) [timely written disclosure of a FCA violation]. "Full cooperation

[m]eans disclosure to the Government of the information sufficient for law enforcement to identify the nature and extent of the offense and the individuals responsible for the conduct." 48 C.F.R. §52.203-13(c).  As set forth below, McKesson regularly violated these regulations.

### 4.     State Law

33.     "[C]ompliance with applicable State and local law" is one of the factors considered by the USAG in registering distributors of Schedule II controlled substances, such as McKesson. McKesson is subject to extensive State and local law since its DCs operate in numerous states.

34.     By way of example only, McKesson operates a DC outside of Sacramento, California and is therefore subject to California's Uniform Controlled Substances Act ("California CSA"), codified at California Health & Safety ("H&S") Code §§11000 *et seq.* McKesson is a "distributor" of Schedule II controlled substances, including opioids. H&S Code §§11012, 11013, 11055. Accordingly, McKesson must obtain a permit to be a distributor from the State of California, which may be denied, revoked or suspended for "[m]aterially falsifying an application," "failure to maintain effective controls against the diversion of precursors to unauthorized persons or entities," failure to comply with the California CSA or its implementing regulations. H&S Code §11106(d) McKesson is obligated to report in writing the theft or loss of Schedule II controlled substances to California authorities within three days of discovery. H&S Code §11103. Any person who knowingly makes a false statement regarding any report or record required under the California CSA is guilty of a crime subject to fine and imprisonment. H&S Code §11105.

### C.     McKesson Misrepresents that It Is Complying With The Law When It Makes Federal Claims Pursuant to Government Contracts.

35.     As alleged below, McKesson failed to provide legally mandated controls and procedures at its DCs to guard against theft and diversion of controlled substances. Plaintiffs and Relators are informed and believe, and on that basis allege, that McKesson has intentionally and knowingly concealed from the DEA Administrator the lack of effective controls and procedures at McKesson's DCs, including but not limited to misrepresenting by commission and omission

12

material facts relevant to a number of the factors listed in 21 C.F.R. §1301.71(b), thereby

preventing the DEA Administrator from accurately evaluating McKesson's required "strict

compliance with security requirements."   As provided by 21 C.F.R. §1301.71, the DEA

determines whether McKesson is providing effective controls against theft and diversion of

controlled substances, but McKesson has prevented the DEA from accurately evaluating and

determining the efficacy of McKesson's security controls and procedures by making

misrepresentations of commission and omission to the DEA, failing to report stolen opioids and

failing to keep adequate records regarding lost opioids.

36.     McKesson's executive management has long known of significant security flaws

in its DCs which allow for the easy theft of products in the supply chain, including Schedule II

opioids, euphemistically known as "shrinkage" at McKesson.[1] A huge amount of product,

including Schedule II opioids, pass through McKesson's 35 DCs on a daily basis. As

Hammergren (McKesson's former CEO) once said to McElligott: "it comes in and goes out so

fast, we don't know where it is."  Hammergren also once commented to McElligott, "I am the

biggest dope dealer in USA."

37.     In or about 2006, McKesson retained a security expert and ASIS Certified

Protection Professional, John Tippit ("Tippit"), to conduct a security review of McKesson's

operations, which identified numerous security lapses at McKesson's DCs, many of which

remain today as discussed below. Hammergren expressly told Tippit not to investigate inventory

of Schedule II drugs, which would have created evidence that McKesson knew that Schedule II

drugs were being stolen from McKesson's DCs. Nevertheless, Tippit's investigation discovered

serious security flaws relating to Schedule II drugs, which Tippit was prohibited from disclosing.

38.     During his investigation, Tippit was able to easily access secured areas within

McKesson DCs, including areas where Schedule II opioids were processed and stored. Tippit

---

[1] McKesson has also suffered loss of inventory in its distribution chain of: (i) Schedule III drugs, which have a "moderate to low potential for physical and psychological dependence," such as acetaminophen with codeine, ketamine, and anabolic steroids; and (ii) Schedule IV drugs, which have a "low potential for abuse," such as Xanax, Darvocet, Valium, Ativan, and Ambien. (*See* www.dea.gov/drug-scheduling)

Second Amended Complaint                                        Case No. CV19-2233-DMR

made several recommendations to improve security at McKesson's DCs, but most of the recommendations were never implemented due to the expense. No full-time internal DC security staff were hired to ensure that the rate of lost and stolen drugs decreased. Implementation of a reporting mechanism to stop Schedule II drugs from being lost or stolen did not occur. Known weaknesses in McKesson's information technology system further compromised a drug inventory system that did not comply with federal regulations. McKesson never disclosed Tippit's findings to federal authorities, including the USAG, DEA or FDA. Many, if not all, of these correctable deficiencies continue to this day.  On information and belief, Tippit's findings related to most or all of McKesson's facilities, and not just one, and confirmed the security flaws further described below.

39.     McKesson's operations of its DCs violated and continue to violate federal law, including but not limited to the statutes and regulations of the CSA, DSCSA and FAR alleged above, because McKesson fails to provide effective controls and procedures as required by these regulations to guard against theft and diversion of controlled substances from known security flaws at its DCs. As a result, McKesson is in breach of numerous contractual obligations with the federal government, including but not limited to provisions of the VA PPV Contract alleged above.

40.     Specific instances of McKesson's violations of mandatory federal laws are as follows:

41.     **Unsecure Production/Storage Areas:**  McKesson knowingly has numerous unmonitored or poorly monitored locations within its DCs where Schedule II drugs are stolen, yet McKesson takes no or inadequate steps to tighten security and allows product to be stored in unsecured areas in violation of federal law.

          a.   The opioids under McKesson's control awaiting further processing at their DCs were commonly not stored in a vault,  in violation of 21 C.F.R. §1301.72 and 21 C.F.R. 1301.77.  Although McKesson had vaults at its DCs, it was and is very common in the DCs for bins of Schedule II

1    controlled substances to remain sitting on loading docks, outside the

2    vaults, for days at a time before moved to the vaults.  Many employees

3    unauthorized to work in the vault with Schedule II drugs have easy access

4    to the drugs. Theft of the product was simple while the product sat

5    unmonitored on the loading docks.  In addition, because Schedule II

6    narcotics were not brought directly to the vault upon arrival, it was easy

7    for an employee to simply not scan a box as arriving on the loading dock,

8    and set the box aside to later steal or place it back in the delivery truck so

9    it could leave the DC undetected.

10    b.   After the drugs were finally moved from the loading dock into the vault,

11    the order fulfillment process would begin.  Totes (containers used by

12    McKesson to store and ship drugs) would be filled with orders to

13    hospitals, pharmacies, and the government.  At least a third of the DCs,

14    used an Order Storage and Retrieval system ("OSR") where orders would

15    be placed in automated warehouse machinery that would automatically

16    store totes containing drugs and store the totes to await retrieval when the

17    order was shipped.  In these DCs, totes filled with opioids would

18    sometimes be placed into the OSR storage system and sit for weeks,

19    outside the vault and unmonitored.  Again, it was simple to steal product

20    from the OSR area.  Having the opioids sit outside the vault was a

21    violation of 21 C.F.R. §1301.72 and 21 C.F.R. 1301.77.

22    c.   In addition, totes were loaded onto the OSR system manually. Employees

23    placed totes onto the OSR system which took the tote and stored the totes

24    on shelves for later retrieval. There was no process to verify that the

25    employee did place the tote with opioids onto the OSR system for storage,

26    and nobody would know if the product was missing until a customer

27    would order the product and the tote is called for retrieval.

28

Second Amended Complaint                                      Case No. CV19-2233-DMR

d.  McKesson's Mississippi DC stopped this illegal practice of using the OSR system for orders including opioids in 2015 and began moving orders of opioids straight from the vault to the shipping area.  However, on information and belief, this practice continues to be in place in approximately one third of McKesson's facilities.

e.  After leaving the vault or the OSR system, orders including opioids would again sit on the loading docks, outside the vault and inadequately monitored, waiting to be loaded into trucks.

f.  In addition to being poorly monitored and storing and processing opioids outside of a vault area, in many facilities alarm systems would break and not be promptly repaired, in violation of 21 C.F.R. §1301.72 and 21 C.F.R. 1301.77.

g.  In addition, McKesson has either no or an insufficient number of security guards in its DCs, as well as broken alarm systems, and unmonitored cameras, creating an unsecure area for the opioids.

42.  **Unsecure/Unfenced Loading Docks and Parking Lots**: McKesson failed to fence in the parking lots and loading docks where opioids were unmonitored, resulting in large scale thefts.  Even at facilities where fences were finally installed, they were unmonitored.  During Tippit's investigation he was able to easily tailgate into the parking lot and dock areas behind someone with a badge, and enter unnoticed into a supposedly secure area.  Moreover, those with badges can allow access to others.  On information and belief, trucks full of Schedule II narcotics waited in these parking lots to deliver the drugs to the DCs, and the drugs were loaded onto unmonitored loading docks and stolen by third parties and in some cases by McKesson employees and/or truck drivers themselves.  Relators are informed and believe that the theft of opioids occurred within the allegedly secured areas.  The DSCSA requires McKesson to sell its product only to licensed companies and to capture the transaction information for every transfer of product, including lot level information and transaction history. 21 U.S.C.A. §

360eee-1.  Due to its poor security measures set forth herein, McKesson instead allowed its employees and truck drivers to steal opioids off its loading docks.  In doing so, McKesson failed to inventory the product it received, and allowed the product to be illegally sold to individuals who were not legally authorized to receive them.  When it learned about these practices, McKesson failed to stop the illegal sales of the product or log lot level information and transaction history for the wrongly sold product, as it was required to do pursuant to 21 U.S.C.A. § 360eee-1.

43.    **Disincentives to Comply with Law**:  On information and belief, McKesson has made representations to the federal government consistent with the claims made to the public, that it has an experienced compliance team comprised of more than 40 diversion experts with more than 240 years of cumulative DEA enforcement experience.  McKesson claims it maintains a compliance program intended to detect and prevent diversion of controlled substances as required under the CSA and applicable implementing regulations.  In fact, McKesson's "internal compliance team" is designed simply to create the false impression for federal and state regulators that McKesson is in compliance with the law. In reality, each of McKesson's DCs is separately managed by a DC manager with the primary responsibility to operate the DC as a profit center, and there is no attempt whatsoever to create a "culture that encourages ethical conduct and a commitment to compliance with the law" as required by 48 C.F.R. §52.203-13(b)(2).

   a.   Each DC manager is pressured to promote profit overall else, including having their compensation based on money saved and profits earned, which incentivizes the managers to conceal security breaches at the DCs in order to minimize the disruption of the distribution of product and the consequent reduction in profits. Each McKesson DC manager is allowed a limited and inadequate budget for security at the DC but is expected to keep operations running efficiently within that limited budget, which

creates an incentive for DC managers to conceal security issues from McKesson's "internal compliance team."

    b.  McKesson's executive management is aware that DC managers do not disclose numerous security breaches and thefts which McKesson must report to the USAG, DEA, and FDA, but McKesson knowingly and intentionally conceals such breaches and thefts.  These policies and practices violate, *inter alia*, 48 C.F.R. §52.203-13.

    c.  McKesson managers are required to bypass automated equipment and allow employees to scan products by hand when there is an equipment failure rather than shut down operations.  It is easy for products to be stolen when employees use hand scanners to fill orders, but DC managers are penalized for delays, so they go forward with processing despite equipment failures.

    d.  McKesson managers are not incentivized to report employees to authorities for stealing narcotics.  Instead, as set forth herein, McKesson deliberately avoids reporting thefts and losses to government authorities.  As a result, employees are aware that the worst thing that will happen to them if they are caught stealing narcotics is that they will be fired.

44.  **Inadequate Personnel**:  McKesson has a policy and practice of understaffing DCs in a manner that is required in order to comply with the extensive laws and regulations described above, which led to theft and loss of Schedule II narcotics.  To cite just one example of inadequate security at McKesson's DCs, as recently as 2017 the entire on-duty security staff at one of McKesson's largest DCs located in Olive Branch, Mississippi consisted of one absentee manager who traveled extensively, borrowed assistance from the facilities team who are not trained or qualified to perform security work, a small contingency of contracted security workers instructed only to check badges, and a single security guard at the entrance to the DC.  McKesson's DC in Olive Branch is approximately 647,000 square feet; the total floor area of the

18

Superdome is 269,000 square feet. In short, McKesson's "internal compliance team" is a fig leaf designed to placate government regulators and to promote McKesson's false public relations campaign that it takes the diversion of opioids at its DCs seriously.  As set forth above, on information and belief, McKesson misrepresents to the federal government that it has a robust team sufficient to prevent theft and loss of Schedule II drugs.

45.   **Concealing Theft**:  Rather than record and report instances of loss or theft of Schedule II drugs, including opioids to federal authorities, as required by, for example, 21 C.F.R. §1301.74, 48 C.F.R. §52.203-13, and 21 U.S.C. §830(b)(1)(C), McKesson's policy is to conceal the theft.

a.   McKesson DC managers are under substantial pressure to maintain operations with an insufficient security budget, despite the well-known problem of ongoing diversion of Schedule II drugs.  If a McKesson customer reports that a delivery of Schedule II drugs was not received, McKesson's practice is to simply reship a second delivery of the controlled drugs without questioning the customer, investigating the missing delivery, or advising the USAG, DEA, FDA or other applicable federal regulators that shipments of controlled drugs are going missing. Instead, if customers begin to regularly complain to McKesson that orders of Schedule II drugs, or other controlled substances or high value product are not being delivered, McKesson institutes a "secondary check" on a distribution line so that product on that line is allegedly inspected a second time before being shipped. The theft of Schedule II drugs, controlled substances and high value product recently became so prevalent at one McKesson DC that up to ten distribution lines had these "secondary checks." Such secondary checks were performed outside the vault.

b.   McKesson does not accurately report controlled substances transactions to the DEA or government regulators, including failing to report to the DEA

1         incidents when McKesson customers complain that opioid orders are not

2         delivered and McKesson ships a replacement order. McKesson actively

3         conceals from the DEA and law enforcement the occurrence and details of

4         specific incidents of diversion of opioids, including the identity of

5         McKesson employees or independent contractors who are discharged for

6         opioid theft.  Diversion of opioids from McKesson's DCs is sometimes

7         discovered by outside sources, such as customers who report receipt of

8         empty opioid bottles, or local law enforcement discovering opioids being

9         sold online via Facebook. Though McKesson has on a few occasions been

10        caught failing to report some losses and thefts, the true vast scope of losses

11        and thefts have not been reported to the DEA.  McKesson had a secret

12        formal policy of not ever reporting thefts or losses, and such thefts and

13        losses ae widespread and common.  As far back as 2004, a loss prevention

14        employee at McKesson told Relator McElligott that McKesson does not

15        have a form to report lost or stolen drugs because such a form would have

16        to go to the DEA, and McKesson did not want the DEA to know it was

17        losing controlled substances.

18     c.   A "code of silence" pervades the distribution systems at McKesson DCs,

19         so that known incidents of opioid theft are not reported.  Relator Kelley

20         requested that McKesson purchase a camera at one DC location to

21         determine why customers were not receiving the products that were

22         supposedly shipped to them.  McKesson refused to incur the cost of a

23         monitored camera.

24     d.   In sum, McKesson fails to properly track the extent of the theft Schedule

25         II controlled substances, but McKesson also does not report known

26         incidents of diversion to federal regulators. Despite its legal and

27         contractual obligation to report such theft, McKesson knowingly and

28

intentionally conceals the theft from federal authorities, including the USAG, DEA and FDA, thereby preventing the federal authorities from accurately assessing the adequacy of McKesson's controls and procedures to prevent the theft.

46.     **Failure to Inventory:**  McKesson does not accurately record, inventory or track Schedule II drugs, including opioids, in its distribution system and does not maintain accurate records of the amount of Schedule II drugs that are stolen from the DCs or elsewhere in the supply chain. As alleged above, Hammergren admitted to McElligott that the flow of product through McKesson's DCs is so rapid and large, McKesson does not keep track of the product. McKesson's director of loss prevention was aware that opioids were being sold off the loading docks by McKesson staff, without inventorying them, resulting in a loss of millions of dollars in retail value of the product.  McKesson declined to cooperate with local law enforcement relating to the stolen product.  McKesson also did not investigate lost opioids.  Hammergren informed Relator McElligott that there was no inventory done of product received from manufacturers. When questioned, Hammergren stated the pills were small and hard to count. McElligott responded that if pills come in boxes of 1000 and there are 100 boxes in a crate, one could do the math to count the pills.  Hammergren responded, "You know nothing about business." Furthermore, McKesson had no data backup for the Drohan Data Center located in Rancho Cordova, California until about 2017, so McKesson was unable to recapture lost data due to natural disaster or human error, including critical data regarding Schedule II opioids which must be reported to federal authorities. As a result of McKesson's policies and practices, McKesson misreports drug inventories to federal authorities. McKesson's failure to inventory violated 21 U.S.C. §830(a) and 21 U.S.C. § 360eee-1.

47.     **Unmonitored Security Cameras:**  McKesson did not use monitored security cameras, and the cameras that recorded footage would simply record over footage every few hours, rendering the cameras useless. McKesson does not have an adequate policy regarding the installation, location or monitoring of security cameras, which is instead left to the discretion of

each DC manager. When controlled substances or other high-value product is stolen from a DC, DC managers often haphazardly redeploy or add additional cameras in that area.  The cameras have known blind spots which employees exploit to steal drugs.  McKesson does not search employees' bags upon exiting the facilities.

48.     **Failure to Perform Background Checks:** McKesson fails to conduct adequate background checks to screen out employees or independent contractors who pose a risk of diverting controlled substances, including opioids. McKesson does not actually perform the background check on many employees or independent contractors, but instead relies on employment agencies to conduct background checks. If an independent contractor is caught stealing product or suspected of stealing product, McKesson will often advise the employment agency simply that the independent contractor is no longer needed, which is part of McKesson's pattern and practice of concealing the extent of its problem with the diversion of high value products, including opioids. At the Tennessee and New Jersey DCs, and on information and belief across all McKesson's DCs, an estimated fifteen percent of the employees or independent contractors discharged by McKesson had access to the purportedly secure areas in McKesson's DCs and were either caught or suspected of stealing high value product including opioids. This unlawful concealment of product theft is rampant at all McKesson DCs.

49.     As the result of the serious flaws in McKesson's security at it DCs—deficiencies actively concealed by McKesson from federal authorities— it is not unusual for product in a distribution line to disappear, which prompts a physical search by DC personnel to try to find the product that is usually unsuccessful. As alleged above, DC managers are incentivized to conceal theft of product, including Schedule II drugs, as well as the termination of employees or independent contractors responsible for the thefts, since their compensation rests in part on the quality of inventory control and low employee turnover. McKesson is successfully keeping the federal government in the dark about the extent of the theft of Schedule II drugs from McKesson's distribution chain and the serious security flaws which allows that theft to occur.

Second Amended Complaint                                    Case No. CV19-2233-DMR

50.     Based on all of the foregoing, McKesson is also in violation of 21 U.S.C. §823(b), since it fails to maintain effective control against diversion of Schedule II opioids into other than legitimate medical, scientific, and industrial channels. The USAG may suspend any registrant who "materially falsified any application filed" under Subchapters I or II of the CSA, or who "committed such acts as would render his registration under section 823 of this title inconsistent with the public interest as determined under such section." 21 U.S.C. §824(a)(1), (4). As alleged above, Plaintiffs and Relators are informed and believe, and on that basis allege, that McKesson has materially falsified registrant applications, either by commission or omission of relevant facts, which render McKesson's registration inconsistent with the public interest, including but not limited to failing to disclose to the DEA facts relevant to the issuance, suspension or revocation of McKesson's registration. Specifically, on information and belief, McKesson materially falsified its registration application that it maintains effective control against the diversion of Schedule II drugs, including opioids, and has complied with applicate state and local law.

51.     In addition, McKesson's concealing of the foregoing violations prevents the federal government from accurately assessing the factors set forth in 21 C.F.R. §1301.71, *supra*. By concealing from the DEA that its system allows unauthorized personnel to access supposedly secure areas, the DEA cannot accurately assess the following security factors, including, inter alia, (i) "[t]he type of vault, safe, and secure enclosures or other storage system (e.g., automatic storage and retrieval system) used" (21 C.F.R. §1301.71(6)); "[t]he type of closures on vaults, safes, and secure enclosures;" (21 C.F.R. §1301.71(7)); "[t]he adequacy of key control systems and/or combination lock control systems" (21 C.F.R. §1301.71(8)); and "[t]he adequacy of supervision over employees having access to manufacturing and storage areas." (21 C.F.R. §1301.71(11).  McKesson's concealing from the DEA the numerous unmonitored or poorly monitored locations within its DCs prevents the DEA from accurately assessing the following security factors: (i) "[t]he extent of unsupervised public access to the facility, including the presence and characteristics of perimeter fencing, if any" (21 C.F.R. §1301.71(10)); (ii) "[t]he

adequacy of the registrant's or applicant's system for monitoring the receipt, manufacture, distribution, and disposition of controlled substances in its operations; (21 C.F.R. §1301.71(14).

**First Claim For Relief**

**Violation of False Claim Act – False Claim for Payment or Approval**

**(31 .S.C. §3729(a)(1)(A))**

52.    Plaintiffs and Relators Kelley and McElligott incorporate by reference all allegations in the preceding paragraphs as if fully set forth here.

53.    McKesson is liable under the FCA by:

   a.    "knowingly present[ing] or caus[ing] to be presented a false or fraudulent claim for payment or approval;" 31 U.S.C. §3729(a)(1)(A).

   b.    "knowingly mak[ing], us[ing] or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim;" 31 U.S.C. §3729(a)(1)(B).

   c.    "conspir[ing] to commit a violation of [the FCA];" 31 U.S.C. §3729(a)(1)(C).

   d.    "knowingly mak[ing], us[ing] or caus[ing] to be made or used, a false record or statement material to an obligation to … transmit … property to the Government, or knowingly avoid[ing] … an obligation to ... transmit ... property to the Government." 31 U.S.C. §3729(a)(1)(G).

54.    As alleged herein, McKesson's wrongdoing meets all four elements of a violation of the FCA: "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis*., 862 F.3d 890, 899 (9th Cir. 2017). Alternatively, McKesson is liable for violating the FCA under the "implied false certification theory," which occurs when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements … if they render the defendant's representations misleading with respect to the goods or services provided." *See, e.g., Universal*

1   *Health Servs. v. United States ex rel. Escobar*, ___U.S.___, 136 S.Ct. 1989, 1999, 195 L.Ed.2d

2   348, 361 (2016) (emphasis added).

3   **False Statements and Fraudulent Course of Conduct**

4       55.    McKesson has and continues to make false statements to the federal government

5   and to engage in a fraudulent course of conduct in its transactions with the federal government

6   regarding the security of McKesson's supply chain and DCs, and its failure to adequately prevent

7   the theft of Schedule II drugs, including opioids.

8       56.    By submitting claims for goods to the federal government, McKesson represents

9   it is in compliance with the purchase contracts for those goods.  The purchase contracts require

10  McKesson to comply with the law and meet stringent safety guidelines to prevent McKesson

11  from allowing unprescribed opioids to flood the country.

12                                              **Scienter**

13      57.    McKesson's senior executives have long known that McKesson's distribution

14  chain and DCs are riddled with security flaws which allow for the rampant theft and diversion of

15  controlled substances, including Schedule II drugs such as opioids. The 2006 Tippit report

16  revealed serious security flaws in McKesson's DCs which McKesson deliberately concealed

17  from federal authorities. McKesson's senior management is also aware of the security flaws

18  alleged above, yet those executives have intentionally and knowingly misrepresented the

19  effectiveness of McKesson's controls and procedures against theft and diversion of controlled

20  substances, thereby submitting false claims to the United States government.

21                                             **Materiality**

22      58.    McKesson's misrepresentations of and omission of information regarding the

23  effectiveness of its controls and procedures against theft and diversion of controlled substances

24  are material, since they concern the very factors on which federal authorities rely to evaluate the

25  effectiveness of McKesson's security and its ability to act as a drug distributor and repackager.

26

27

28

Second Amended Complaint                              Case No. CV19-2233-DMR

59.     McKesson's false claims regarding the sufficiency of its security controls and procedures are also material to the contracts between McKesson and federal government, including but not limited to the VA PPV Contract.

60.     The federal government has fought the opioid epidemic plaguing this country for many years and instituted increasingly stringent regulations in its effort to control the flow of drugs, including, most recently, passing laws and regulations requiring systems to be put in place to electronically track Schedule II drugs.  When relator McElligott suggested to Hammergren that using electronic tracking of drugs would be a great thing, Hammergren replied, "Until something shows up where it's not supposed to be."[2]

61.     On information and belief, the DEA has levied severe penalties against facilities which failed to maintain appropriate records and failed to report diversion of drugs. On information and belief, one of the violations that was the subject of these enforcement actions was simply terminating employees for theft of drugs rather than reporting the thefts to government and law enforcement agencies.

**Payment by the Federal Government**

62.     As the result of McKesson's false material claims regarding its controls and procedures against the theft and diversion of controlled substances, the federal government has paid and continues to pay McKesson considerable sums of money, thereby contributing to McKesson's profitability and effectively financing McKesson's continued operation of a distribution system plagued by massive theft of opioids.

---

[2] Hammergren co-authored a book published in 2008, entitled "Skin in the Game: How Putting Yourself First Today Will Revolutionize Health Care Tomorrow," which describes on page 14 how radio-frequency identification ("RFID") tags can be used to track and monitor any prescription drug. McKesson does not use RFIDs to track the Schedule 2 controlled substances within its distribution system.  As referenced above, Relator McElligott suggested to Hammergren that using RFIDs would be a great thing, and Hammergren replied that it would be great until something showed up where it was not supposed to be.

Second Amended Complaint                              Case No. CV19-2233-DMR

63.     The VA PPV Contract attached as **Exhibit A** is representative of numerous federal contracts under which McKesson and its affiliates receive monetary payments from the United States as a result of McKesson's false claims.

64.     The United States does business with McKesson pursuant to contracts such as the VA PPV Contract because McKesson is lawfully registered and licensed under federal and state law to store and distribute controlled substances such as Schedule II opioids. McKesson is registered and licensed for such activities only as a result of McKesson's misrepresentations to federal authorities regarding the efficacy of its controls and procedures to prevent the theft of controlled substances.

65.     The United States paid money to McKesson based on the claims, records or statements by McKesson or caused to be made by McKesson, without the United States being aware of the falsity or fraudulent nature of the claims, records or statements and in reliance on the accuracy of those claims, records or statements.

66.     As a proximate result of McKesson's violation of the False Claims Act, the United States has suffered monetary damages by paying amounts to McKesson based on the false or fraudulent claims, records or statements submitted by McKesson or caused to be submitted by McKesson. In addition to its actual damages, the United States is entitled to penalties and other relief as deemed appropriate by the Court.

## PRAYER FOR RELIEF

Plaintiffs and Relators Carl Kelley and Michael McElligott, acting on behalf of the United States and in their individual capacities, pray as follows:

1.     For treble damages pursuant to 31 U.S.C. §3729(a)(1) or other applicable law in an amount to be proven at trial;

2.     For penalties pursuant to 31 U.S.C. §3729(a)(1) or other applicable law

3.     For attorney fees and costs pursuant to 31 U.S.C. §3729(a)(3) or other applicable law; and

4.     For such other and further relief as the Court deems just.

Respectfully submitted,

DATED:  September 8, 2020          QUADRA & COLL, LLP


By:   /s/ James A. Quadra
          JAMES A. QUADRA
          REBECCA COLL
          ROBERT D. SANFORD

          Attorneys for Plaintiffs and Relators
          CARL KELLEY and MICHAEL
          MCELLIGOTT


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


DATED:  September 8, 2020          QUADRA & COLL, LLP


By:      /s/ James A. Quadra
          JAMES A. QUADRA
          REBECCA COLL
          ROBERT D. SANFORD
          MACHAELA MINGARDI

          Attorneys for Plaintiffs and Relators
          CARL KELLEY and MICHAEL
          MCELLIGOTT

# EXHIBIT A

## PHARMACEUTICAL PRIME VENDOR CONTRACT
## VA797P-12-D-0001

**PURPOSE**:  The purpose of the VA Pharmaceutical Prime Vendor (PPV) contract is to provide VA facilities and participating Other Government Agencies (OGA) facilities with an efficient method of obtaining Government contracted pharmaceutical and medical/surgical products with "just-in-time" deliveries.  The PPV contract covers the 50 United States, Washington, DC, Puerto Rico, U.S. Virgin Islands, Saipan, and the Philippines. The net price of the pharmaceutical and medical/surgical products furnished under this contract is the prevailing Government contracted price less the awarded distribution fee.  The net price for the Wholesale Acquisition Cost (WAC) Based Priced Generics (WBPG) pharmaceuticals is the current published WAC price less the awarded discount percentage.

Non-contracted items (open market) are excluded from this contract.

VA is the primary user of this contract.  Other participants may withdraw from this contract at any time without affecting the terms and conditions of the contract.  Additions and deletions of participating facilities will be made by mutual agreement between VA and PPV contractor by way of contract modification.

**CONTRACT PERIOD**:  Resultant contract(s) shall be effective August 10, 2012.  Base performance period is August 10, 2012, through August 9, 2014 with 3, two-year options. *(Modification  P0001)*  Renewal of options is at VA's discretion.  (Note clause FAR 52.217-9, Option to Extend the Term of the Contract)

**CONTRACTING OFFICERS:**

     German S. Arcibal, Senior Contract Specialist
     Department of Veterans Affairs
     VA National Acquisition Center
     PO Box 76, Hines, IL 60141
     E-mail: german.arcibal@va.gov
     Tel:    708-786-7663
     FAX:  708-786-5221

     Billy Fong, Contract Specialist
     Department of Veterans Affairs
     VA National Acquisition Center
     PO Box 76, Hines, IL 60141
     E-mail: billy.fong@va.gov
     Tel:    708-786-4992
     FAX:  708-786-5221

     FEDEX , UPS and Overnight Mailing Address:

     Department of Veterans Affairs
     OPAL / National Acquisition Center
     1st Avenue, 1 Block N. of 22nd Street
     Bldg. 37
     Hines, IL  60141

2

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**TYPE OF CONTRACT**:  The Pharmaceutical Prime Vendor (PPV) contract is a hybrid of Requirement Type and IDIQ contracts.  Pharmaceutical items that are priced under separate FSS contracts, VA National Contracts, BPAs and BOAs shall be Indefinite Delivery, Requirements-Type Contract(s) (Refer to FAR Clause 52.216-21, "Requirements").  Medical/Surgical Products and WBPG Pharmaceuticals shall be Indefinite Delivery-Indefinite Quantity (IDIQ) contracts. (Refer to FAR Clause 52.216-22, "Indefinite Quantity").  Procurement of Medical/Surgical Products and WBPG Pharmaceuticals is optional.

**SUBCONTRACTING PLAN REQUIREMENTS:**  Pursuant to the provisions of Public Law 95-507, all large business concerns are required to have an approved subcontracting plan for contracts valued over $650,000 before the Government can award a contract (see FAR 52.219-9 for more details).  The PPV contractor is required to submit to the Contracting Officer an annual sub-contracting plan for review and approval.

**CCR AND ORCA REQUIREMENTS**:  Per FAR 4.11 Central Contractor Registration and FAR 4.12 Representations and Certifications prospective contractors shall maintain a current and accurate record in both databases.

**PPV PARTICIPANTS**:  Facilities from the following agencies are participants in this contract:

> Dept. of Veterans Affairs (VA)
> State Veterans Homes (SVH)
> Dept. of Health and Human Services (HHS), Program Support Center,
> > Supply Service Center (SSC), Perry Point, MD
> Dept. of Health and Human Services Indian Health Service (IHS)
> Immigration Health Service Corps (IHSC) *(Modification P0003)*
> Department of Homeland Security (DHS)
> Bureau of Prisons (BOP)
> Howard University (HOW)
> Public Health Service (PHS), (Saipan, Commonwealth of Northern Mariana Island)
> Federal Health Care Centers (FHCC)
> Peace Corps (PC)
> VA Commercial Repackaging Contractor

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## DEFINITIONS:

For the purpose of and as used throughout this solicitation, and any resultant contract(s), the following words or terms are used as defined.

Adequate Supply - A supply of items made available to the customers that allow conformity with the delivery requirements set forth in I-18, "Delivery", within the parameters of the fill-rate and historical purchase patterns.

Automatic Replenishment - A management information system tool normally used in a large hospital or warehouse setting. The PPV automated order entry system is linked to a pharmacy management system to create orders based on product usage. The system tool eliminates the guesswork typically involved in the ordering and inventory management processes.

Area Office - A Federal Indian Health Service facility that oversees the day-to-day operations of the Indian Health Service within its specified geographical location. An Area Office may serve as the "Parent" facility for designated IHS facilities.

Basic Ordering Agreements (BOAs) - A BOA is a national non-committed agreement that establishes the product price of an item manufactured or distributed by a National Industries for the Blind (NIB) or National Industries for the Severely Handicapped (NISH) workshop.

BIG 4 - Under Public Law 102-585, Veterans Healthcare Act of 1992, Section 603, the Department of Health and Human Services (including Public Health Services and Indian Health Services), along with the Department of Defense, the Department of Veterans Affairs, and the U.S. Coast Guard are four organizations statutorily entitled to receive the Federal Ceiling Price (FCP) for pharmaceuticals (covered drugs).

Blanket Purchase Agreement (BPA) - A BPA is a simplified method of filling anticipated repetitive needs for supplies or services by establishing "charge accounts" with qualified sources of supplies. Pharmaceutical BPAs are under the provisions of the FSS contracts. Pricing for Pharmaceutical BPAs are either straight discount off the FSS price, or sliding scale pricing based on volume utilization.

Bulk - (Used in relation to orders and deliveries): A customer order of a large quantity of a single product or the combination of numerous products that are palletized and shrink wrapped versus being delivered via case or tote. Bulk deliveries are required by VA CMOPs, HHS, SSC Perry Point facility and the VA National Acquisition Center's accounts.

Chargeback Arrangements/agreements (Chargebacks) - A reimbursement agreement between the PPV and the product suppliers/manufacturers which allows the PPV to be made fiscally whole for products sold to authorized customers of this program. The Government will not become involved in these agreements, nor will the Government assume any responsibility for resultant monies. Chargebacks shall be handled in accordance with industry standards.

4

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DEFINITIONS: (continued)**

Closed Distribution Products (CDP) - There are products that are currently on closed distribution through the PPV program.  The closed distribution can be required by the manufacturer or by the FDA.  Reasons for the closed distribution of a product include patient safety, provider registration, patient provider education, or the product being new to the market.  Most orders for closed distribution products are passed through the PPV for direct delivery by the product supplier.

Community Based Out Patient Clinic (CBOC) - A VA-managed or contracted satellite facility located in the local community to provide service to eligible Veterans.

Confirmation Printback - An electronic confirmation report generated from the PPV's  ordering system and electronically sent back to the ordering facility indicating that the requested items are available, on manufacturer back order, out of stock, or deleted, etc.  Confirmation printback is also referred to as the "Confirmation Printback Report".

CMOP - Consolidated Mail Outpatient Pharmacy - A system currently consisting of seven large automated VA facilities that nationally support the filling and mailing out of prescriptions directly to eligible patients.

Contracting Officer (CO) - Government official designated to award, administer, and obligate the Government to the responsibilities of any resultant contract(s) awarded against this solicitation. The CO for this contract is located at the Department of Veterans Affairs, National Acquisition Center (NAC), in Hines Illinois.  The CO serves as the liaison between the PPV and all customers participating under this program.  The terms "the NAC CO" or" VA NAC CO", or "the "VA's CO" have the same meaning and may be used interchangeably throughout the solicitation.

Contracting Officer Technical Representative (COTR) - A Government official delegated by the VANAC Contracting Officer and serves as a liaison between the PPV and the VANAC Contracting Officer.  The term Contracting Officers' Representative (COR) has the same meaning and may be used interchangeably throughout the solicitation.

Covered Drugs –Sole source and multi-source innovator drugs for which a prescription is required and is marketed under an original New Drug Application (NDA) approved by the Food & Drug Administration (FDA); Biologic License Application (BLA) approve by the FDA; and Generics that are marketed under an NDA (commonly referred to as authorized generics). Pricing for Drugs are covered under Section 603 of Public Law 102-585.  See definition of Federal Ceiling Price (FCP).  Covered Drugs are identified in the Government price file with a letter "C" under column I. (Added by Amendment 6)

Customer - A VA or Other Government Agency (OGA), authorized to use resultant contract(s). Customer is also referred to as "facility" or "using facility."

5

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DEFINITIONS: (continued)**

Diversion - Pharmaceutical products ordered under Federal contracts are intended solely for the use of authorized ordering activities in carrying out their Federal missions; they are not intended for resale or barter.  Any transfer of Federal contract-priced items that does not service the ordering activity's defined mission, as well as any transfer for the purpose of generating a profit on the difference between contract prices and commercial prices (such as "AWP") is an improper diversion of Federal supplies.  (See Reports Section I- 28 and clause AS3023 herein)

Drop Shipments - Products ordered by the customer through the Prime Vendor Program and shipped directly to the customer from the product supplier.  Drop ship arrangements are usually short term.

Electronic Data Interchange (EDI) - Inter-process (computer to computer application) communication of business information in a standardized electronic form.

Fast Pay/Alternate Payment Program - An expedited payment procedure used under the Pharmaceutical Prime Vendor Program, wherein payments are made to the PPV within 24 to 48 hours.

The VA has negotiated with a financial institution (currently US Bank) to provide any resultant PPV contractor(s) payment within 24–48 hours.  At the current time, there is a $0.50 transaction fee per invoice that shall be paid by the PPV to the financial institution processing invoices.  All VA orders shall be processed in this manner, with some OGAs also making payments under the Fast Pay method.  (See Attachment A for list of customers paying under the Fast Pay Program)

Federal Ceiling Price (FCP) - FCP is the application of Section 603 of the Veterans Health Care Act, Public Law 102-585 (the Act).  Section 603 enacts a drug discounting process administered by the Department of Veterans Affairs (DVA) for the benefits of Federal Agencies considered the "Big 4" (Dept. of Veterans Affairs, Dept. of Defense, Dept. of Health and Human Services [which includes Indian Health Service and Centers for Disease Control], and the Coast Guard).

Federal Supply Schedule (FSS) - Also known as the General Services Administration (GSA) Schedules Program or the Multiple Award Schedule Program.  The Federal Supply Schedule program is directed and managed by GSA and provides federal agencies a simplified process for obtaining commercial supplies and services at prices associated with volume buying.  Indefinite-delivery contracts are awarded to provide supplies and services at stated prices for given periods of time.  GSA has delegated authority to VA to procure medical supplies under the VA Federal Supply Schedules program.  FSS contracts for pharmaceuticals, medical supplies, and other medical-related items and services are awarded and administered by VA.

Fill or Kill - Products or quantities not filled by the PPV and canceled from the order.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DEFINITIONS: (continued)**

First Fill - In some instances the PPV shall be required to first fill the government's PPV orders before filling their commercial customers' orders.  The NAC contracting officer will notify the PPV when the PPV is required to fill the government's orders first.  A written agreement between VA and the product contractor may also be provided to the PPV.

Indian Health Service (IHS) - An Agency within the Department of Health and Human Services which is responsible for providing Federal Health Services to American Indians and Alaska Natives.

IHS Geographical Area - Commonly referred to as "IHS Area".  A group of IHS (including all IHS and tribal) facilities within a geographical area.

Implementation Period - A 120 calendar day period from date of award.  The implementation period will be used as a phase-out, phase-in transition period from the current contract to the newly-awarded contract.  "Transition Period" is also referred as "Implementation Period".

Manufacturer Back Order (MBO) - A physical order placed by the PPV to a product supplier and which is not shipped to the prime vendor from the product supplier within seven calendar days.

Miscellaneous Other Government Contracts - Any regional or local contracts awarded by any Government Agency participating in the PPV program.  The National Acquisition Center (NAC) will authorize the PPV to load pricing against any Miscellaneous Other Government Contracts.  .

National Acquisition Center Account - A Department of Veterans Affairs customer account that generally requires large bulk deliveries that are shrink-wrapped and palletized.

National Standardization Contract Items - Products awarded under competitive procedures on a national contract.  National contracts are committed-use, mandatory source contracts for VA facilities.  The mandatory use by the VA facilities helps facilitate VA's standardization of its National Formulary as well as the consolidation of volume buying requirements.  OGAs and Option 1 State Veteran Homes have restricted access to National Standardization Contracts unless a formal commitment is made between the OGA, VA and the contractor.

National Supply Service Center (NSSC) - A Federal Indian Health Service Facility in Oklahoma City, Oklahoma, that serves as a procurement agency for Indian Health Service and tribal facilities located throughout the United States.  The NSSC serves as the "Parent" facility for its designated IHS facilities.

Next-Day Delivery - Orders placed by participating customers by 6:00p.m. customer local time (local time at the ordering facility) shall be delivered the next business day (Monday-Friday), (Monday-Saturday for CMOP's only).  For example, orders placed by 6:00p.m. customer local time on Wednesday will be delivered to the customer on Thursday; orders placed on Friday or Saturday will be delivered on Monday except that orders placed by the CMOP on Friday will be delivered on Saturday and Saturday orders from the CMOP will be delivered on Monday.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DEFINITIONS: (continued)**

Next-Scheduled Delivery Day - Based on the terms of this solicitation and any resultant contract, the next-scheduled delivery day is the day agreed upon by the prime vendor and the customer for delivery of products. For some OGA's the next scheduled delivery day may not necessarily denote that the delivery shall be made within 24 hours. (See Section 1-18 Delivery).

Offer - Synonymous term for proposal. Offer means a response to a solicitation that, if accepted by the Government, will bind the offeror to perform the resultant contract.

Ordering Account - An ordering account is a physical location within a facility where ordering capability, versus read-only capability, from the PPV's ordering system is given. Account functionality is controlled by the level of access granted. An ordering account creates a financial obligation when the order for pharmaceuticals is transmitted to the PPV. (Example: Pharmacy inpatient ordering account vs. Pharmacy Chief read-only access.) Facilities may have more than one ordering account (e.g. inpatient, outpatient, etc.). Only designated ordering officers shall be given ordering access.

Ordering Officer (Applicable to VA only) - Non-warranted federal employees designated in writing as ordering officers by the NAC contracting officer. Ordering Officers are authorized to place orders through the PPV contract and are prohibited from buying open market items through the PPV contract(s), are precluded from ordering direct from FSS contracts, precluded from negotiating prices, and precluded from negotiating/changing contract terms.

Outpatient Center (OPC) - A VA satellite facility, located on the grounds of a VAMC or in the local community to provide service to Veterans. Also referred to as an Outpatient Clinic.

Paperless Invoice System - A feature on the PPV's electronic ordering system which provides each customer a complete invoice. The electronic invoice must reflect the requirements outlined throughout the solicitation and must be provided in printable format to customers.

Parent Facility - A participating facility responsible for the approval and/or payment process of its affiliated satellite facilities. For the Indian Health Service, the "Parent Facility" may be represented by a RSSC, Area Office, or the NSSC.

Pass-Through Orders - A customer order for contracted products that are not normally stocked by the PPV, usually at the direction of the product supplier, which is usually based on the nature or handling of the product (frozen etc.) The customer orders the product directly with the Government product supplier or the PPV, and the product is delivered directly to the customer by the product supplier. The product supplier notifies and bills the PPV, who then invoices and receives payment from the customer. Pass-through arrangements are developed in advance and are ongoing.

Pharmacy Benefits Management (PBM) - The VA's program office for the Pharmaceutical Prime Vendor program.

8

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DEFINITIONS: (continued)**

Pharmaceutical Prime Vendor (PPV) - A business concern that serves as the major provider of a broad range of pharmaceutical products to customers within a geographic area.  A prime vendor is responsible for maintaining adequate inventory levels and delivering products to participating facilities next-scheduled business day.  A pharmaceutical prime vendor is also referred to as "contractor" and/or "prime vendor".

Products/Items/Units - Synonymously used to denote the merchandise requested by the customers to be delivered through the prime vendor program.

Product/Item/Unit Usage Data - A list of drug/pharmaceutical (Federal Supply Class 65) products and other products covered by this solicitation with actual therapeutic purposes and that are dispensed through a pharmacy service, along with their associated estimated quantities, and that have been identified by customers for use through the PPV program either on a recurring or non-recurring basis.  Products, items and units, are used synonymously throughout this solicitation.

Point of Contact (POC) - A designated person at each facility authorized to assist the PPV.  This person usually has minimal or no contract authority to represent the CO or the COTR, but serves as a contact source between the PPV and the facility.

Recurring Items - Items ordered by customers on a regular basis at least once per month.

Regional Supply Service Centers (RSSC) - A Federal Indian Health Service Facility that serves as the authorizing agency for Indian Health Service hospitals and clinics and tribal facilities located throughout their defined regions.   A RSSC may serve as the "Parent" facility for designated IHS facilities.

Regions - For the purpose of this solicitation and any resultant contract(s), a region is a geographical grouping of participating facilities as outlined in Section I-31, Fee Schedule, and Attachment A.

Reservation Orders - A separate PPV order placed at the discretion of the customer, only in situations of MBOs; wherein the PPV reserves the customer's request for products until the products become available for release.  (See Section I-9)

RPMS (Resource and Patient Management System) -The primary information system used by Indian Health Service.

Satellite Facility - A participating facility whose order, must have the approval of another participating facility before the PPV can fill the order.  Only the satellite's parent facility has the authority to approve the order on behalf of the Government.

9

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DEFINITIONS: (continued)**

<u>Sequestered Products</u> - Products that the VANAC will designate to the PPV as products available to VA PPV or PPV customers only.  A determination by the VANAC or the product supplier to sequester products for a specific class of customers participating under the PPV program may occur when there is limited availability of contracted product, or at the product supplier's request, or when the product is intended for a specific program.

<u>Split-Screen Order System</u> – A PPV provided software program feature that is required to be part of the PPV's automated ordering system for facilities identified by the VANAC as being a satellite facility requiring approval of orders from a parent facility.  Facilities that may require this feature are Option 2 SVHs, identified OPCs, and identified IHS and Tribal facilities.

<u>State Veteran Home (SVH) Option 1</u> - A participating SVH with an approved Sharing Agreement with a VA Medical Center (VAMC).  An Option 1 SVH places its own delivery orders to the PPV and pays the PPV directly utilizing state funds.  (See Attachment A for designated Option 1 SVHs).

<u>State Veteran Home (SVH) Option 2</u> - A participating SVH with an approved Sharing Agreement with a VA Medical Center (VAMC).  The Option 2 SVH's parent facility (VAMC) may require approval of the delivery order before the PPV can fill the order.  The VAMC pays the PPV utilizing VA funds.  (See Attachment A for designated Option 2 SVHs).

<u>Stock Outage</u> - An occurrence wherein the PPV is unable to provide customers with requested products.  As opposed to a MBO situation, the PPV is held responsible for stock outages.

<u>Tribal (638) Facility</u> – A federally recognized American Indian or Alaska Native facility operated under the management of the Tribe versus the auspice of a federal IHS facility.  Synonymously referred to as a "638" facility.  Public Law 93-638 authorized the tribe to operate healthcare facilities.  To participate in the VA PPV program, 638 Tribal Facilities must have a contract or compact with a federal IHS.

<u>Universal Product Numbers (UPNs)</u> - A unique identifier of healthcare products.  It is derived from either the HIBCC-LIC or UCC/EAN bar code labeling data structures.  The HIBC-LIC format is variable in length, alpha-numeric and consists of the manufacturer LIC assigned by HIBCC, the labeler's product or catalog number, and the package level (or inventory unit) indicator.  The UCC/EAN format is fixed length, all numeric and consists of the UCC/EAN assigned product supplier number (company prefix), numeric item number, a package level (or inventory unit) indicator, and a calculated check character.  This definition specifies that a unique UPN should be created and assigned to each packaging level (or inventory unit) of each product, and to create UPN standard compliant barcode labels on all of their healthcare products at each unit of inventory.  The term "Universal" means that the UPN is to be the key identifier for all product units.  It should be used to communicate information about all product units between all trading partners in the supply chain.  In consonance with this request, contractors awarded a contract under this solicitation shall utilize UPNs that are commercially available

10

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DEFINITIONS: (continued)**

from product suppliers.  The UPNs shall be the key reference to healthcare product information in all product recalls, business documents, and reports called for under the terms of this contract. PPV contractors are not required to mandate that product suppliers obtain UPNs.  If a UPN is established independently by a product supplier for a healthcare product required to be supplied to the ordering facilities, authorized to utilize the PPV contract, the PPV is required to obtain from such product supplier and utilize that UPN in accordance with the requirements of this solicitation.

Veterans Affairs Medical Centers (VAMCs) - The medical facilities operated by VA.

Department of Veterans Affairs National Acquisition Center (VANAC) - The contracting office for this procurement.

Veterans Integrated Service Network (VISN) - A VISN is a group of VA Medical facilities within a geographic area.  Currently 23 VISNs exist within VA.

Veterans Integrated Systems Technology Architecture (VISTA) - The Department of Veterans Affairs' primary information system.

WAC Based Priced Generics (WBPG)-Any generic pharmaceutical that is not under a current Federal Government contract or Government pricing agreement.  A generic pharmaceutical item that is not priced separately under an existing contract and is priced under the PPV contract based on the published Wholesale Acquisition Cost (WAC) shall be known as WAC Based Priced Generics (WBPG).  A WAC Based Priced Generics is the lowest priority in the ordering hierarchy of contracted items when loading the customers' prices under the VA PPV contract. (**Added by Amendment 6**)

## PHARMACEUTICAL PRIME VENDOR CONTRACT
## VA797P-12-D-0001

**STATEMENT OF WORK:**

**I-1 Scope**

a.  The Pharmaceutical Prime Vendor (PPV) shall maintain an adequate supply and distribute all drug/pharmaceutical (Federal Supply Class 65) items and other contracted items dispensed through pharmacy service with actual therapeutic purposes (e.g. nutritional supplement items) under Government supply contracts.  These items are sold under various Federal Supply Schedules (FSS), VA National contracts, Blanket Purchase Agreements (BPAs), Basic Ordering Agreements (BOA), and miscellaneous other Government contracts.  Prospective prime vendors shall have a minimum of 5-years experience as a prime vendor or pharmaceutical wholesaler.

b.  Products and services under any resultant contract(s) are for direct use by the facilities covered under this contract.  Resale of products by participating facilities is prohibited.  The Government anticipates that after award additional facilities/agencies may be added to the contract(s) on a quarterly basis.  The Government will negotiate a bilateral modification to add a facility.  Facility deletions will also be processed by modification.

c.  The Government anticipates that payment under any resultant contract(s) will be made to the PPV contractor(s) within the terms and conditions of the Prompt Payment Act, (clause included).  Fast Pay, a VA administered alternate payment program for the PPV, is mandatory for all VA facilities participating in this contract.  The use of the Fast Pay Program is OPTIONAL for Other Government Agencies (OGAs) participating under this contract. Currently there are approximately 400 VA and OGA accounts making payments using the existing Fast Pay Program (See Attachment A).  The Government anticipates offers of a larger negative Distribution Fee for those customer accounts using the Fast Pay Program (See Section I-31 Fee Schedule).  At anytime during the performance period of this contract, when a NET 30 day paying customer commits to making payments under the Fast Pay program in order to receive the awarded larger negative distribution fee, the Government will notify the contractor to include the FAST Pay Customer at the awarded Fast Pay distribution fee.

d.  The PPV shall provide and have in effect an emergency contingency plan for disaster recovery to protect the Government from disruption of the requirements outlined in this solicitation.  The PPV is required to submit an emergency contingency plan annually or when there is a change in the plan.

e.  The PPV shall be required to make available upon request, the following product categories at the established government prices.  The product categories are listed as Special Item Numbers (SINs) on Federal Supply Schedule (FSS) Group 65, Part I, Section B, Drugs, Pharmaceuticals & Hematology Related Products

| Special Item Number (SIN) | Description |
|---|---|
| SIN 42-2A | Single source innovator, multiple source innovator, and biological and insulin pharmaceutical products (i.e. covered drugs) |

12

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-1 Scope (continued)**

| Special Item Number (SIN) | Description |
|---|---|
| SIN 42-2B | Generic & multiple source pharmaceuticals & drugs, human blood products, & over-the-counter drugs |
| SIN 42-3 | Complete IV delivery systems |
| SIN 42-5 | Dietary/Nutritional/ supplements |
| SIN 622 | Antiseptic Skin Cleansers, Detergents, Dispensers only small personal sizes and no industrial dispenser items |

f.  In addition to the above product categories, the PPV also shall maintain an adequate supply of, and distribute products under the contracts programs listed below.

1.  Blood-glucose test strip items included on Federal Supply Schedule Group 65, Part VII, In-Vitro Diagnostics, Reagents, Test Kits, and Test Sets.

2.  Medical/surgical products in the categories listed below at the established government contract prices.  Availability and delivery of medical/surgical items through the PPV contract shall be in limited quantities strictly for outpatient pharmacy dispensing at the medical facility level.  The PPV is prohibited from fulfilling bulk orders (i.e., bulk orders placed by VA's CMOP facilities) for this category of items.  The medical/surgical items to be provided on the PPV contract(s) are grouped as Special Item Numbers on FSS Schedule Group 65, Part II, Section A,  Additionally, medical/surgical products shall be made available on the PPV contract for products awarded on VA's standardization contracts, FSS/Blanket Purchase Agreements, and Basic Ordering Agreements.  The purchase of medical and surgical products through the PPV contract(s) is optional for ordering facilities.

| SIN | Description |
|---|---|
| A-1 | Adhesive Tapes/Bandages |
| A-2 | Applicators/Swabs/Wipes/Pads |
| A-3 | Bandages/Gauze |
| A-4 | Dressings |
| A-6 | Sponges, Surgical |
| A-10 | Cannulas, Airways, Tubes and Accessories |
| A-12 | Colostomy/Ostomy Products |
| A-13 | Gloves, Medical, Surgeons and Exam (Latex & Vinyl) All Sizes |
| A-13(a) | Sterile Latex Gloves |
| A-13(b) | Sterile Vinyl Gloves, |
| A-13(c) | Non-Sterile Latex Gloves |
| A-13(d) | Non-Sterile Vinyl Gloves |
| A-15 | Needles, Syringes & Jet Injectors |

13

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-1 Scope** (continued)

| SIN | Description |
|---|---|
| A-15(a) | Needles, Hypodermic |
| A-15(b) | Syringes |
| A-15(c) | Syringes & Needle Combination |
| A-15(d) | Syringes & Needle Combination (anti stick) |
| A-15(e) | Protective sheaths for needles, hypodermic & IV (anti stick) |
| A-15(f) | Needles, Biopsy |
| A-15(g) | Jet Injectors |
| A-16 | Stockings (Anti-Embolism/Compression Only) |
| A-22(b) | Urinary Drainage Bags, Kits and Sets |
| A-26 | Incontinent Products |
| A-26(a) | Pads, Bed Linen Products |
| A-26(b) | Diapers |

g.  All items ordered shall be provided to the ordering facilities in accordance with the terms and conditions of the PPV contract and on a "Fill or Kill" basis.  PPV contractor(s) shall provide service to all the participating facilities covered by the region(s) on which an award is made. Individual delivery orders will be issued by participating facilities against the PPV contract for the items required.

h.  CMOP Specific Requirements -The PPV shall, at VA's request, furnish the VA CMOP facilities (Line Item 14) with bulk orders and bulk delivery of pharmaceuticals and products listed in I-1 (e).  The PPV shall designate a VA CMOP Distribution Coordinator that will be responsible for coordinating all business activities between the CMOP Directors and the PPV.

i.  National Acquisition Center (NAC) Accounts Specific Requirements - Upon request by the NAC accounts (included in Line Item 6), the PPV shall coordinate large and bulk orders from a standard list of pharmaceutical items (such list will be furnished to the PPV during the implementation period).  Drop shipments shall be made through product contractors only when approved by the customers.  The awarded PPV distribution fee for such drop shipments shall be applied to the orders.  A NAC account Distribution Coordinator designated by the PPV shall be responsible for coordinating all business activities between the Directors and the PPV operations officials.

j.  The Government reserves the right to require the PPV to have a system available for the storage, inventory and rotation of Government-owned stock of pharmaceuticals and limited medical-surgical supplies.  The Government intends to negotiate any additional terms and conditions of this requirement with the awarded Prime Vendor.

k.  Facilities appearing in the ordering system shall have the city listed as part of the name (e.g. VA Medical Center Atlanta, VA Outpatient Clinic Seattle, Muckleshoot Tribal IHS Auburn, WA, FCI Hospital Reno).

14

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

l.   The PPV shall be required to provide FDA approved and Trade Agreement Act (TAA) compliant WAC Based Priced Generics (WBPG).  Only WBPG with FDA approved National Drug Codes (NDC) and published WAC are included in this requirement.  The PPV is required to carry the lowest WAC priced generic pharmaceuticals when provided with description of the item and usage rate by the PPV customer.  Order placement of WBPG through the PPV contract is optional and subject to periodic review by the Government.  The Government may unilaterally cancel in part or in whole the requirement for the PPV to provide WBPG (cancellation can be by individual agency or for all PPV participants).  The distribution fee shall not apply to the WBPG. This requirement applies only to VA, SVH, IHS, BOP and IHSC (US Immigration and Customs Enforcement Health Service Corps, formerly DIHS).

m.   Covered drugs missing from Government electronic price file(s):

Once included in the Government electronic price file(s), covered drugs are not expected to disappear from the Government price files.  The PPV shall obtain confirmation from the NAC Contracting Officer prior to changing the status, deleting or removing any covered drugs from the PPV's electronic catalog.  The PPV shall continue to make available all covered drugs for purchase by all eligible PPV customers (Big 4) at the price on the last day the item (s) appeared in the Government electronic price file(s).  Once the appropriateness of the removal or deletion is determined by the NAC Contracting Officer, the PPV will be authorized to process any credit/rebill or adbill as appropriate.

n.  PPV shall not accept drop shipment orders for non-contracted items, including items under FSS contract that are designated as Prime Vendor "False". *(Modification P0002)*

o.  Whenever products with no expiration date assigned by the manufacturer are shipped to a CMOP, McKesson shall enter, in the invoice for those items, an expiration date of five years from the Purchase Order date.  *(Modification P0004)*

p.  McKesson is required to distribute pharmaceutical products from Non-TAA countries if such pharmaceutical products are awarded on a contract issued by the National Acquisition Center (NAC) and authorized for prime vendor distribution .  (*Modification P00013*)

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## I-2 Transition Period (Phase-Out/ Phase-In Period)

To ensure sufficient administrative time has been allowed for continuity of services at required quality levels as well as anticipated inventory levels, contract(s) shall begin after 120 calendar days from date of award, or May 10, 2012, whichever is later.  All contract costs associated with the transition period shall be borne by the PPV contract awardee.

For VA customers only - The VA PBM will provide the most recent historical data for each ordering facility to the PPV 30 calendar days after date of award.  For OGAs, each ordering facility shall provide usage data to the PPV within 30 calendar days after date of award.  The PPV shall download all FSS and National contract products and prices from the website at www.pbm.va.gov, no later than the 15th day prior to the contract effective date, with the most current update to be downloaded the day prior to the effective date of the contract(s).  BPA contract products and prices will be provided to the PPV within 30 calendar days of date of award.

## I-3 Implementation Plan

Offeror shall submit a written proposed implementation plan with its offer.  This plan shall be in a time line chart format and shall detail a layout of when each ordering facility for the proposed region will receive installation and testing of the electronic ordering system at each Government site; training of Government employees; bar coding of each Government facility's shelves; price loading of all Government contract items; offeror's internal inventory preparation and distribution system; and offeror's plan to ensure that its purchase agreements are in place with all Government sources.  Conversion shall be accomplished within the 120-day transition period as stated above.  Failure to complete the conversion within the transition period may result in the contract being declared terminated for cause.  Along with the Implementation Plan, the offeror shall also furnish in compliance with the provisions of Section I-8 Training, the training schedules and sites.  All sites shall be notified 14 calendar days in advance of the date of scheduled training.

## I-4 Customer Service

a.  A designated VISN specific PPV representative shall make a monthly scheduled sales call (a physical visit) to all sites to discuss customer satisfaction unless an alternate plan is agreed upon by the POC.  Additional calls may be required to answer questions, solve billing and inventory problems, and review reports.

b.  Quarterly meetings or conference calls will be held with the participating Agency Program Managers, Contracting Officials at the VA NAC, PBM representatives, and the contract designated PPV Contract Administrator.  Quarterly business reviews will also be conducted with the VA VISN Pharmacy Executive, IHS Area Pharmacy Consultants (APC), and IHS NSSC Director.  The Government will give the participants 15 calendar days notice prior to the conference call.

c.  At a minimum, a monthly conference call will be held with the contracting officials at the VA NAC and the designated contract administrator for the PPV contract.  VA NAC will give the participants 10 calendar days notice prior to the conference call.

16

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-4 Customer Service (continued)**

d.  Conference calls pertaining to paragraphs b. and c. above will be organized and initiated by VA NAC, and will serve to encourage communication between all parties and serve as a forum to resolve any common issues within a region or activity.

e.  During each site visit, the PPV representative shall review at a minimum the following with each facility POC or designee(s):

    1. Assess utility of hand-held/mobile ordering devices and web-based ordering system
    2. Review shelf labels and modify as necessary
    3. Review inventory support software for proper calculation of order turns and ordering quantities (for those government agencies utilizing inventory support software)
    4. Review pertinent updates/improvements with ordering and reporting system
    5. Provide account overview (i.e. contract compliance, product utilization, etc.) and advise of improvement strategies
    6. Provide education/field questions as requested or as deemed necessary

f.  In addition to any scheduled conference calls, any and all problems and critical issues will be addressed immediately by the PPV upon notification by the using facility, COTR or NAC Contracting Officers.

**BOP and IHSC Specific Customer Service Requirements:** *(Modification P0003)*

a.  Prospective PPVs are advised that due to certain restrictions within the Bureau of Prisons, PPV employees that enter the secure confines of BOP and IHSC facilities/institutions will be subject to the following investigative procedures.  (Note: These investigative procedures will not be required in situations where routine/emergency deliveries do not require entry into the secured BOP or IHSC facility.)

    1. National Crime Information Center (NCIC) Check
    2. Completion of the Contractor Pre-Employment Form
    3. Daily possession of a valid picture identification and daily entry into secured facility via metal detector

b.  Employees, such as the Customer Service representatives, that need ongoing entry into secured BOP or IHSC institutions will also need to provide a fingerprint check and a name check at the discretion of the BOP or IHSC institution. *(Modification P0003)*

**I-5 Electronic Ordering System**

a.  The PPV shall provide, at no additional cost to the Government, each participating ordering facility the software necessary for electronic order entry and bar code scanning capability.

b.  The PPV shall provide at no cost to the Government, individual Internet access for each user (ordering facility's ordering points(s)) of the PPV Program.

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-5 Electronic Ordering System (continued)**

c.  The PPV shall provide no-cost replacement of non-functioning handheld/mobile order entry devices when the failure is due to normal use and handling.

d.  Technology shall be refreshed by the PPV at the release of new handheld devices or contract renewal at no cost to the Government.

e.  Software upgrades shall be provided and installed by the PPV as they become available at no cost to the Government.

f.  PPV furnished hand-held devices to be provided for each Parent and Satellite ordering account shall include, at a minimum, unless required elsewhere throughout this solicitation:

Two hand-held/mobile order entry devices per ordering account capable of:

Accepting information from customers bar coded shelves
Accepting product information from bar codes
Accepting hand keyed in product information
Providing item description
Updating labels
Providing Current Economic Order Quantity
Providing Current Safety Stock Level
Processing product receipt
Transmitting PPV order through PPV furnished Automated Order System.
Two-way communication with at least daily updates of the item catalog

The devices must meet VA's and OGA's wireless security requirements for 802.11 wireless standards

g.  PPV shall also provide, at no cost to the Government, the software necessary to order products. PPV provided software shall be capable of providing:

1.  A web-based ordering system

2.  Access to the PPVs' complete product database (electronic catalog) in addition to access to the PPV's national level customer real-time database.

3.  Access for all PPV customers to view the databases for pricing and product source selection prior to creating and transmitting an order to the PPV

4.  An inventory management program for all VA facilities and those OGA customers requesting the program. The inventory management program provided by the PPV shall have the following reporting capabilities:

18

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-5 Electronic Ordering System (continued)**

      a.  Demand Forecasting- Weighting factors are applied to past purchases to predict future needs by NDC, CMOP ID for CMOP reports (data will be provided to the PV

      b.  Economic order quantity- The quantity of stock to order that minimizes costs

      c.  Safety stock levels- Safety Stock is used to compensate for delays in    or greater than anticipated demand

      d.  Calculations of reorder point and minimum and maximum inventory stock levels

      e.  Generation of bar coded shelf labels containing this information

      f.  Ability to override normal demand forecasting

      g.  Ability to designate lead-time, which affects required inventory stock levels

      h.  Calculation of theoretical inventory turns by product and per customer account

      i.  Support of stratified inventory analysis method - This stratified inventory system according to total dollar purchase for the items (A, B, and C items) and must allow the tracking of high dollar cost products so these products can be managed more aggressively.

      j.  Ability to determine the confidence level of calculated results (using a method such as Mean Absolute Deviation Percentage (MADP)

      k.  Report capabilities to support the available tools, including the ability to run national reports

5.  The capability for all customers to update and print labels and bar codes.  During the implementation period, the PPV shall provide all bar code shelf labels and affix the labels to the ordering facilities' pharmacy shelves.  The PPV shall print and deliver shelf labels for all items as requested by facilities but no more often than quarterly.  Labels must be color coded according to the stratified inventory analysis method (Orange for A items, Blue for B items, and Yellow for C items).

6.  An online accessible account that can accommodate up to ten user-defined fields

7.  A Confirmation Printback

8.  A paperless invoice system

h.  PPV's automated ordering system shall contain and not be limited to, the following fields with the option to customize the display for products:

1.  PV to assign account number (ordering agency to identify read-only or ordering account)
2.  Product Name
3.  Generic Name
4.  Product Description:  Strength, Package Size, Manufacturer
5.  National Drug Code (NDC) for applicable pharmaceutical products
6.  Universal Product Number (UPN) (when available) – applies to healthcare products
7.  Universal Product Code (UPC) (when available)
8.  PPV's Product Number– standardized across vendor's ordering system
9.  CMOP Product Identification

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-5 Electronic Ordering System** (continued)

10. VA Class/Drug Classification System (i.e. AHFS, First Databank)
11. Product Number as assigned by ordering facility (where available)
12. Product denoted as a CII Control Schedule (where applicable)
13. Reference of established DEA number (where applicable)
14. Reference of established HIN number (where applicable)
15. Government Product  Contract Number (FSS, National, BPA, BOA, or Miscellaneous)  At a minimum, the last five digits of the Government Contract # will be included
16. Type of contract – contract identification or code that identifies as FSS (F), National (N), Miscellaneous or other government (M) contracts (See Reports I-28(B)3, CNTLD
17. Product Government Contract expiration date
18. Product Contract price (specific to the pricing and contract eligibility of each customer)
19. Drug Efficacy Study Implementation (DESI) Indicator Standards
20. Product Lot number (on Invoice and Reports Only)
21. Product Expiration Date (on Invoice and Reports Only)
22. Product Bio-equivalency Rating
23. Drug Efficacy Study Indicator (DESI)
24. Customer Delivery Zone (CMOP applicable)
25. Product denoted as available as a Drop Shipment
26. Product denoted as available as a Pass-Through Shipment
27. Product denoted as unavailable due to MBO, PV out of stock, Lockout procedures or Allocation situations
28. PV Distribution Center releasing requested product
29. PV assigned invoice number
30. PV payment information

i. The PPV shall provide real time pricing updates and actual product quantity available.  All updates are to be accomplished by 6:00am (ET) of the effective date of the update.  For order placement, all pricing updates must be available and viewable by 6:00am (ET) daily on the facility's ordering screen.

j. The PPV automated ordering system shall provide on-screen, real time, generic cost referencing.  The generic cost referencing look-up screen shall contain all of the trade names and generic names for a product when either the trade or generic name is entered by the customer for referencing.

k. For the purpose of this solicitation and any resultant contract(s), the Government has the right to use, disclose, reproduce, prepare derivative works, and display publicly in its facilities in any manner and for any purpose, data generated from the resultant contract.  Data means recorded information, regardless of form or the media on which it may be recorded.  The term includes technical data and computer software.

l. The PPV shall also provide, at no cost to the Government, the software necessary to support physical inventories.  The software provided by the PPV shall have the capability of accepting

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-5 Electronic Ordering System (continued)**

data from the hand held devices or from manual data entries. The software capabilities shall also support acceptance of inventories from independent inventory companies if properly formatted. Inventories shall be editable and exportable after submission.

This system must record at a minimum:

1. Date
2. Account number
3. Account name
4. NDC or UPC
5. Vendor stock number
6. Product description
7. Quantity of inventory
8. Unit price
9. Total inventory cost

m. The electronic ordering system shall also have the capability to search for facilities using multiple search parameters and display the results based on the search parameter(s) used. This capability shall be available to program offices (VA NAC, PBM, NSSC for IHS facilities, BOP for BOP facilities, IHSC for IHSC facilities). Only PBM and NAC will have access to all PPV accounts. *(Modification P0003)*

Example, search by **State** should yield result that displays all the PPV facilities in a particular state, or search by **VISN** should display all facilities located within a particular VISN:

**Inquiry Search**

| DEA Number | ID or Account Number | Facility Name | VISN | City | State |
|---|---|---|---|---|---|
| | | | | | |

The search result display shall include at a minimum the following heading: DEA Number, ID or Account Number, Facility Name and Complete Address, VISN, Distribution Center, Fast pay indicator (Y or N), Cost of Goods or Distribution Fee and 12 Month Sales.

**Sample Search Result Display**

| DEA Number | ID or Account Number | VISN | Facility Name | Distribution Center | Fast Pay (Y or N) | Cost of Goods or Dist. Fee | 12 Month Sales |
|---|---|---|---|---|---|---|---|
| PD1222331 | 825200 | 16 | VA Outpatient Clinic, Mobile, AL 36604 | Birmingham | Y | -5% | 12,000,000 |
| AB2233445 | 111111 | 16 | FCI Forrest City, Forrest City, AR 72335 | Little Rock | N | -4.75% | 50,000 |
| AC5566778 | 234566 | 16 | Coushatta Tribe, Elton, LA 70532 | Birmingham | N | -4.75% | 150,000 |
| AD7788991 | 123456 | 16 | Oklahoma SVH, Ardmore, OK | Oklahoma City | N | -4.75% | 100,000 |

21

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-5      Electronic Ordering System (continued)**

**Specific Ordering System Requirements:**

**CMOP Specific Ordering System Requirements:**

a.  The PPV shall provide all VA CMOP facilities with software meeting the requirements as outlined in Section I-5, a. through l. above.

b.  The PPV shall also provide all VA CMOP facilities, at no cost to the Government, appropriate software interfaces to operate Automatic Replenishment communications used with automated warehouse materiel management systems.  Appropriate interfaces shall be made available to CMOP operating systems.  The CMOPs' inventory control systems track the NDC number, lot number, and expiration date.

c.  To meet the specific ordering requirements of the CMOP (see Section I-9), interface with the CMOP inventory system shall at a minimum provide the following:

    1.  Automatic ordering based on usage and/or minimal par levels by VA Product identifier.
    2.  Paperless invoice system
    3.  Automatic replenishment, stocking of the products into the inventory system
    4.  Unique electronic signature for receiving each line item on an invoice
    5.  Barcode technology to facilitate tote management by zone (i.e., each CMOP has as many as 20 zones for products to be stored, each zone has specific product package size requirements defined by the NDC code.  A product may be required in multiple zones).
    6.  Automatic authorized price updating
    7.  Payment system based upon receiving an item under a given order
    8.  PPV product number linked to NDC, UPC or UPN number
    9.  PPV Software program shall recognize that inventory is available (on the shelf) once the inventory level has been updated in the CMOP inventory system
    10. Ordering system shall be network compatible
    11. Capability for assignment of a unique user name/password for the technician receiving product and for signing the receipt of an invoice
    12. Lot number and lot expiration date shall be passed back to the CMOP automated system

Offerors are encouraged to make a site visit to a CMOP facility prior to the submission of offer.  CMOP addresses are shown in Attachment A.  Please contact the VA NAC contracting officer at 708-786-7663 to coordinate the visit.

The PPV shall provide to the following Government program management offices, at no cost to the Government; appropriate software applications listed above in this section, (excluding the hand-held/mobile units), and shall ensure read-only access to appropriate management offices of the Agency ordering sites below.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

Only VA NAC and PBM will have access to all participating agencies' records..  The Director of
the IHS NSSC and designees in Oklahoma City, Oklahoma shall have access to all of the IHS

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-5 Electronic Ordering System (continued)**
**Specific Ordering System Requirements (continued)**

**CMOP Specific Ordering System Requirements (continued)**

and Tribal participating facilities records.  Other agency Program Management offices will be given access to their respective facilities records

**Department of Veterans Affairs**:
a.  Contracting Officer, or designees, PPV Team, National Contract Service, VA National Acquisition Center, P.O. Box 76, Hines, IL  60141 (viewing capability for all ordering sites)

b.  Deputy Chief Consultant PBM, or designees, Pharmacy Benefits Management (119), Veterans Health Administration, Building 37, Room 139, 1st Ave. 1 Block North of 22nd Street, Hines, IL  60141 (viewing capability for all ordering sites)

c.  Associate Deputy Chief Consultant PBM/CMOP, or designees, Veterans Health Administration, Building 37, Room 139, 1st Ave. 1 Block North of 22nd Street, Hines, Il 60141 (viewing capability for all ordering sites)

**Federal Bureau of Prisons (BOP)**:
a.  Chief of Pharmacy, Health Services Division, Federal Bureau of Prisons, 320 1st Street, NW, Washington, DC 20534 (All participating BOP sites).

b.  Access shall also be provided to BOP Regional Chief Pharmacists; Chief of Clinical Pharmacy Programs; Chief, Central Processing Pharmacy Services; Central Processing Staff Pharmacists; Chief, Pharmacy Logistics Support; Bureau's Electronic Medical Record (BEMR) Pharmacist; HIV/Hepatitis Pharmacist Program Manager; and future central/regional office positions.

**Department Of Health and Human Services:**
   **Indian Health Service**:
   1.  Director, NSSC, 501 N.E. 122nd St, Suite F, Oklahoma City Oklahoma 73114 (IHS and Tribal facilities Nationwide) (NSSC located in Heartland Region)

   2.  Area Pharmacy Consultant, Billings Area Indian Health Service, 2900 4th Avenue North, Billings, MT 59103 (IHS and tribal sites in Northwest Region)

**Immigration Health Service Corps (IHSC)**
a.  Chief of Pharmacy Consultant, Department of Homeland Security, Immigration & Customs Enforcement, Enforcement Removal Operations, ICE Health Service Corps, 500 12th St. SW, 2nd Floor, Washington, DC  20536 (All participating IHSC sites).

b.  Access shall also be provided to IHSC Regional Consultant Pharmacists, and future IHSC Headquarters/regional office positions as delegated/designated by IHSC Chief Pharmacist/Pharmacy Consultant. *(Modification P00003)*

23

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-5 Electronic Ordering System (continued)**

**Specific Ordering System Requirements (continued)**

**Department Of Health and Human Services:**

**Indian Health Service (continued)**

3.  Area Pharmacy Consultant, Albuquerque Area Indian Health Service – Acoma Indian Hospital, Interstate 40, exit 102, San Fidel, NM 87049 (IHS and tribal sites in Southwest Region)

4.  Area Pharmacy Consultant, Portland Area Indian Health Service, 1220 SW Third Avenue, Room 1414 NW Northrup Street, Suite 800, Portland, OR 97209 (IHS and tribal sites in Northwest Region)

5.  Area Pharmacy Consultant, Aberdeen Area Indian Health Service, 115 4th Avenue SE, Aberdeen, SD 57401 (IHS and tribal sites in Upper Midwest region)

6.  Area Pharmacy Consultant, Bemidji Area Indian Health Service –White Earth Health Center, 40520 Co Hwy 34, Ogema, MN 56569 (IHS and tribal sites in upper Midwest Region)

7.  Area Pharmacy Consultant, Phoenix Area Indian Health Service, Two Renaissance Square, 40 North Central Avenue, Suite 606, Phoenix, AZ 85004 (IHS and tribal sites in Southwest Region)

8.  Gallup Supply Management Officer, Navajo Area Indian Health Service – Gallup Regional Supply Service Center, P.O. Box 3090, Gallup, NM 87305 (IHS and tribal sites in Southwest region)

9.  Chief Contracting Officer, Alaska Area Indian Health Service, 4141 Ambassador Drive, Suite 300, Anchorage, AK 99508 (IHS and tribal sites in Alaska Region)

**I-6 Installation**

The PPV, at no cost to the Government, shall provide installation of the above- cited software within the 120-day implementation transition period.  The PPV shall provide each facility with 14 calendar days advance notice prior to installation.  All installation work must be completed and tested by the PPV no later than 10 days prior to the end of the implementation transition period.

**I-7 Maintenance and Repair**

Emergency service and repair calls shall be made available on an unlimited basis at no cost to the Government.  The PPV shall restore the ordering system to normal operating condition within 24 hours after notification by the Government   The PPV shall also restore to normal operating condition within 24 hours after notification by the Government malfunctioning PPV-furnished

24

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-7 Maintenance and Repair (continued)**

hand-held order entry devices.  If repair is not feasible, PPV shall replace the devices with the same or updated devices.  Government ordering facilities shall not be without order entry devices (whether repaired or replaced) for more than 72 hours from the time notice was given to the PPV.  The PPV shall not be responsible for any repairs or replacement parts needed because Government employees, as determined by the Government, neglected the devices, made improper application, maintenance or alteration, or because external factors (i.e. deficiencies in air conditioning, humidity control or electrical power) contributed to the malfunction or damage.  Risk of loss remains with the contractor with the exception of repairs necessitated by abuse, neglect, vandalism, or Acts of God.  Upon completion of the contract term, the PPV shall arrange to pick-up all PPV furnished devices at no expense to the Government.

**I-8 Training**

a.  The PPV shall provide, at no cost to the Government, orientation and training in the operation of its automated ordering system and process, to personnel at each customer's ordering facility.  Facilities may request training for new employees. Training should be provided on- site at each participating customers' facility.  However, in the rare instances where the PPV requests that the training be offered somewhere other than the customers' facility, then the location of the off-site training site shall be within a 100 mile radius from the customers' facility.

b.  The PPV shall notify all sites 14 calendar days before the date of their scheduled training.  The training shall include actual demonstration and operation of the software and hand-held order entry devices.  Qualified PPV personnel shall provide the training no later than ten calendar days prior to the end of the 120 calendar day transition period.  Along with the Implementation Plan, the PPV shall also furnish training schedules for all sites (see I-3 Implementation Plan & Instructions to Offerors, FAR Clause 52.212-1).

c.  Prior to site training, the PPV shall make available webinar training sessions providing an overview of the PPV's ordering system.

d.  Training at a minimum shall cover the following and shall include an electronic version of the training information (e.g. power point):

   1.  Proper use of order entry devices
   2.  How to access PPV's inventory status
   3.  Order placement process (product inquiry, placement, order edit, printback confirmation, drop-shipment process, pass-throughs, new item requests for stock additions, identifying drop-shipments, controlled substances, how to request new items, etc.)
   4.  How to maintain ordering system
   5.  Downloading price changes
   6.  Performing file maintenance
   7.  Requesting bar code labels
   8.  Download contractually required reports

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-8 Training (continued)**

    9.  Operation of Inventory Management program
    10. Any other commercially available training in use of the order entry devices and ancillary items

e.  After award, participating management offices and individual facilities will provide the PPV a designated point of contact.  The PPV shall work with each Agency's managing office to contact each facility to schedule the initial training for each site.  PPV shall also provide updates or systems changes, and training on these changes as they occur throughout the term of the contract.  The designated point of contact at each facility will be responsible for assurance that the appropriate personnel to be trained are available.

f.  A PPV contact person and telephone number shall be provided to each facility in the event additional instruction is necessary.  The training shall be at no cost to the government.  The PPV shall be responsible for training when there is a change in ordering personnel and on demand throughout the contract period.

g.  The PPV shall be required to provide at no cost to the government a complete set of electronic Training Guides and Operating Manuals for the ordering system, hand-held order entry device and software furnished by the PPV to each individual ordering facility.  The Training Guides and Operating Manuals shall be provided prior to but no later than the actual time of training.

h.  In addition to the initial training requirements, the PPV shall provide quarterly web-based training on PPV related topics to be identified by the facility POC.  The PPV shall notify the contracting officer of the availability of these training sessions.

**BOP Specific Training Requirements:**

BOP must approve a Federal Bureau of Prisons Security Clearance Application for each individual employed by the PPV who will be assigned by the PPV to provide the required training to BOP personnel.  The Security Clearance must be approved by BOP prior to PPV personnel obtaining access to a BOP facility.  The PPV shall coordinate with the BOP Designated Point of Contact to notify individual authorized prison personnel at least 14 calendar days prior to making any site visits for the purpose of training.

**IHS/NSSC/ Oklahoma City Oklahoma Specific Training Requirements**:

The NSSC shall coordinate with the PPV during the implementation period to provide a training schedule for all its satellite facilities.  The schedule shall reflect a listing containing all of the customers with scheduled times, locations, points of contract, and facility phone numbers.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-9 Ordering**

a.  Each authorized ordering facility will be responsible for its own order placement.  For the Department of Veterans Affairs, order placement will be made by duly designated (in writing) Ordering Officers and/or warranted contracting staff.

b.  All orders for items authorized for distribution through the PPV shall be processed through use of the PPV furnished electronic order entry system as specified in Section I-5.  The PPV shall also accept phone and or facsimile orders when use of the electronic order entry system is temporarily unavailable or inoperable, or in the case of an emergency delivery requirement.

c.  Facilities such as Option 2 SVHs, NSSC serviced facilities, and other IHS facilities that require a parent facility for order approval shall also be responsible for their own order placement, however, they shall be required to process all electronic orders thru the Split-Screen Ordering System specified under the Satellite Facility Split Screen Ordering requirements of this solicitation.

d.  PPV customers shall have access to view only their unique database for pricing and product source selection. (Added by Amendment 6)

e.  The PPV shall process delivery orders on a "fill or kill" basis.  The PPV shall cancel from the delivery order items that cannot be filled.  The PPV shall indicate the cancelled items on the customer order confirmation.  No backorders are allowed.  Once cancelled, the PPV is precluded from placing the cancelled items on backorder.

f.  The PPV's ordering system shall have an item-description link for the customer to notify the PPV of expected item usage.  The PPV shall respond to the usage request within two business days with the expected date of availability, amount of stock, or the reason for the inability to stock.

g.  In some instances, the PPV shall be required to first fill government orders before filling its commercial-based customers orders.  In such situations, the Government will present the PPV with a written agreement from the product supplier to release the product to the PPV customers first.

h.  PBM/NSSC reserves the right to direct the PPV allocation to VA and IHS facilities.

i.  Reservation Orders- In order to give the participating PPV customers the same procurement opportunity as the prime vendor's commercial customers, the participating customers shall have the opportunity to place a reservation order for a product that is determined to be on a manufacturer's back order (MBO).  In the ordering process, when an item is "killed" off the customer's order due to a MBO, the customer may inform the PPV to reserve and then release the product back to the requesting customer upon its availability.  The customer will be responsible for a separate and distinct reservation order through the PPV's electronic order.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-9 Ordering** (continued)

system for the MBO product.  Reservation orders shall not be included in the contract fill-rate calculation.  Reservation orders may remain unfilled for a period not longer than 30 days from the customer's initiation before the customer is notified of its cancellation by the PPV, or by an earlier cancellation at the customer's request.  A reservation order may not remain open for longer than 30 days.  If the order is filled before the 30-day time-frame, then the purchase order is closed by the PPV.  For cancellations of reservation orders due to the 30 day timeframe, the customer shall have the opportunity to re-issue a new, separate and distinct reservation order for the same product and quantity, without losing their original position on the PPV's availability wait list.  The product price charged to the customer for a reservation order shall be the contract price in effect at the time the initial reservation order is placed.

j.  The PPV shall make every effort to ship orders complete with single lot numbers.  When quantity equaling a case is ordered, then a full complete case is expected versus a case quantity of loose items.

k.  At a minimum, the PPV's customer ordering screen must contain the following fields:

1. Ordering Agency's name and PV assigned account number
2. Product Name
3. Product Number as assigned by ordering facility (where available)
4. PPV's Product Number – standardized across the PPV's ordering system
5. Generic Name
6. Product Description
7. Strength, Package size, Manufacturer
8. National Drug Code (NDC) for applicable pharmaceutical products
9. Universal Product Number (UPN) – applies to healthcare products
10. Universal Product Code (UPC)
11. Product denoted as a CII Control Schedule (where applicable)
12. Established DEA number (where applicable)
13. Established HIN number (where applicable)
14. Product Government Contract Number (FSS, National Contract, BPA, or Miscellaneous) (At a minimum, the last five digits of the Gov't Contract # will be included)
15. Type of contract – contract identification or code that identifies product as FSS (F), National (N), or Miscellaneous other government (M) contracts
16. Product Contract price (specific to the pricing and contract eligibility of each        customer)
17. Product Bio-equivalency Rating
18. Customer Delivery Zone (CMOP)
19. Product denoted as available as a Drop Shipment
20. Product denoted as available as a Pass-Thru Shipment
21. Product denoted as unavailable due to MBO (including reason), PV Out of Stock, Lockout procedures or Allocation situations
20. Automatic Substitution option
21. Product Inquiry search option

28

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

### I-9 Ordering (continued)

22. Price per unit
23. Drug Efficacy Study Implementation (DESI) Indicator

l.   For all approved PPV electronic orders placed no later than 6:00pm customer local time, the PPV is required to provide next day, (or for some specified facilities, next scheduled delivery day) delivery of a complete order.

m.   All orders processed thru the electronic ordering system shall receive a confirmation printback  from the PPV sent electronically back to the ordering facility.  At a minimum, the confirmation printback shall reflect the requirements specified in Section I-15 (Confirmation Printback Report) of this solicitation.

n.   For Special Orders such as Control Drugs (CII's) and Closed Distribution shipments, the orders shall be identified as such on the customers' PPV ordering screen.  The confirmation printback shall reflect the total line item cost of the customer's special order.

The customer's electronic automated order request for Schedule II Control Drugs, in accordance with Controlled Substances Ordering System (CSOS), shall be followed up by the ordering facility by providing the PPV with an electronic or hard copy of DEA Form 222. The PPV's responsibility to release and deliver the customer's Control Drug order under the terms and conditions outlined in this solicitation, commences upon the PPV's receipt of the required DEA Form 222.  Printback for electronic orders shall resemble DEA Form 222 in compliance with all DEA regulations.

o..   Drug Bio-equivalency Rating-The PPV shall show the Food & Drug Administration (FDA) Orange Book therapeutic drug equivalency rating for each drug on each customer's order screen which will allow customers to view the equivalency ratings when making drug product selections.  If the PPV plans to use another rating system, such as the Z-Rated system, the PPV shall identify and explain the system that will be used and what it means.

This information shall be provided to all ordering officials at the time of the program installation and training.  Information regarding the drug bio-equivalency rating shall also be posted on the PPV website for instructions and guidance throughout the term of the contract.

p.   Technical Support– Technical support shall be available to customers daily during local normal business hours, until 6:00pm customer local time excluding Federal Holidays.

q.   The government reserves the right to require the PPV to provide at no cost to the government an HL-7 interface that allows for the Agency's internal inventory system associated with its operating system (VISTA, RPMS, etc) to generate and automatically upload product reorder quantities into the PPV's online ordering system for order review and submission.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-9 Ordering (continued)**

**Specific Ordering Requirements:**

**Satellite Facility Split-Screen Ordering:**

a.  The PPV shall provide an automated ordering system capable of establishing a "Split-Screen Ordering" process for VA's Option 2 SVHs, VA OPCs and IHS facilities.

b.  Satellite facilities will be responsible for ordering their own products through the PPV web-based ordering system.  However, a satellite facility being serviced by a parent facility must have its orders transmitted simultaneously to the designated Parent Facility and the PPV through the split-screen system. The satellite facility's order is required to be approved by the parent facility prior to the PPV delivering the order to the satellite facility.

c.  Whenever PPV order requests are initiated by the satellite facilities and transmitted through the PPV's "split order" concept, the following functions shall take place:

1.  The satellite facility's order shall be sent electronically to the PPV for acknowledgment of receipt of order and stock allocation, but held in abeyance until approval has been received from the parent ordering facility before the order is filled.

2.  Within 30 minutes of the PPV's receipt of the satellite facility's order, a confirmation printback, shall be generated from the PPV and transmitted back to the satellite facility.  The printback at a minimum, shall indicate what items will be "filled or killed" along with the information required in Section 1- 15 (Confirmation Printback Report) of this solicitation.  Upon receipt of a printback, the requesting satellite facility shall be capable of requesting a substitute product/item/unit and generating a substitute order if needed, through the same electronic split screen ordering processes.

3.  The parent facility shall approve the order and funding by assigning the final purchase order number. The parent facility shall also be able to perform maintenance on the order, i.e., view, edit, add or delete items as needed and approve the order before the PPV fills the order.  This process shall be completed electronically except when use of the electronic order entry equipment is unavailable or inoperable, or in a case of an emergency delivery requirement.

4.  When approved by the parent facility, the order is transmitted electronically to the PPV. The approved order is the final authorization for the PPV to fill and deliver the order to the satellite facility.

5.  Within 30 minutes of receipt by the PPV of the approved order from the parent facility, a confirmation printback, shall be generated by the PPV and sent electronically to the parent facility.  The printback shall, at a minimum, confirm what items will be "filled or killed" along with the information required in Section I-15 (Confirmation Printback Report).

30

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-9 Ordering (continued)**

**Specific Ordering Requirements: (continued)**

**Satellite Facility Split Screen Ordering: (continued)**

6. Before payment can be made to the PPV for any satellite facility order placed, the order shall indicate the parent facility's correct purchase order number assigned when the order was originally approved by the parent facility.

7. The designated parent facility is responsible for the payment of their satellite facility orders if:

   a. Orders have been properly relayed to the designated parent facility through the PPV's split-screen ordering system
   b. Orders were assigned a parent purchase order number prior to the delivery of the order by the PPV, and
   c. The parent facility has received a proper PPV invoice*

   * In the event the parent facility receives a PPV invoice that does not reflect the required information, the invoice will be returned to the PPV unpaid within 7 days of receipt, for correction, proof of authorization to release product, proof of delivery and subsequent resubmittal by PPV of a proper invoice.

   In the event that the PPV releases a Satellite facility order without the direction and approval of their designated ordering/approving office, that order shall be considered to have been released without the Government's authority and the Government shall not be obligated for any payments.

**CMOP Specific Ordering Requirements:**

a. Each CMOP will create electronic orders to the PPV CMOP proprietary system and the PPV's electronic ordering system and software. Each CMOP order shall be prepared with an identified inventory zone and at a minimum shall reflect:

   1. The CMOP customer account number
   2. The customer's purchase order/delivery order number
   3. The NDC numbers for the products required
   4. The quantity of each product required
   5. The delivery location for each order

b. In addition to the required 30-minute transmittal of a PPV Confirmation Printback to the ordering CMOP, the PPV shall:

   1. Segregate like lot numbers by products

31

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-9 Ordering (continued)**

**Specific Ordering Requirements: (continued)**

**CMOP Specific Ordering Requirements: (continued)**

2.  Separate parcels onto separate pallets by CMOP Zone (as identified on the CMOP's original order)
3.  Create an ASN file to be transmitted to the ordering CMOP, showing the required data elements of the inventory management program.  (Such as, but not limited to, delivery zone, lot number, expiration date, package size and product identification)
4.  The PPV shall submit invoices that include the lot number, expiration date and quantities of each line item.
5.  Acknowledge the preferred product ranking order of the ordering CMOP, on each order. CMOP Director and PPV will use this information in an attempt to establish the authority for Automatic Substitution as deemed necessary.

**IHS Specific Ordering Requirements:**

**NSSC, Oklahoma City, Oklahoma:**

 In addition to the general ordering requirements listed above, the IHS Specific Ordering Requirements for the National Supply Service Center (NSSC) shall consist of:

a.   A PPV-furnished web-based ordering system:

1.  That allows a minimum of three individuals to place PPV orders simultaneously.
2.  That has the capability to receive, send, and release individual customer orders without having any effect on each other.
3.  That has the capability to receive, send, release and print each order individually.
4.  That has the capability to delete or add to customer's orders once received at the NSSC.

b.   A PPV-furnished Spilt-Screen Ordering System for all customers serviced by the NSSC.

   The NSSC provides PPV procurement support services to 127 IHS and Tribal facilities through the prime vendor program.  Fifty-nine (59) facilities are geographically located within the Heartland Region, solicitation line item 8 of this solicitation.  The remaining 68 facilities are geographically dispersed as follows (See Attachment "A" for specific locations):

| | | | |
|---|---|---|---|
| North Region: | 6 | Southwest Region: | 8 |
| Appalachians Region: | 3 | Northwest Region: | 17 |
| Everglades Region: | 1 | West Coast Region: | 10 |
| Upper Midwest Region: | 17 | Great Lakes Region: | 6 |

c.   A PPV furnished Paperless Invoicing System.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-9 Ordering (continued)**

**Specific Ordering Requirements: (continued)**

**IHS Specific Ordering Requirements: (continued)**

**NSSC, Oklahoma City, Oklahoma: (continued)**

d.  A PPV furnished electronic ordering system that provides a unique password that shall be assigned to each individual to be identified once the order has been transmitted from the satellite facility to the NSSC.  The individual's name, or code shall be attached to the order, and once printed at the NSSC, the name or code, shall be printed at the end of the order transmission.

e.  A PPV furnished electronic ordering program that provides a unique electronic signature for receiving each line item on an invoice.

f.  A PPV furnished electronic ordering program that provides the technicians receiving product to have a unique password for the signing receipt of an invoice.

Offerors are encouraged to make a site visit to the NSSC, Oklahoma City, Oklahoma by contacting the NAC Contracting Officer at (708) 786-7663.

**Other IHS Facilities Specific Ordering Requirements:**

a.  The PPV shall establish a "Split Order" feature for each designated IHS Parent Facility for the automated order entry software installed at the following IHS sites and for the IHS and Tribal customers serviced by the PPV:

  1.  Alaska Area Office IHS in Anchorage, Alaska (Region: Alaska);
  2.  NSSC in Oklahoma City, Oklahoma (Region: Heartland);
  3.  Portland Area Office HIS in Portland, Oregon (Region: Northwest);
  4.  Phoenix Area Office HIS in Phoenix, Arizona (Region: Southwest);
  5.  Albuquerque Area Office IHS in Albuquerque, New Mexico (Region: Southwest Region)
  6.  Gallup RSSC for Navajo Area in Gallup, NM (Region: Southwest)

b.  The software program provided by the PPV shall have the capability to process all electronic orders placed by the IHS satellite facilities in a manner as specified above in "Satellite Facility Split Screen Ordering" system requirements.  The process then transmits a request for an order to the satellite facility's designated Parent Facility and simultaneously to the PPV's distribution center.

33

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## I-9 Ordering (continued)

### Specific Ordering Requirements: (continued)

### Facilities Located Outside the Continental United States- Specific Ordering Requirements:

In addition to the ordering requirements outlined above, the participating facilities that are geographically located outside the Continental United States will be placing orders Monday through Friday, and the PPV shall be required to provide delivery no later than 72 hours from receipt of order.

## I-10  Expiration Dating

a.  Expiration dating of all pharmaceutical products delivered under this program shall have a minimum shelf life of 6 months remaining upon delivery to the Government.

b.  Expiration dating of bulk pharmaceutical items delivered to the HHS SSC, Perry Point (included in Line Item # 2) and the National Acquisition Center accounts (included in Line Item #6) shall have a minimum shelf life of 20 months remaining upon delivery.  All other pharmaceutical items delivered to the National Acquisition Center accounts (included in line Item #6), shall have a minimum shelf life of 12 months remaining upon delivery.

c.  Prior approval by the facility, PBM, NSSC, or NAC is required before delivery of short-dated products.

## I-11 Prior Authorization Substitution

A substitution agreement between the PPV and the ordering facility's point of contact (POC) may be arranged for stock outages or MBOs against a requested product ordered.  With such agreement, an agreed upon alternate product shall be automatically substituted by the PPV. When the PPV uses the automatic substitution process, the ordering facility shall be notified of the substitution and the substituted item must be annotated as such on the customer's confirmation printback.  Once such an agreement is entered into between the PPV and the individual ordering facility, the PPV shall maintain an adequate supply of the alternate product. The Government makes no commitment to buy the alternate item.  Automatic substitution by the PPV without the customer's prior approval is prohibited.

## I-12 Lock Out Procedures

a.  The Department of Veterans Affairs (VA) has awarded and continues to award National Standardization Contracts.  National Standardization Contracts are committed use, mandatory source contracts for VA facilities.  OGAs that made a formal commitment and agreed to the mandatory use are included in the National Standardization Contract.

b.  A listing of current National Standardization contracts and authorized users will be provided prior to implementation.

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-12 Lock Out Procedures (continued)**

c.  Upon the effective date of a new National Standardization Contract item, the PPV shall make the specified Standardization item(s) available, and lock out the ordering facilities' ability to purchase any other equivalent items.  Lock out mechanisms shall be made for all package sizes with the exception of unit dose package type.  The VA NAC will notify the PPV of new National Standardization Contract award including the ordering agencies/facilities authorized to place orders under the contract.  All National Standardization Contract items shall be clearly designated as such on the PPV automated order entry system inquiry/order entry screen.

d.  Although all National Standardization Contract items are mandatory source items for all VA and OGA facilities that have been identified as committed to the contract, there will be instances when a facility will need to procure an alternate source product.  A description of these circumstances are shown in 1-4, below.  When an ordering facility attempts to order an alternate product, and the following exceptions can be legitimately allowed, the automated order system must permit the user to manually override the lock-out program and select one of the exceptions before continuing the ordering process.  The exception information must be captured in the PPV automated order system so that the data is included in the procurement history and related reports (see section I-28 for report requirements).

1.  PPV Stock Outage –The PPV shall provide electronic notification weekly to the VA NAC if a National Standardization Contract product is out of stock due to or related to circumstances involving the PPV's distribution and inventory operations.  The notification shall be provided by the PPV through the electronic purchase history management report system (See Reports section, Section I-28).

2.  MBO – The PPV shall provide electronic notification weekly to the VA NAC if a National Standardization Contract product is out of stock indicating it is due to a product supplier backorder.  The notification shall be provided by the PPV through the electronic purchase history management report system (See Reports section, Section I-28).

3.  Continuous Patient Care Exception - A facility may order other than the National Standardization Contract item to meet patient care needs.

4.  National Standardization Contract Waiver- A VA facility may receive a waiver from PBM for a National Standardization Contract item.  VA NAC will notify the PPV of this exception, and the PPV shall allow the facility to order a product other than the National Standardization Contract item.  Other Government Agencies (OGA) may receive waivers from their respective parent agencies.  In these instances the VA NAC will notify the PPV of this exception, and the PPV shall allow the facility to order a product other than the National Standardization Contract item.

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

### I-13 Manufacturer Back Orders (MBO)

a.  The PPV shall notify facilities on the PPV's confirmation printback report (Section I-15) of any manufacturer back- ordered item.  The PPV shall also notify the VANAC Contracting Officer of any MBO's.

b.  The Government retains the right to investigate the backorder situation to determine the cause of the backorder and to provide assistance to the PPV and the participating customers during the MBO period.

c.  When mandatory national standardization contract items are on backordered by the product supplier, the VANAC contracting officer may notify the PPV that the Government will acquire the same or similar items from another source and automatic substitution will be suspended for the standardized item.

d.  Credits due to PPV customers based on product reprocurement costs caused by MBOs, shall be routed from the National Standardization Contractor through the PPV, back to the participating PPV customer in accordance with the Credits and Rebills section of this solicitation.

### I-14 Stock Outages/ Cancellations/ Back Orders, (other than MBO)

a.  PPV Stock outages due to cancellations/backorders by the PPV, on products that have met the prerequisites (Fill Rate Section I-16, paragraphs a. through d.) of the fill rate formula, shall be included n the service level calculation of the fill-rate.

b.  PPV Stock outages due to cancellations/back orders by the PPV shall be considered a failure to perform by the PPV, and may be considered grounds for Termination for Cause.

c.  A failure by the PPV to provide customers with products ordered due to a PPV stock outage or cancellation, or back order on products that have met the prerequisites of the fill rate formula (Fill Rate Section I-16, paragraphs a through d), shall free the requesting ordering facility to acquire the same or similar items from another source without breaching/violating the PPV contract, while holding the PPV responsible for any excess product procurement costs incurred by a participating PPV customer due to the PPV's stock outage.

d.  Credits due to the PPV customers based on excess product procurement costs caused by a PPV stock outage, cancellation/backorder, shall be routed from the PPV, back to the participating PPV customer in accordance with the Credits Section  (I-27) of this solicitation.

### I-15 Confirmation Printback Report

a.  A confirmation shall be printed back to the ordering facility within 30 minutes of order transmission to the PPV from the facility.  A confirmation relating to a customer's request for a drop shipment or pass-through order, shall be printed back to the ordering facility within 24 hours of order placement  The confirmation printback shall appear on the customer's ordering

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-15 Confirmation Printback Report** (continued)

screen, be printable and accessible through the reports module.  The confirmation printback shall reflect the correct product price to be charged the customer at the time the order is placed.  The awarded Distribution Fee shall be imbedded in the correct product price.  A confirmation printback for a drop shipment or pass-through order, shall also reflect the expected product suppliers delivery time, along with any other special terms and conditions required by the product supplier.

b.   At a minimum, the confirmation printback provided by the PPV shall reflect the following information:

1.   PPV name and address and PPV "bill to" address
2.   The Government ordering facility's name and ship to address
3.   The Government ordering facility's PPV assigned account number
4.   The Government ordering facility's Purchase order/Delivery order number
     This would be the final, approved Purchase order/Delivery order number assigned by Parent facility if order was initiated by a Satellite Government facility.
5.   Confirmation printback report date and time
6.   Product Description for each item ordered
7.   NDC, UPN, UPC, or appropriate product number (non-pharmaceutical items) listed for each item ordered
8.   PPV established product number for each product ordered
9.   Product Number as assigned by ordering facility (where available)
10.  Quantity requested and availability confirmed for each product ordered.  If the product is unavailable, printback shall indicate if the product is available at an alternate distribution center
11.  Unit price confirmed for each product ordered
12.  Extended price of each line item, reflecting PPV distribution fee (imbedded in each contract product price)
13.  Identification of, and reason(s) why product is unavailable, such as MBO's, PPV  stock outages, product deletions, or manufacturer or PPV allocations, (Codes are acceptable)
14.  Confirmed grand total of the order
15.  Indication of what requested product are special order or require a drop shipment or pass-through process
16.  Assigned paperless invoice number from the PPV
17.  Invoice.dat; data file information (required for Drug Accountability.) VA Drug Accountability Point of Contact is Mr. Dave Blocker, OIFO, (205) 943-2319

c   The government reserves the right to amend the drug accountability data file during the contract period at no cost to the government.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## I-16 Fill Rate

a.  The PPV shall provide next-day delivery (or next scheduled delivery day as specified) with a minimum 97% fill-rate as defined below in the service level calculation.  The fill rate shall be calculated on a daily basis for each individual facility account as follows.

Service Level Calculation/ Fill Rate = (equals)   $\dfrac{\text{Units (Items) Delivered}}{\text{Units (Items) Ordered (less MBO Units*)}}$

b.  All items ordered, but killed by the PPV, shall be included as an item ordered in the gross and adjusted fill calculations.  If the fill rate is less than 97%, the PPV must be able (when requested) to provide documentation to the Government of its attempts to maintain product availability from the manufacturer.  The supporting documentation requested by the Government could include, but is not limited to, documentation that supports the existence of an outstanding purchase order between the PPV and the product manufacturer/supplier for the requested units/items.  In order for the PPV to include an MBO Unit in the above Service Level Calculation, the outstanding purchase order between the PPV and the product supplier shall have been in existence for no less than three calendar days prior to the customer's request.  Failure by the PPV to meet next-day or next scheduled day delivery fill-rates will be officially recorded as part of the PPV contract performance which is available for public review and may also be considered as grounds for Termination for Cause.

    *In order for the PPV to include an MBO Unit in the above Service level Calculation, an MBO Unit must be equal to or greater than the number of units ordered on the customers' order.

c.  The following are prerequisites to the application of the Service Level Calculation/Fill-Rate:

1.  Ordering facilities shall provide the PPV usage information as soon as possible after award.  The initial 90 calendar days from start-up of each individual institution are exempt from the calculation.  If an award is made to the incumbent PPV, the 90-day exception does not apply.  After 90 days, the PPV is responsible for tracking usage and for adjusting its inventories to assure the 97% fill rate.

2.  Products ordered by a facility whose usage data has not been provided will be excluded from service level calculation, for a period of 90 days from PPV's notification of such usage.

3.  Product quantities of the most recent month in question that exceeds the prior 30-day usage by 150% will be exempt from the calculation (excludes MBOs from the past 90 days).

## I-17 Recalls

If any product distributed under this contract is recalled or removed by the manufacturer, or if a recall is suggested or mandated by a regulatory or official Agency, the PPV shall be responsible for taking the following actions:

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-17 Recalls (continued)**

a.  Immediately upon receiving notice of the recall, the PPV shall notify all customers receiving distribution of the product under this contract using the most expeditious manner.  The subject line shall include the name of the product being recalled.

b.  The PPV shall not ship recalled products to the customers.

c.  Expeditiously notify the following management offices of the Department of Veterans Affairs and Indian Health Service

> Contracting Officer, PPV Team, National Contract Service
> VA National Acquisition Center, P.O. Box 76, Hines, IL  60141
> Fax –708-786-5221
> E-Mail - German.Arcibal@va.gov

> Pharmacy Benefits Management (119), Building 37, Room 139
> 1st Avenue 1 Block North of 22nd Street, Hines, IL  60141
> Fax - 708-786-7891
> E-mail – Tom.Borysek@va.gov

> Supervisor, Pharmacy Support Branch, NSSC, 501 N.E. 122nd St, Suite F,
> Oklahoma City, OK 73114
> Fax – (405) 951-6057
> E-mail – joe.bryant@ihs.gov

d.  At a minimum, the recall notifications shall include the following information:

1.  Complete item description, (product number & lot number) and/or identification
2.  Contract and Delivery Order number
3.  Reason for recall
4.  Disposition Instructions.  If a direct recall is issued, the PV shall include the manufacturer disposition instructions.
5.  Level of recall

The notifications may be sent via e-mail, or by the PPV through its electronic ordering system, and shall be separate and independent from any other correspondence such as invoices.  The product name (generic and trade), and level of recall (if available) must be included in the subject line.

e.  The PPV shall issue replacement product or credit for any product recalled.  The customer shall have the option of accepting either replacement product or credit in exchange for the recalled product.  Any replacement or account credit shall be made in accordance with the delivery terms required by this solicitation.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-18 Delivery**

a. Routine delivery for all sites, (except CMOPs (Line Item #14), the NAC accounts (included in Line Item 6), and participating facilities outside the Continental United States (included in Line Items 4, 11, 12 & 13)), is required daily, Monday through Friday, to the delivery point(s) established by the facility. The PPV shall provide next-day or next scheduled delivery day for all orders placed by 6:00pm customer local time. Delivery shall be between the hours of 8:00am and 4:00pm customer local time. Delivery to multiple sites may be required by some of the facilities. Customers shall be able to place PPV orders seven days a week. PPV orders placed on Friday, Saturday or Sunday shall require delivery on the following Monday.

b. The PPV shall notify the VANAC contracting officer of any changes in distribution centers.

c. The PPV shall be required to use alternate distribution centers to fulfill the requirements of the customer and to prevent product outages that may endanger the patients.

d. When the adjusted fill rate falls below 97% for the customer's PPV primary distribution center, the PPV shall establish the use of alternate PPV Distribution Center(s) at the request of the customer. Before the underperforming distribution center may be re-established as a customer's primary distribution center, the PPV shall provide documentation to the VANAC contracting officer of corrective actions taken to improve the fill rate.

e. The use of an alternate Distribution Center by the PPV shall be at no cost to the Government and shall be seamless to customers for order placement, delivery, and payment processes established under this contract.

f. Bulky items may be drop shipped when mutually agreed upon between the PPV, the participating customer and the product supplier. Drop shipments must be shown on the customer confirmation printback. The awarded PPV distribution fee shall be applied to drop-shipment orders.

g. Delivery orders that include products classified as "controlled drugs" shall be packaged separately from the rest of the delivery order and in accordance with DEA requirements.

h. Delivery vehicles shall conform to drug integrity and storage as outlined in USP 1079.

i. Delivery inspection and acceptance shall be performed in accordance with FAR 52.212-4(a). The Government will witness products received at the loading dock (or specified delivery location) and sign delivery receipt documents before the PPV driver departs. Witness of products received in no way waives the Government's rights under FAR clause 52.212-4(a) Inspection and Acceptance.

j. The PPV shall act as a conduit to drop shipment orders to expedite and simplify the order and payment processes.

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-18 Delivery (continued)**

1. A drop shipment order shall be identified on the customer's ordering screen for approval by the customer prior to the order being picked/filled/delivered.  The PPV shall confirm in the customer confirmation printback the item as being drop shipped.  Unless approved by the customer, drop shipments directly from product manufacturers for recurring products are prohibited.

2. When a drop shipment request is initiated by the PPV customer, the PPV shall be responsible for placing the drop shipment order to the product supplier.

   The PPV shall, within 24 hours, provide the customer a confirmation printback regarding the expected delivery date from the product supplier, the product pricing, and the following minimum information:

   a. PPV name and address and PPV "bill to" address
   b. The Government ordering facility's name and ship to address
   c. The Government ordering facility's PPV assigned account number
   d. The  Purchase order/Delivery order number from the ordering facility.  This would be the final, approved purchase order/Delivery order number assigned by Parent facility if the order was initiated by a Satellite Government facility
   e. Confirmation printback report date and time
   f. NDC, UPN, UPC, or appropriate product number (non-pharmaceutical items) listed for each item ordered
   g. Product Number as assigned by ordering facility (where available)
   h. Quantity requested and availability confirmed for each product ordered
   i. Unit price confirmed for each product ordered
   j. Extended price of each line item, reflecting the PPV negative distribution fee (imbedded in each contract product price)
   k. Confirmed grand total of the order
   l. Paperless invoice number from the PPV
   m. Invoice.dat; data file information (required for Drug Accountability.) VA Drug Accountability Point of Contact is Mr. Dave Blocker, OIFO, (205) 943-2319 (See Attachment B)

3. When a drop shipment method is required by the PPV to meet the fill rate requirements of the facility for contract products that are not in stock due to a failure by the PPV, then the PPV shall be responsible for providing the order in accordance with the terms of the PPV contract.  Drop shipments shall be shown on the customer's confirmation printback and the awarded negative PPV distribution fee shall be applied to the order.  The invoice for the drop shipment shall be submitted by the PPV in accordance with the terms of this contract.

4. When a drop shipment method is required by the PPV to meet a facility's request for a quantity of products that is excluded from the fill rate calculation and the quantity

41

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-18 Delivery (continued)**

requested exceeds the PPV's stock, the PPV remains responsible and shall accept the Government's order.  The PPV shall place a direct delivery order (drop shipment) from the product supplier.  The PPV shall, within 24 hours, provide the customer a confirmation printback indicating the expected delivery date, product pricing and information required under I-I8 2. above.  Next day or next scheduled delivery day requirements do not apply to drop shipment orders as indicated in this paragraph.

k.   When the PPV is notified by the customer of a "Pass-Through Delivery" being made by the product supplier to the ordering customer, the PPV shall be responsible for invoicing the customer in accordance with the terms of this contract.  The PPV shall be notified by the product supplier of the terms and conditions (products, Govt. pricing, expected delivery etc.) of the customer's order, and the PPV shall create the PPV invoice based on the information provided by the supplier.  The PPV is responsible for submitting the invoice as quickly as possible to the customer once all the information is acquired from the product supplier.  The awarded negative distribution fee shall apply to Pass-Through Deliveries. When the PPV is made aware of such information, the PPV ordering system should denote what products are only available as Pass-Through Deliveries.

l.   The PPV shall be responsible for reporting Dropped-Shipped and Pass-Through products itemized by line item as specified in the applicable reports listed in Section I-28.

m.   Environmental Considerations- Where possible the PPV, while ensuring the safe and proper distribution of the items ordered under this contract, shall use appropriate packing materials that have the least impact on the environment.  Manufactured or disposed packing or shipping materials which decompose or can be recycled, are preferred.  Products shall be delivered on non-wooden pallets.

## CMOP and National Acquisition Center (NAC) Account(s) Specific Delivery Requirements:

Delivery is required next day and the PPV shall ship items six days a week (Monday through Saturday) to the CMOPs (Line Item #14) and NAC (included in Line Item #6) delivery points shown in Attachment "A".  Delivery shall be made between the hours of 5:30 am and 8:00 am customer local time unless other agreements are made between the individual CMOPs, NAC accounts and the PPV.  The VA NAC Contracting Officer shall be notified by the PPV about special delivery agreements with the CMOPs NAC accounts and the PPV.  The CMOPs and the NAC accounts shall be able to place orders six days a week (Monday through Saturday).  Orders placed on a Friday or Saturday are required to be delivered the following Monday, unless otherwise specified.

1.   The PPV shall bar-code each tote and/or box delivered for receiving at the VA-defined dispensing zone.

2.   Each line item within the tote/box shall be listed in the electronic invoice.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-18 Delivery (continued)**

**CMOP and National Acquisition Center (NAC) Account(s) Specific Delivery Requirements:**
**(continued)**

    3.  When a discrepancy is acknowledged, a resolving credit memo/invoice shall be generated by the PPV.  Credit memos may be applied by the PPV to the current invoice.

    4.  The PPV shall palletize full case products in such a manner that only one P.O. is on each pallet.  Orders for less than full cases must be delivered in totes by the PPV with one line item per tote.

    5.  The PPV shall provide deliveries twice per day to any CMOP upon request.

    6.  For controlled substance orders, full-case order quantities shall be palletized by the PPV with only one P.O. per pallet.

    7.  The PPV shall not delivery full case orders in totes.

**Facilities Located Outside the Continental United States- Specific Delivery Requirements:**

All participating facilities that are geographically located outside the Continental United States (included in Line Item #s 4, 11, 12, and 13) will place orders Monday through Friday.  The PPV shall be required to provide delivery no later than 72 hours from receipt of order.

**I-19 Emergency Delivery**

a.  Emergency deliveries shall be delivered within 12 hours (36 hours for those facilities located outside the Continental United States) of receipt of order by the PPV, 24 hours per day, seven days a week.

b.  When required by participating facilities, the PPV shall provide six emergency deliveries per calendar month at no additional transportation/handling cost to the facility. Emergency deliveries above the six per calendar month deliveries provided at no cost, shall be processed by the PPV in accordance with the emergency delivery time, terms and conditions under the contract but prior to the release of the emergency delivery, the PPV shall notify the customer that applicable and reasonable transportation and handling costs will be applied to the customer's order.  Emergency deliveries caused by the PPV's non-compliance to the requirements of the contract shall be at no cost to the PPV customers and shall not count against the six no-cost emergency deliveries.

c.  Emergency orders may be placed with the PPV by fax or telephone.  At a minimum, when the order is from a satellite facility, the PPV shall obtain verbal approval and be in receipt of an approval number from the satellite facility's approving office prior to releasing an emergency order. The PPV shall then, within 24 hours, enter the faxed or phoned-in emergency order into the PPV ordering system for subsequent processing through the electronic ordering system.

## PHARMACEUTICAL PRIME VENDOR CONTRACT
## VA797P-12-D-0001

**I-19 Emergency Delivery (continued)**

Emergency orders entered into the system by the PPV shall be clearly designated as such to avoid duplication of orders.  Emergency order purchasing data shall be part of the PPV customer's purchase history.  The PPV shall notify the NAC Contracting Officer of repetitive emergency orders by facilities.

d. Prior to contract effective date, the PPV shall provide the COTR or designated POC of each facility, the name, telephone number, and/or mobile number of the PPV representative responsible for providing the emergency service.

**I-20 Paperless Invoice System**

a. The PPV shall furnish a paperless invoice feature on its electronic ordering system which provides each customer a correct and complete invoice based on the PPV's confirmation printback report (which shall be based on the customer's order), along with the actual receipt of   product(s).

b. In addition to the printback confirmation information, the electronic invoice shall also reflect the actual lot numbers, expiration dates, and customer delivery zones (where applicable) of the products released under the customer order.

c. In order to be considered a proper invoice from the PPV, the electronic invoice shall also include any changes made by the PPV customer prior to actual delivery and must meet the terms and conditions set forth in the payment requirements of the solicitation.

d. Paperless invoices shall be downloadable and printable.

**I-21 Returns Goods Policy**

a. The PPV shall accept customer returns in accordance with applicable laws, regulations, and normal business practices for credit at no charge to the facility for conditions 1 through 5 below.  Returned products shall be credited to the individual ordering facility accounts within seven days of product receipt.

1. Products shipped through the PPV contract in error (i.e. incorrect item, price, or quantity);

2. Products received through the PPV contract with visible or concealed damages;

3. Products received through the PPV contract with visible soiling or with an appearance of tampering.

4. Recalled products, regardless of level of recall or date of receipt.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-21 Returns Goods Policy (continued)**

    5.  Products received through the PPV contract that have less than six months shelf life dating  at the time of receipt from the PPV, unless otherwise authorized by facilities.

b.  Once the PPV is notified by the customer of a product return as a result of any of the conditions listed in 1 through 5 above, the PPV shall arrange the return be accomplished in no later than two scheduled delivery days.

c.  The customer will be responsible for the safe keeping, proper storage and proper handling of the product until the return is picked-up.

d.  VA uses a separate contractor (i.e. GRX) for the return of products that are outside the conditions listed in items 1 through 5 above.  The PPV shall process the credits and pass them on to the PPV customers.

e.  Whenever the PPV accepts a request for return of products purchased from the PPV that are outside of the conditions listed in items 1 through 5 above (i.e. order error by the customer), the PPV shall perform such return in accordance with standard industry practice:

    1.  For returned products stocked by the PPV, the products shall be returned to the PPV at no charge to the customer.

    2.  For special order products requiring return of the product to the supplier by the PPV, the customer will pay the fee normally charged by the product supplier to its commercial customers.

**I-22 Federal Government Holidays**

Alternate delivery schedules may be required for the Government holidays listed below.  Each ordering facility is responsible for specifying alternate delivery dates in writing to the PPV no later than the end of the 120-day implementation/transition period.

| | |
|---|---|
| New Year's Day | January 1 |
| Martin Luther King's Birthday | 3rd Monday in January |
| President's Day | 3rd Monday in February |
| Memorial Day | Last Monday in May |
| Independence Day | July 4 |
| Labor Day | 1st Monday in September |
| Columbus Day | 2nd Monday in October |
| Veterans Day | November 11th |
| Thanksgiving Day | 4th Thursday in November |
| Christmas Day | December 25 |

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-22 Federal Government Holidays** (continued)

When a holiday falls on a Sunday, the following Monday will be observed as a legal holiday.  When a holiday falls on a Saturday, the preceding Friday is observed by U.S. Government agencies.

There may be a few additional American Indian or Alaska Native Holidays wherein an IHS facility may not be available to accept deliveries.  IHS facilities will notify the PPV in writing of those holidays and their specified alternate delivery dates no later than the end of the 120 day transition period.

The PPV shall notify each facility seven calendar days in advance of any delivery day changes made by the PPV due to a planned PPV inventory shut down, etc.

**I-23 Price Loading**

a. The VANAC is the only entity authorized to approve price changes to Federal Government contracts, BPAs and BOAs.  Any notice of price changes received by the PPV directly from product contractor or participating customer shall be forwarded by the PPV to the VANAC Contracting Officer for validation.  If the PPV makes any price changes as a result of notifications from other than VANAC, such changes are considered unauthorized and no price adjustments shall be allowed to the PPV.

b. *The PPV shall host a SFTP site and allow VANAC to post the price files to the site on a nightly basis, including weekends.  The file will be a tab delimited format.  There will be two types of price file transmissions, a Delta file and a Complete file.  Delta file consists of changes made to items and pricing for a given day.  Complete file contains all active prices.  VANAC will transmit the Delta and Complete files nightly.   The PPV shall electronically load across all PPV distribution centers all contract actions including price changes, product additions/deletions, contract extensions, and contract expirations by 6:00 am Eastern Time (ET) on the effective date of the change.  All changes shall be visible on the PPV ordering system by 6:00 am Eastern Time (ET). (**Modification number 35**).*

c. *Updates pertaining to miscellaneous contracts will be made available by the VA NAC to the PPV. (**Modification number 35**).*

d. The PPV shall be responsible for loading correct price information on each participating customer ordering screen as specified in Section I-5 e. of this solicitation.  The PPV ordering screen shall provide information specific to the pricing and contract eligibility of each customer, and shall be available for use by the customer for online inquiry into product pricing and quantity availability.

e. The PPV shall load all price updates authorized by the VA NAC, (e.g. quantity discounts, BPA discounts, incentive agreements) for individual ordering sites, or agencies, and updates shall be available on the customer's PPV screen within 24 hours.

f. Public Law 102-585 prohibits pharmaceutical contractors from charging specified Federal entities prices higher than the calculated Federal Ceiling Price (FCP) for certain covered pharmaceutical products.  Occasionally, pricing for FSS contract items (covered drugs only) may require a retroactive effective date as required by this legislation.

46

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-23  Price Loading** (continued)

g.  In accordance with Public Law 102-585, Veterans Health Care Act of 1992, FSS contractors that manufacture "covered drugs", as defined by the Public Law, must recalculate their pricing on an annual basis.  FSS Contractors are then given the opportunity to update their contract pricing to reflect the approved calculation changes.  Pursuant to the Public Law, these changes must go into effect by January 1st of the following calendar year.  The VA estimates 12,000 covered drug changes to be made, the majority of which will have price changes during the period of December through January.  Due to the large number of pricing changes that must be completed before the end of the calendar year, the update schedule shown above will not apply when forwarding these price changes to the PPV.  The NAC Contracting Office will work with the PPV to establish a time frame of forwarding such Public Law price changes electronically to the PPV.

h.  The PPV shall separate pharmaceutical products with dual pricing structure into:

    1.  One price available to all VA customers and other customers designated by the product supplier.

    2.  One price for OGAs.

i.  The PPV shall load two individual up-front prices for certain line items and be responsible for ensuring the appropriate customers receive the appropriate pricing.  Public Law pricing is granted to the "Big 4" customers, however, a FSS contractor can extend this pricing to all Government customers.

j.  The PPV shall imbed its awarded distribution fee in the VANAC furnished product prices.  Since the Government anticipates a better distribution fee from the PPV for customers paying under the Fast Pay program, OGA customers may determine to switch over to the Fast Pay program.  In this case, the VANAC will notify the PPV via a modification, whenever a participating OGA customer determines to switch over to the FAST PAY method of payment.  Such notification shall require the PPV to apply the awarded FAST PAY distribution fee to the customer's account.  Likewise, if a Fast Pay OGA customer determines not to continue in the Fast Pay program, the NAC will notify the PPV by modification to apply the NET 30 day fee to the OGA customer.

k.  Failure by the PPV to timely and correctly load VA price reductions in accordance with the requirements outlined in this Section (I-23) will require the PPV to reimburse the Government the difference between the price paid by the PPV customer and the correct price for each order placed for the affected product from the date the price reduction should have occurred until the date the PPV charged the customer the correct price.  This amount shall bear simple interest from the date the PPV customer originally made payment until repaid by the PPV.  The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount was overcharged and then at the rate applicable for each six-month period as fixed by the Secretary until amount is paid by the PPV.  In addition, the

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-23  Price Loading (continued)**

Contracting Officer may negotiate additional consideration for excessive errors in billing or excessive delays in corrections or excessive delays in repayment of the overcharges and interest due.  Excessive errors in billing may be considered by the Government as grounds for Termination for Cause (See Clause 52.212-4 Contract Terms and Conditions – Commercial Items).

l.   The Government may conduct periodic audits of PPV Government customer accounts.  The failure by PPV to resolve the pricing discrepancies uncovered by an audit will cause the matter to be pursued under the Disputes Act of this contract.  For pricing reviews/audits conducted by the VA Pharmacy Benefit Management, the PPV shall be:

1.  Notified in writing by the NAC PPV Contracting Officer of the findings of the PBM audit,

2.  Required within 60 days to provide to the PBM through the NAC PPV Contracting Officer a written response and determination regarding the audits findings and

3. Within 90 days of the PPV's initial acknowledgement of the findings of the PBM audit and the PPV's response to the NAC PPV Contracting Officer, the PPV shall be responsible to issue credits to the customers affected by the price discrepancies.

m.  Veterans Affairs, Office of Inspector General (OIG) may conduct periodic audits of PPV Government customer accounts.  Audits may also include review of performance compliance to the terms of the PPV contract. (Added by Amendment 6)

**I-24 Price Administration**

a.  The PPV shall comply with Section I-23, Price Loading when entering the contract prices (new    or revised) into the PPV ordering system.  The contract price shall remain in effect until

1.  The contract expires, or
2.  The VA NAC Contracting Officer notifies the PPV of a price change or the deletion of the item.

b.  Contract price(s) applicable to any miscellaneous other government contracts provided to the PPV shall remain in effect until:

1.  The Government contract expires, or
2.  Informed by VA NAC of prices changes, deletions, or contract termination.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## I-25  Product Additions

a.  The PPV shall load and make available all NAC authorized product additions in accordance with the terms and conditions of this solicitation and its resultant contract(s).  Product addition usage requirements shall be provided to the PPV by the customers within 90 days of the effective date of the product addition.  In instances where the PPV shows no purchasing activity for a new product addition within the initial six month period, the PPV shall notify the NAC Contracting Officer of the null activity and the PPV may request a re-evaluation of the addition of the product to the program.

b.  For product additions due to a change in the manufacturer's NDC number, or due to the deletion and replacement of a product by the manufacturer, or in situations where the PPV is notified by the VA NAC that the Government has determined a need to switch its procurement selections to the only available contract-priced product; the PPV shall assign the usage history of the original product to the current product addition.

c.  PPV shall honor participating customer's requests for addition of covered or branded drug's usage into generic drug usage history. The PPV shall inform the customer when the addition process has been completed.

## I-26 Rebills, Reclaims or Adbills

a.  Rebills, Reclaims or Adbills are procedures used to correct a previous invoice.

b.  The PPV shall make price changes only in accordance with paragraph I-23 Price Loading, and I-24 Price Administration.  Invoices and payments shall be reviewed for accuracy by both the ordering facility and the PPV within three months of notification by product manufacturers of charge-back denial.  The PPV shall not issue rebills, reclaims, or adbills after this date, unless approved by the NAC Contracting Officer.  All rebills, reclaims, and adbills, shall be clearly identified as such, and shall reference the original Purchase Order or Delivery/Task Order number (as assigned by the Parent facility in instances when the order was requested by a Satellite facility), the original PPV invoice number, original order date, an itemized listing (by NDC/UPC if available) of the product(s) affected, any credit memo associated with the rebill, reclaim or adbill, involved, the reason(s) for the rebill, reclaim or adbill and the effective date of the price change.

c.  Rebills, reclaims, or adbills issued by the PPV shall reflect the original NDC/UPC price charged, corrected price, quantity ordered, and net difference due, after any original credited amount has been   applied and shall reference the original P.O.

d.  Rebills, reclaims, or adbills issued by the PPV shall be available online to receiving customers (except IHS and tribal customers serviced by the NSSC), with the option to print a hard copy.

e.  Rebills, reclaims, or adbills issued by the PPV for the IHS and tribal customers serviced by the NSSC shall be available only to the NSSC, Oklahoma City, Oklahoma.

## PHARMACEUTICAL PRIME VENDOR CONTRACT
## VA797P-12-D-0001

**I-27 Credit Accounts:**

a.  The PPV shall create credit accounts for each Government account participating under the PPV contract.

b.  Credit Accounts created by the PPV shall contain credits for product returns, shorts, discounts from product contractor, debits, volume discounts, tiered discounts, rebates, FSS BPA discounts, allowances in lieu of returns, reverse distribution, etc.  Each credit issued shall be clearly identified as such, and shall reflect the original purchase order, (as assigned by the Parent facility in the instances when the order was requested by a Satellite facility), the original PPV invoice number, original order date an itemized listing of the product(s) affected, any rebill associated with the credit, and the reason(s) for the credit (i.e. product contractor credit, merchandise return, BPA program name, etc.).

c.  The PPV shall issue credits timely and all credits issued shall reflect the net credit amount available to the customer.

d.  The PPV shall credit all credits due to a customers' credit account on a daily basis, and shall notify customers of credit balances on a monthly basis.

e.  An order by a customer using the available credit amounts in its credit accounts shall be of sufficient value to expend the account's total value against its order.  The customer will communicate its order in such a manner as to ensure an efficient processing of the credit purchase.  This transaction is a business matter between the PPV and the customer.

f.  The PPV shall take all necessary steps to ensure that credits that become available close to the end of the Governments Fiscal Year (September 30th), are available for use in the customer credit accounts no later than five days prior to the end of the fiscal year.

g.  All credits issued shall be available online to each customer (except IHS and tribal customers serviced by the NSSC), with the option to print a hard copy.

h.  All credits issued for the IHS and tribal customers serviced by the NSSC in Oklahoma City, Oklahoma, shall be available only to the NSSC.  For all IHS and Tribal sites serviced by the NSSC, the individual facility's credit accounts shall be set up with the NSSC as the parent facility.  All documentation regarding credits and debits for the sites serviced by the NSSC, shall meet the requirements cited herein and shall be released only to the NSSC.

i.  The PPV is cautioned that credit purchases shall not result in the transmission of an EDI 810 transaction, except for those amounts of any order that are not sufficiently covered by the credit amount.

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

j.  **APPLIES TO CMOP ONLY**

1.  The PPV shall establish a Purchase Order number for credits in the following format: Station Number, followed by a dash, followed by "CR", followed by the month/year (mm/yr) the credit is issued.  For example, a credit processed for August 2012 for station 600 would be: 600-CR0812.

2.  The PPV shall establish a Purchase Order number for Rebills similar to the credit process previously described herein, except that rebills will be identified in the PPV system as "RB".  For example, if Station 600 had a rebill in August of 2012, the Purchase Order number would be 600-RB0812.

3.  The PPV shall deliver hard copies of the credit and rebill statements to the CMOPs with the next delivery.

4.  The PPV shall provide the original invoice number on the credit and rebill documents for facility use as needed.  The PPV shall provide electronic system capability that allows CMOP facilities to search by invoice number for easier identification of the original purchase order.

    There may be instances due to Public Law price changes or other price administration adjustments where the Government may require the PPV to submit such identified specific credits under a specific government established delivery order.

**I-28 Reports**

a.  The following reports shall be available online, in real time, printable and downloadable as an export delimited file and Excel compatible format to the agencies identified.

1.  Customers shall be able to print multiple pages simultaneously and to scroll through multiple pages.

2.  Customers shall be able to access online global data and be able to create/customize data into consolidated reports.

b.  Report formats are provided as a guide, but the fields cited herein shall be shown.  The order of the field placements on the individual reports is at the discretion of the PPV.  The VA NAC and PBM are the only organizations authorized access to all Agency reports.  The PPV shall provide the Director of the NSSC a duplicate of all reporting data that is provided to each IHS and Tribal facility throughout IHS.  The Director of the NSSC is responsible for compiling all IHS and Tribal data and for providing the necessary reporting information to IHS headquarters.

c.. The PPV shall provide its standard report package through a Management Information System (MIS) module that is interfaced with the Automated Ordering System, (Transaction Processing System (TPS)) used for placing electronic orders.  This MIS module shall be available to the

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

c. Director of Pharmacy Service, or designated Point of Contact (POC).  The reports shall be available at the ordering facility level.  Failure by the PPV to provide the reports timely may adversely affect the PPV's performance rating.  For reporting purposes, the PPV shall include in its automated order system a standard field to denote "business size" for product contractors who hold Government contracts (i.e., FSS contract and/or National contract, etc.).  This field is not required to appear on the ordering screen of the automated order system.  However, the field may be required in reports requested by the Government offices listed below.  The Contracting Officer will furnish the PPV the business size status information for all contractors whose products will be distributed through the PV program.

d. Reports shall be able to be generated for purchases made over the past 60 months.      The PPV shall provide all archived purchase data upon request by the NAC and other Program Offices within 30 days of request.

| | I-28 (B)  Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices | I-28 (C) Reports for Supply Offices and Pharmacy Directors located at each ordering site | I-28 (D) IHS Specific Report Requirements for  Indian Health Service, National Supply Service Center, (NSSC) Oklahoma City, OK |
|---|---|---|---|
| 1. Velocity I | Vendor Contract Supply Problem | Velocity I | Non-Formulary Drug |
| 2. Velocity II | National Contract Compliance | Velocity II | Narcotic Drug Report |
| 3. Usage | Sales Report | Usage | Report 45 –Drug Distributed by Facility Report |
| 4. Contract Compliance | Fill Rate Report (Global) | Narcotic Drug Report | Product Allocations |
| 5. Narcotic Drug Report | Agency  Summary Report | Vendor Contract Supply Problem | |
| 6. Fill Rate | Grand Summary | Contractors' Sales Summary | |
| 7. Product Allocations | Contractor Sales Summary Report | Contract Compliance Report | |
| 8. | Product Allocations | | |
| 9. | Product Diversion Alert | | |
| 10. | CMOP Out of Stock/MBO Report | | |

The standard report packages shall include the following:

In addition to NDC#s, the PPV shall use Universal Product Numbers (UPN's) and Unit Product Codes (UPC's) as unique item number identifiers when they are available by manufacturers.

52

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

Only VA NAC and PBM shall have global read only access to ALL reports for ALL participating facilities covered by the PPV contract(s).  IHS NSSC, Oklahoma City, Oklahoma shall have access to all IHS & Tribal facility customers.

**I-28  (A) Reports for Ordering Facilities**

**Velocity Report I – Items listed in descending order by dollars spent**
**Velocity Report II --Items listed alphabetically by generic description**

**Fields required for both reports:**

| | |
|---|---|
| a.  NDC | h. Cost of  product |
| b.  UPN | i.  Contract type- identification or code that identifies product as FSS, National, BPA, Misc. contract or **WBPG** designation. |
| c.  UPC | j.   FSS, National, BPA or Misc. Contract number. |
| d.  Generic Description | k.  Dollars spent on product for specified reporting period. |
| e.  Dosage form | l.   Total products purchased for specified reporting period. |
| f.  Strength | m.  Historical movement of product from Contract Start up Effective date to end of specified reporting period. |
| g.  Package size/product/item unit | n.   Average product movement during specified reporting period. |

**a.   Usage Report- Items listed alphabetically by generic description**

**Fields required:**

| | |
|---|---|
| a.  Generic Description | h.  Total products purchased |
| b.  Dosage form | i.   Total dollars of products purchased |
| c.  Strength | j.   Purchase for specified reporting period in units. |
| d.  Package size/order unit | k.  Purchase for specified reporting period in dollars. |
| e.  National Drug Code | l.   Manufacturer |
| f.  Universal Product Number | m.  Summary of Total at end of reports:<br>1.  Cost/order unit<br>2.  FSS, National, BPA or Misc. Contract Number or **WBPG** designation . |
| g.  Unit Product Code | |

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-28 Reports** (continued)

**I-28 (A) Reports for Ordering Facilities** (continued)

   **b. Contract Compliance Report, Items listed by generic class and alphabetically by generic description with generic class**

**Fields required:**

| | |
|---|---|
| a. Generic Description | g. Quantity purchased during specified timeframe. |
| b. Dosage form | h. Dollars purchased during specified timeframe. |
| c. Strength | i. Cost/order unit |
| d. Package size/order unit | j. Cost/each dispensed unit |
| e. FSS, National , BPA, Misc. Govt. contract number or **WBPG** | k. Contract type – identification or code that identifies item as FSS, National, BPA , **WBPG** or Misc. Govt. contract item |
| f. Manufacturer | |

   **c. Narcotic Report, Listing of Schedule II and Schedule III narcotic controlled substances sorted alphabetically by generic description**

**Fields required:**

| | |
|---|---|
| a. Generic Description | h. Product Code |
| b. Dosage form | i. Control Schedule |
| c. Strength | j. Quantity shipped |
| d. Package size/order unit | k. Invoice Number |
| e. Cost/order unit | l. Date shipped |
| f. National Drug Code | m. Manufacturer |
| g. Universal Product Number | |

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

**I-28 (A) Reports for Ordering Facilities** (continued)

### d.  Fill Rate Report, Daily

1.  The PPV, within 24 hours after the end of the ordering period (defined as 6:00pm customer local time) shall report daily fill-rate activity that transpired at the ordering facility account level.  The fill rate information for all days to date in a given specified timeframe shall be accessible within this report.  The following are the minimum fields required:

**Fields required:**

| | |
|---|---|
| a.  FSS, NATIONAL, BPA, MISC. contractor  Name | f.  Total Product Ordered |
| b.  Identification of specified reporting period. | g.  Total products Filled |
| c.  Facility Name | h.  PPV Shorts |
| d.  Facility Account Number | i.   Shorts due to MBO's |
| e.  Report  Date (MM/DD or Month-Day format acceptable) | j.   Daily Fill Rate  Percentage |

### e.  Product Allocation Report:

The PPV shall make available product allocation status on its ordering screen at the time customers perform product inquiries or when creating the release of orders.  The confirmation print back, must also show that a product is unavailable due to an allocation status.

**Fields required:**

| | |
|---|---|
| a.  NDC | h.  Package size/product/item unit |
| b.  PPV product number | i.   Contract type-  identification or code that identifies product as FSS, National, BPA, **WBPG** or Misc. contract designation |
| c.  UPN (where available) | j.   FSS, National, BPA or Misc. Contract number. |
| d.  UPC (where available) | k.  Allocation Start Date |
| e.  Product  Description | l.   Anticipated Allocation End Date |
| f.  Dosage form | m.  Customers  Allocation Level |
| g.  Strength | n.  Allocation Assigned by: (VA, PPV, MFG) |

55

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** **(continued)**

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices**

The PPV shall make available to the following Government program management office global read-only access to all ordering facility account records whether created by automated order system or manual order system..  These program offices shall have access only to their respective facilities' records except for the Director of the NSSC, which shall have access to all IHS and Tribal data.

**Department of Veterans Affairs**

    a.  Contract Specialist, PPV Team, Pharmaceutical Products Division (049A1N2PV), VA National Acquisition Center, P.O. Box 76, Hines, IL  60141 (all ordering sites)

    b.  Director, Pharmacy Benefits Management (119), Veterans Health Administration, Hines, IL 60141 (all ordering sites)

**Department Of Health and Human Services**

    a.  Director, NSSC, 501 N.E. 122nd St, Suite F, Oklahoma City Oklahoma 73114 (IHS and Tribal facilities Nationwide) (NSSC located in Heartland Region)

    b.  Area Pharmacy Consultant, Billings Area Indian Health Service, 2900 4th Avenue North, Billings, MT 59103 (IHS and Tribal facilities in Billings IHS Area located within Northwest Region)

    c.  Area Pharmacy Consultant, Albuquerque Area Indian Health Service – Acoma Indian Hospital, Interstate 40, exit 102, San Fidel, NM 87049 (IHS and Tribal facilities in Albuquerque IHS Area located within Southwest Region)

    d.  Area Pharmacy Consultant, Portland Area Indian Health Service, 1220 SW Third Avenue,Room 1414 NW Northrup Street, Suite 800, Portland, OR 97209 (IHS and Tribal facilities in Portland HIS Area located within Northwest Region)

    e.  Area Pharmacy Consultant, Aberdeen Area Indian Health Service, 115 4th Avenue SE, Aberdeen, SD 57401 (IHS and Tribal facilities in Aberdeen Area IHS located within Upper Midwest region)

    f.  Area Pharmacy Consultant, Bemidji Area Indian Health Service –White Earth Health Center, 40520 Co Hwy 34, Ogema, MN 56569 (IHS and Tribal facilities in Bemidji IHS Area located within upper Midwest Region)

    g.  Area Pharmacy Consultant, Phoenix Area Indian Health Service, Two Renaissance Square, 40 North Central Avenue, Suite 606, Phoenix, AZ 85004 (IHS and Tribal facilities in Phoenix Area located within Southwest Region)

    h.  Gallup Supply Management Officer, Navajo Area Indian Health Service - Gallup Regional Supply Service Center, P.O. Box 3090, Gallup, NM 87305 (IHS and Tribal sites in Southwest Region)

    i.  Chief Contracting Officer, Alaska Area Indian Health Service, 4141 Ambassador Drive, Suite 300, Anchorage, AK 99508 (IHS and Tribal sites in Alaska Region)

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

**Federal Bureau of Prisons (BOP)**

    a.  Chief of Pharmacy, Health Services Division, Federal Bureau of Prisons, 320 1st Street, NW, Washington, DC 20534 (all participating BOP sites)
    b.  BOP Regional Chief Pharmacists
    c.  Chief of Clinical Pharmacy Programs
    d.  Chief, Central Processing Pharmacy Services and Central Processing Staff Pharmacists
    e.  Chief, Pharmacy Logistics Support
    f.  Bureau's Electronic Medical Record (BEMR) Pharmacist
    g.  HIV/Hepatitis Pharmacist Program Manager

**Immigration Health Service Corps (IHSC)**

    a.  Chief of Pharmacy/Pharmacy Consultant, Department of Homeland Security, Immigration & Customs Enforcement, Enforcement Removal Operations, ICE Health Service Corps, 500 12th St., SW, 2nd Floor, Washington, DC  20536 (All participating IHSC sites)

    b.  IHSC Regional Consultant Pharmacists

    c.  IHSC Headquarters/regional office positions as delegated/designated by IHSC chief Pharmacist/Pharmacy Consultant.

## PHARMACEUTICAL PRIME VENDOR CONTRACT
## VA797P-12-D-0001

1.  **Vendor Contract Supply Problem Report-**

The PPV shall provide a weekly report identifying any problems encountered with supplies as it affects its performance under the PPV contract.  The report shall specifically address manufacturer backorder situations, price discrepancies, chargebacks, and shipping or delivery problems.  The report shall contain, at a minimum, the following:

| Code | Character Length | Description | Example |
|------|------------------|-------------|---------|
| Date | 17  N | Calendar Quarter | 04/01/04-04/07/04 mm/dd/yy  - mm/dd/yy |
| Cntname | 25  Alpha | FSS/National /BPA, **WBPG**, Misc. Contractor. | XYZ Laboratories |
| Cntno | 11-15 Alpha Numeric | FSS/National/BPA Contract Number assigned by VA NAC | V797P-1234N |
| Mfr. Chgback # | 11 (Alpha Numeric) | Manufacturer's Contract/Chargeback Number | 123XYZ987A |
| NDC | 11 | National Drug Code | 00008154505 |
| UPC | 11 | Unit Product Code | 23569589752 |
| UPN | 8-20 Alpha Numeric variable or 14 numeric fixed | Universal Product Number | +A123BJC5D6E71G or 00391234678906 |
| Generic | 64 | Generic Description | Amoxapine, 100 MG, Tab, 100s |
| Status | 60 | Brief description of issues/problems | Mfg. B/O; product release in 30 days |

The status shall clearly state the reason(s) for any stock outage or backorder, and shall indicate the length of time for replenishment by the product supplier.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

   2.  **National Contract Compliance Report, Monthly**

   The PPV shall provide a report identifying facilities that have requested an alternate source product, deviating from the national mandatory contract pursuant to one of the exceptions stated in section I-12 (Lockout Procedures).  The VA NAC Contracting Officer shall furnish the PPV a listing of agencies and agency sites that shall be given access to purchase items awarded on national contracts within 30 days after date of award of a National contract.  The report shall contain at a minimum, the following elements:

| Code | Character Length | Description | Example |
|------|------------------|-------------|---------|
| Date | 17 | Calendar Quarter | 03/01/04-03/31/04 |
| Generic | 64 | Generic Description | Cimetidine |
| NDC | 11 | National Drug Code | 00089458201 |
| UPC | 11 | Unit Product Code | 23569589752 |
| UPN | 8-20 Alpha Numeric variable or 14 numeric fixed | Universal Product Number | +A123BJC5D6E71G or 00391234678906 |
| Size | 3-8  Alpha Numeric variable | Product package size | 1ml |
| Purchase | 6 Numeric (0 decimal) | Total Units Purchased | 5 |
| Cost | 8 Numeric (0 decimal) | Unit Contract Price | 150.58 |
| Total | 11 Numeric (0 decimal) | Total Charge for that line item (excluding distribution fee) | 752.90 |
| Cntname | 25 | FSS/National Contractor | XYZ Laboratories |
| Cntno | 11 – 17 Alpha Numeric | FSS/National Contractor Number assigned by VA NAC | V797P03-NC-1234 |
| Facility | 20 | Name of Facility | VA Hines, IL |
| STN | 5 –7 (2-3 Alpha, 3-4 Numeric) | Medical Center Number or facility number | 765, 520AY or FP1234 |
| Status | 60 | Reason Cited for Deviation | Patient experience negative reaction |

"Station Number (STN)" is a number used to identify each ordering site.  The station number coupled with an Agency code (e.g. VA, BOP, IHS, SVH, IHSC) continues to be the unique identification number for each ordering site (e.g. "FP1234", "534VA.  Any sites added to the contract after award shall include the facility's station number.

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

3.  **Sales Report, Monthly**

a.. Within 15 calendar days following the end of each month, the PPV shall provide electronically a monthly report of sales for each facility (identified by assigned station number).  The report shall show an itemized line item product cost.  Unit cost can be listed by ascending or descending order or by chronological invoice date.  The data is required for each facility covered under the contract.

b.  The PPV shall provide an online aggregate sales report, which identifies purchases made by each Agency, and grouped by FSS, National, BPA, BOA, and Miscellaneous contracts shall accompany the itemized sales data.  The report shall contain at a minimum, the following fields:

| Description | Field Length | Expanded Description | Example |
|---|---|---|---|
| Date | 17 | Calendar quarter covered by Report | 04/01/04 – 04/30/04 |
| STN | 7 Alpha Numeric | Facility Number | 695, 520AY or FP1234 |
| NDC | 11 | National Drug Code | 00007463902 |
| UPC | 11 Char. | Unit Product Code | 25698745689 |
| UPN | 8 – 20 Variable Alpha Numeric or  14 Fixed Width Numeric | Universal Product Number | +A123BJC5D6E71G or 00391234678906 |
| Gendesc | 64 | Generic Description | Ampicillin |
| Str | 10 | Product Strength | 500mg |
| Form | 11 Alpha | Dosage Form | CAP |
| Pkg | 10 Alpha | Package Size | 1000 |
| Unit Cost | 10 Numeric  (2 decimal) | Unit Contract Cost (including dist. Fee) | 314.50 |
| #Units | 6 Numeric (0 decimals) | Total Units Purchased | 5 |
| TtlCost | 12 numeric (2 decimal) | Total Charge for that line item (including dist. fee) | 1572.50 |

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

    **3.   Sales Report, Monthly (continued)**

| Description | Field Length | Expanded Description | Example |
|---|---|---|---|
| CntNo | 10-15<br>Alpha Numeric | FSS/National, BPA, Misc Govt. Contract Designation | V797P-1234k<br>e.g. 578-P2000 |
| CntID | 14 Alpha | FSS, National, miscellaneous other Govt contract or **WBPG** Designation | F=FSS; N=National;<br>M-Miscellaneous Govt Ctr.<br>**WBPG**= WAC Based Priced generics |
| Mfr. Chgback # | 11 Alpha Numeric | Manufacturer's Contract/ Chargeback Number | 123XYZ987A |
| Vendname | 25 Characters | Name of Vendor/Contractor | XYZ Labs |
| PVCnt | 11<br>Alphanumeric | Contract number assigned to Prime Vendor by VA NAC | V797P-9876k |
| PV Name | 25 | Name of Prime Vendor | XYZ Distr. Co. |
| Class | 5 | VA Classification Number | AMO52 |
| Invoice Number | 10  Alpha Numeric | Invoice number | 15649yy |
| Invoice Date | 8 | Invoice date | MM/DD/YY |
| Sale date | 8 | Date of line item sale.  If this is a summary of multiple sales during the month, you may use the last day of the month as an indicator format should be MM-DD-YY | MM/DD/YY |
| Distribution Center Number | 7 Alpha Numeric | Identification of PPV distribution center | 123NYS9 |
| Distribution Fee | 4 Numeric (2 decimal) | Fee charged for distribution (exclusive of any other fees) | 1.25 |
| DEA | 9 (2 Alpha then 7 Numeric) | Drug Enforcement Agency #<br>(Global) of the ordering facility | AB3361879 |

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

**3. Sales Report, Monthly (continued)**

| Description | Field Length | Expanded Description | Example |
|---|---|---|---|
| Item Number | 0-10 Alpha Numeric | PPV Item number | 15649yy |
| Customer Number | 0-10 Alpha Numeric | PPV Customer Number | 123456 |
| Customer PO | 22 Alpha Numeric | PPV Customer Purchase Order Number | 12345678jhfjkshfj |
| Invoice Reference Number | 10 Alpha Numeric | Invoice number that a credit refers back to | 15649yy |
| Transcode | C-1 | Transaction Code<br><br>1=Contract C/R Credit<br>2=Misc Credit<br><br>3=Salable Return<br><br>4=unsalable Credit<br><br>5=Other Billing Correction<br><br>6=Contract C/R Rebill<br><br>7=Regular Invoice | Contract Credit/rebill<br><br>Credit/Rebill  Credit Customer Handling Charges<br>Salable Return<br><br>Unsalable Return<br><br>Other Billing Correction<br><br>Contract Credit/rebill<br><br>Regular Invoice |
| Transdescp | 30 Alpha | Transaction Description | See above |

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

**4. Fill Rate Report (Global), Monthly**

The version of the fill rate report shown in I-28(A), above, shall be a compilation of all Agency ordering sites' information.  Therefore, the recipients listed above in the introductory section of I-28 (B) shall only receive fill rate information for their respective agency or all agencies, in the case of the VANAC Contracting Officer and VA Pharmacy Benefits Management and all IHS agencies and Tribal facilities for the NSSC Director.  The fill rate shall be calculated daily and reflected in this report.  Within 30 calendar days following the end of each month, the information shall be provided in ASCII fixed-width format.  The data is be required for each facility covered under the contract.

**5. Agency Summary Report, Agency,(i.e., VA, BOP, IHS, etc.)**

**Fields required:**

1. Sales to Agency, year-to-date (e.g. Govt. Fiscal Year 10/1/011 – 9/30/012)
2. Sales to Agency during specified reporting period
3. Sales by station number during reporting period
4. Number of facilities serviced during reporting period

**6. Grand Summary Report, – Report to VANAC Only**

**Fields required:**

1. Grand total report – sales to all agencies during specified reporting period
2. Total sales to each Agency (e.g. VA, BOP, IHS, etc.) during reporting period
3. Number of all facilities serviced during reporting period
4. Number of all facilities, by Agency, serviced during reporting period

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

7. **Contractor's Sales Summary Report – Report to NAC Only**

   **Fields required**

| | |
|---|---|
| a.  FSS, National, BPA, BOA, Miscellaneous government contractor's name. | e.  Summary for each FSS, National or Miscellaneous other government Contractor. |
| b.  Contract number | f.  Total dollars purchased, all items under each contract. |
| c.  Total dollars purchased from this contractor under the given contract during previous quarter | g.  Total dollars purchase |
| d.  Summary by Contract Type | h.  Grand total of all purchases made from FSS, National or Miscellaneous other Govt. Contractor |

8. **Product Allocation Report:**

   The PPV shall make available product allocation status on its ordering screen at the time customers perform product inquiries or when creating the release of orders.  The confirmation printback, must also show that a product is unavailable due to an allocation status.

   **Fields required**

| | |
|---|---|
| a.  NDC | h.  Package size/product |
| b.  PPV product number | i.  Contract type-  identification or code that identifies product as FSS, National, BPA, Misc. contract designation |
| c.  UPN (where available) | j.  FSS, National, BPA or Misc. Contract number. |
| d.  UPC (where available) | k.  Allocation Start Date |
| e.  Product  Description | l.   Anticipated Allocation End Date |
| f.  Dosage form | m.  Allocation Level |
| g.  Strength | n.   Allocation Assigned by: (VA, PPV, MFG) |

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer) and Program Management Offices** (continued)

**9.  Product Diversion Alert- Report to NAC ONLY**

1    The reported information is required as a tool for the PPV and the VANAC Contracting Office, along with product suppliers to ensure that pharmaceutical products ordered under Federal Supply Schedule (FSS) contracts are intended solely for the use of authorized ordering activities in carrying out their Federal missions; they are not intended for resale or barter.

2.   The report shall only be used as an alert to the VANAC Contracting Office, when the PPV has determined that a participating facility has exceeded its normal purchasing thresholds by a significant amount such as the tripling of usual ordered quantities by an activity, coupled with its failure to demonstrate a corresponding increase in its institutional size or patient base (see Clause AS3023, included herein), which in some cases may be a sign of possible product diversion.

3.   The PPV is informed that the information in this alert may be shared with the entity responsible for the possible product diversion.

4.   The submission of an alert for possible product diversion does not render the PPV responsible or liable for the suspected possible product diversion..

**Fields required**

| | |
|---|---|
| a.  NDC | i.  Contract type-  identification or code that identifies product as FSS, National, BPA, **WBPG**, Misc. contract designation |
| b.  PPV product number | j.  FSS, National, BPA or Misc. Contract number. |
| c.  UPN (where available) | k.  Customer identification (Station #, PPV acct # etc) |
| d.  UPC (where available) | l.   Start Date of suspected diversion |
| e.  Product  Description | m. Increased % level of product purchase |
| f.  Dosage form | n.  Procurement History (quantity, purchase order numbers, invoices, etc) |
| g.  Strength | o.  Status of action taken by PPV |
| h.  Product size | |

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** (continued)

**I-28 (B) Reports for VA National Acquisition Center (Contracting Officer)** and Program
**Management Offices** (continued)

**10  CMOP Out of Stock Report – Report to NAC Only**

The PPV shall provide a weekly report every Monday identifying the top 25 items that were
out of stock for all the CMOP facilities from the previous week.  The report shall be sorted by
the quantity of the out of stock item.  The report shall contain, at a minimum, the following:

| Code | Character Length | Description | Example |
|------|------------------|-------------|---------|
| Item Number | 10 | PPV Item Number | 123456789 |
| Generic Description | 64 | Generic Description | Lisinopril 10mg Tab |
| NDC | 11 | National Drug Code | 00000112233 |
| Vendor Name | 24 | Product Supplier Name | XYZ Company |
| Out Of Stock & M.B.O. Quantity | 10 | Number of bottles, tubes, boxes, etc., unavailable due to an out of stock and/or MBO status | 80,800 |

**I-28 (C) Online Reports for Pharmacy Directors and Acquisition Offices at
the Ordering sites:**

a.  The PPV shall provide the following online reports to VA's facilities attention: Logistics
Managers and VA's Director of Pharmacy Svc; and for other government agencies, direct
the report to the attention of Chief, Pharmacy Svc. and to Chief Acquisition and Material
Management.  The reports shall be available online, real time with the capability of being
printed or downloaded.

1.  Velocity I – As described in I-28 (A)
2.  Velocity II – As described in I-28 (A)
3.  Usage Report – As described in I-28 (A)
4.  Narcotic Report – As described in I-28 (A)
5.  Vendor Contract Supply Problem Report, Weekly, FSS or National contractor to be
Listed alphabetically 1-28 (B)
6.  Contractors' Sales Summary- As described in I-28 (B)
7.  Contract Compliance Report – As described in I-28 (A)

b.  The respective contract number shall identify any item under contract: FSS, National, BPA,
BOA or miscellaneous other government contract (e.g., VANAC numbering format starts
with identifier "V797P" and is followed by a five-character Alpha Numeric serial number:
example "V797P-1234k".

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports (continued)**

**I-28 (D) IHS NSSC Specific Report Requirements:**

a. The following reports are in addition to the reports listed in sections I-28(A) – (C).  The reports shall be available online in real time for download within 15 calendar days following the end of each month.

b. Reports shall be provided to the Director of the NSSC.

c. The NSSC shall have access to PPV/IHS purchase history information and reports for all IHS facilities nation-wide.  This information will be used by IHS to determine participation in the VA National Contracts, BPA's and other government contracts.

**Report 45 –Drugs Distributed by Facility** (or similar report that will provide the following information:

**Fields Required**:

| | |
|---|---|
| a.  Product purchased including generic and item description | f.   Total dollars of all products purchased |
| b.  Contract Type designation (FSS, National Contract, BPA, **WBPG**, etc.) | g.  Grand total by usage of all purchases. |
| c.  IHS/ Tribal facility information including account number, facility name, city and state. | h   Date of purchase(s). |
| d.  Product information including NDC, item number, strength, dosage, and count size | i.   Grand total (by usage) of all purchases made during specified reporting period. |
| e.  Total quantity of each product purchased | |

**This report shall reflect revolving history from the effective date of the contract.**

a.  Reports are to be distributed for the "Department of Health and Human Services – Indian Health Service (IHS)" to the following:

1.  Director, NSSC, and the C.O.T.R., 501 N.E. 122nd St, Suite F, Oklahoma City, Oklahoma 73114  (IHS and Tribal facilities Nationwide)
2.  Area Pharmacy Officer, Billings Area Indian Health Service, 2900 4th Avenue North, Billings, MT 59103 (IHS sites in Northwest Region)
3.  Chief Pharmacy Officer, Santa Fe Indian Hospital, 1700 Cerrillos Road, Santa Fe, NM 88340 (IHS sites in Southwest Region)
4.  Area Pharmacy Officer, Portland Office,1220 SW Third Avenue, Room 1414 NW Northrup Street, Suite 800, Portland, OR 97209 (IHS and Tribal sites in Northwest region)

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**I-28 Reports** **(continued)**

**I-28 (D) IHS NSSC Specific Report Requirements:** **(continued)**

5. Area Pharmacy Officer, Aberdeen Area Indian Health Service, 115 –4th Avenue, Federal Building Aberdeen, SD 57401 (IHS site in Upper Midwest region)
6. Chief Pharmacy Officer, IHS Indian Hospital, Red Lake, MN 56671 (IHS sites in upper Midwest Region)
7. Area Pharmacy Officer, Phoenix Area IHS, Two Renaissance Square, 40 North Central Avenue, Phoenix, AZ 85004 (IHS and Tribal sites in Southwest & Northwest Regions)
8. Gallup Supply Management Officer, Gallup Supply Service Center, P.O. Box 3090, Gallup, NM 87305 (IHS sites in Southwest region)
9. Chief Contracting Officer, Alaska Area Indian Health Service, 250 Gambell Street, Anchorage, AK 99501 (IHS and Tribal sites Alaska Region)

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DISTRIBUTION FEE:**

**LINE ITEM 1-13 (REGIONS)**

| PHARMACEUTICAL PRODUCTS | FAST PAY DISTRIBUTION FEE |
|---|---|
| BASE PERIOD | -8.65% |
| OPTION PERIOD 1 | -9.15% |
| OPTION PERIOD 2 | -9.65% |
| OPTION PERIOD 3 | -10,05% |

| PHARMACEUTICAL PRODUCTS | NET 30 DAYS DISTRIBUTION FEE |
|---|---|
| BASE PERIOD | -8.15% |
| OPTION PERIOD 1 | -8.65% |
| OPTION PERIOD 2 | -9.15% |
| OPTION PERIOD 3 | -9.55% |

| MEDICAL/SURGICAL PRODUCTS (Fast Pay &Net 30) | DISTRIBUTION FEE |
|---|---|
| BASE PERIOD | -8.65% |
| OPTION PERIOD 1 | -9.15% |
| OPTION PERIOD 2 | -9.65% |
| OPTION PERIOD 3 | -10.05% |
| **Note: IDIQ. Optional Procurement** | |

| WAC BASED PRICED GENERICS (WBPG) PHARMACEUTICALS ((Fast Pay &Net 30) | DISCOUNT OFF PUBLISHED WAC |
|---|---|
| BASE PERIOD | -8.65% |
| OPTION PERIOD 1 | -9.15% |
| OPTION PERIOD 2 | -9.65% |
| OPTION PERIOD 3 | -10.05% |
| **Note: IDIQ. Optional Procurement** | |

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**DISTRIBUTION FEE (cont):**

**LINE ITEM 14 (CMOP)**

| PHARMACEUTICAL PRODUCTS | FAST PAY DISTRIBUTION FEE |
|---|---|
| BASE PERIOD | -8.65% |
| OPTION PERIOD 1 | -9.15% |
| OPTION PERIOD 2 | -9.65% |
| OPTION PERIOD 3 | -10.05% |

| WAC BASED PRICED GENERICS (WBPG) PHARMACEUTICALS | DISCOUNT OFF PUBLISHED WAC |
|---|---|
| BASE PERIOD | -8.65% |
| OPTION PERIOD 1 | -9.15% |
| OPTION PERIOD 2 | -9.65% |
| OPTION PERIOD 3 | -10.05% |
| **Note:  IDIQ.  Optional Procurement** | |

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## I-31 Hand-Held Order Entry Device (*Modification P 00033*)

a.  As part of its distribution fee, the PPV shall provide each PPV ordering account two hand-held order entry devices and any accessories associated with such devices.  The hand-held order entry devices will enable on-line real-time ordering (see section I-5, Automated Ordering System).  The prime vendor shall replace at no cost to ordering facilities any nonfunctioning hand-held devices due to normal use and handling. Additional hand-held order entry devices above the two required to be provided to each account may be provided at no cost based on availability as determined by the PPV.

b.  Additional hand held order entry devices shall be temporarily loaned by the PPV at no additional cost to the Government for periodic inventory purposes.  The temporary loan of the devices shall not exceed one week.

## 1-32 Licenses, Permits, and Registration Requirements

Offerors must have in effect prior to the start of the contract, and must maintain for the life of the contract, all current licenses, permits and registrations required by State, local and Federal Government agencies.  Offerors shall make such documentation available upon request by the VA NAC Contracting Officer.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

### 52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION) (APR 2011)

(a) *Inspection/Acceptance*. (Tailored) Pharmaceutical products will be ordered by the Government through the authorized VA Pharmaceutical Prime Vendor(s).  The Government's inspection rights become effective upon receipt at the Government ordering facility.  The Contractor shall only tender for acceptance those items that conform to the requirements of this contract.  The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance.  The Government may require repair or replacement of nonconforming supplies or re-performance of nonconforming services at no increase in contract price.  The Government must exercise its post-acceptance rights (1) Within a reasonable time after the defect was discovered or should have been discovered; and (2) Before any substantial change occurs I the condition of the item, unless the change is due to the defect in the item.

(b) *Assignment*. The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727). However, when a third party makes payment (*e.g.,* use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c) *Changes*. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) *Disputes* (DEVIATION)

(1) This contract is subject to the Contract disputes Act of 1978, as amended (41 U.S.C. 601-613).  Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.2333-1, Disputes, which is incorporated herein by reference.  The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(2)  The Civilian Board of Contract Appeals (CBCA) has jurisdiction over any disputes arising under this contract.  Also, a dispute arising between a product supplier and an authorized VA Pharmaceutical Prime Vendor does not give rise to a "claim" under the Disputes Clause, FAR 52.233-1.

(e) *Definitions*. The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) *Excusable delays*. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION)
(APR 2011) (continued)**

weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

  (g) Invoice. (DEVIATION)

   (1) The Contractor shall submit an original invoice and three copies (or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include—

      (i) Name and address of the Contractor;

      (ii) Invoice date and number;

      (iii) Contract number, contract line item number and, if applicable, the order number;

      (iv) Description, quantity, unit of measure, unit price and extended price of the items delivered; lot number, product expiration date and PPV assigned customer account number.

      (v) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

      (vi) Terms of any discount for prompt payment offered;

      (vii) Name and address of official to whom payment is to be sent;

      (viii) Name, title, and phone number of person to notify in event of defective invoice; and

      (ix) Taxpayer Identification Number (TIN). The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

      (x) Electronic funds transfer (EFT) banking information.

         (A) The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

         (B) If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision, contract clause (*e.g.,* 52.232-33, Payment by Electronic Funds Transfer—Central Contractor

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION)**
**(APR 2011) (continued)**

Registration, or 52.232-34, Payment by Electronic Funds Transfer—Other Than Central Contractor Registration), or applicable agency procedures.

(C) EFT banking information is not required if the Government waived the requirement to pay by EFT.

(2) Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) prompt payment regulations at 5 CFR Part 1315.

(h) *Patent indemnity*. The Contractor shall indemnify the Government and its officers, employees and agents against liability, including costs, for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark or copyright, arising out of the performance of this contract, provided the Contractor is reasonably notified of such claims and proceedings.

(i) Payment.—

(1) *Items accepted*. Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract.

(2) *Prompt payment*. The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR Part 1315.

(3) *Electronic Funds Transfer (EFT)*. If the Government makes payment by EFT, see 52.212-5(b) for the appropriate EFT clause.

(4) *Discount*. In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the specified payment date if an electronic funds transfer payment is made.

(5) *Overpayments*. If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall—

(i) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the—

(A) Circumstances of the overpayment (*e.g.*, duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);

(B) Affected contract number and delivery order number, if applicable;

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION) (APR 2011) (continued)**

(C) Affected contract line item or subline item, if applicable; and

(D) Contractor point of contact.

(ii) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

(6) *Interest*.

(i) All amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in Section 611 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in (i)(6)(v) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(ii) The Government may issue a demand for payment to the Contractor upon finding a debt is due under the contract.

(iii) *Final decisions*. The Contracting Officer will issue a final decision as required by 33.211 if—

(A) The Contracting Officer and the Contractor are unable to reach agreement on the existence or amount of a debt within 30 days;

(B) The Contractor fails to liquidate a debt previously demanded by the Contracting Officer within the timeline specified in the demand for payment unless the amounts were not repaid because the Contractor has requested an installment payment agreement; or

(C) The Contractor requests a deferment of collection on a debt previously demanded by the Contracting Officer (see 32.607-2).

(iv) If a demand for payment was previously issued for the debt, the demand for payment included in the final decision shall identify the same due date as the original demand for payment.

(v) Amounts shall be due at the earliest of the following dates:

(A) The date fixed under this contract.

(B) The date of the first written demand for payment, including any demand for payment resulting from a default termination.

**PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001**

**52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION) (APR 2011) (continued)**

(vi) The interest charge shall be computed for the actual number of calendar days involved beginning on the due date and ending on—

(A) The date on which the designated office receives payment from the Contractor;

(B) The date of issuance of a Government check to the Contractor from which an amount otherwise payable has been withheld as a credit against the contract debt; or

(C) The date on which an amount withheld and applied to the contract debt would otherwise have become payable to the Contractor.

(vii) The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract.

(j) *Risk of loss*. Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

(2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

(k) *Taxes*. The contract price includes all applicable Federal, State, and local taxes and duties.

(l) *Termination for the Government's convenience*.  (Tailored) The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work.  In the event of a partial termination, only the terminated portion shall be affected, and the contractor shall proceed as instructed by the Contracting Officer.  Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) *Termination for cause*. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION)**
**(APR 2011) (continued)**

be liable to the Contractor for any amount for supplies or services not accepted, and the
Contractor shall be liable to the Government for any and all rights and remedies provided by law.
If it is determined that the Government improperly terminated this contract for default, such
termination shall be deemed a termination for convenience.

   (n) *Title*. Unless specified elsewhere in this contract, title to items furnished under this contract
shall pass to the Government upon acceptance, regardless of when or where the Government
takes physical possession.

   (o) *Warranty*. The Contractor warrants and implies that the items delivered hereunder are
merchantable and fit for use for the particular purpose described in this contract.

   (p) *Limitation of liability*. (Tailored) Except as otherwise provided by an express or implied
warranty, the Contractor will not be liable to the Government in breach of warranty action for
consequential damages resulting from any defect or deficiencies in accepted items.

   (q) *Other compliances*. The Contractor shall comply with all applicable Federal, State and
local laws, executive orders, rules and regulations applicable to its performance under this
contract.

   (r) *Compliance with laws unique to Government contracts.* The Contractor agrees to comply
with 31 U.S.C. 1352 relating to limitations on the use of appropriated funds to influence certain
Federal contracts; 18 U.S.C. 431 relating to officials not to benefit; 40 U.S.C. 3701, *et seq*.,
Contract Work Hours and Safety Standards Act; 41 U.S.C. 51-58, Anti-Kickback Act of 1986;
41 U.S.C. 265 and 10 U.S.C. 2409 relating to whistleblower protections; 49 U.S.C. 40118, Fly
American; and 41 U.S.C. 423 relating to procurement integrity.

   (s) *Order of precedence*. Any inconsistencies in this solicitation or contract shall be resolved
by giving precedence in the following order:

   (1) The schedule of supplies/services.

   (2) The Assignments, Disputes, Payments, Invoice, Other Compliances, and Compliance
with Laws Unique to Government Contracts paragraphs of this clause.

   (3) The clause at 52.212-5.

   (4) Addenda to this solicitation or contract, including any license agreements for computer
software.

   (5) Solicitation provisions if this is a solicitation.

   (6) Other paragraphs of this clause.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION) (APR 2011) (continued)**

(7) The Standard Form 1449.

(8) Other documents, exhibits, and attachments.

(9) The specification.

(t) Central Contractor Registration (CCR).

(1) Unless exempted by an addendum to this contract, the Contractor is responsible during performance and through final payment of any contract for the accuracy and completeness of the data within the CCR database, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the CCR database to ensure it is current, accurate and complete. Updating information in the CCR does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.

(2)(i) If a Contractor has legally changed its business name, "doing business as" name, or division name (whichever is shown on the contract), or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in FAR Subpart 42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day's written notification of its intention to (A) change the name in the CCR database; (B) comply with the requirements of Subpart 42.12; and (C) agree in writing to the timeline and procedures specified by the responsible Contracting Officer.

The Contractor must provide with the notification sufficient documentation to support the legally changed name.

(ii) If the Contractor fails to comply with the requirements of paragraph (t)(2)(i) of this clause, or fails to perform the agreement at paragraph (t)(2)(i)(C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the CCR information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the "Suspension of Payment" paragraph of the electronic funds transfer (EFT) clause of this contract.

(3) The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the CCR record to reflect an assignee for the purpose of assignment of claims (see Subpart 32.8, Assignment of Claims). Assignees shall be separately registered in the CCR database. Information provided to the Contractor's CCR record that indicates payments, including those made by EFT, to an ultimate recipient other than that Contractor will be considered to be incorrect information within the meaning of the "Suspension of payment" paragraph of the EFT clause of this contract.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-4 Contract Terms and Conditions—Commercial Items (June 2010) (DEVIATION) (APR 2011) (continued)**

(4) Offerors and Contractors may obtain information on registration and annual confirmation requirements via the internet at http://www.ccr.gov or by calling 1-888-227-2423 or 269-961-5757.

**ADDENDUM TO FAR 52.212-4 CONTRACT TERMS AND CONDITIONS — COMMERCIAL ITEMS**

Clauses that are incorporated by reference (by Citation Number, Title, and Date), have the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

The following clauses are incorporated into 52.212-4 as an addendum to this contract:

**AS12 RESTRICTION ON DISCLOSURE AND USE OF DATA  (FEBRUARY 1998)**

Offerors or quoters who include in their proposals or quotations data that they do not want disclosed to the public for any purpose or used by the Government except for evaluation purposes, shall--

(a)  Mark the title page with the following legend:

"This proposal or quotation includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed -- in whole or in part -- for any purpose other than to evaluate this proposal or quotation.  If, however, a contract is awarded to this offeror or quoter as a result of -- or in connection with -- the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in this data if it is obtained from another source without restriction.  The data subject to this restriction are contained in sheets (insert numbers or other identification of sheets)", and

(b)  Mark each sheet of data it wishes to restrict with the following legend:

"Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal or quotation."

**AS3002 COST RECOVERY FEE  (AUG 1998)**

The cost recovery fee is assessed against all purchases made by OGA participants only in the PPV program.  The fee is .25% and shall be imbedded in the price of all products purchased by the OGA participants.  The PPV shall make the appropriate provisions in the automated order system to include cost recovery fee in the acquisition price field which appears in all order-entry and confirmation modules.  The PPV shall forward all fee monies collected, 60 days after the end of each calendar quarter (i.e. October - December, January - March, April - June, July - September)

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## AS3002 COST RECOVERY FEE  (AUG 1998) (continued)

to: Agent Cashier, Department of Veterans Affairs, Service & Distribution Center, Fiscal Division (901A), P.O. Box 7005, Hines, IL 60141.  A copy of a sales report shall be included with the remittance. The sales report shall show by total dollars, all sales made to the OGA accounts only and shall be itemized to show the site (station number) level.  The remittance shall be made by check or money order, and made payable to Department of Veterans Affairs.  The contract number shall be identified on the check or money order.  A complete list of all OGA participants that shall be assessed the cost recovery fee will be furnished at the time of award.

## AS3023 – DIVERSION OF PHARMACEUTICAL PRODUCTS  (SEP 2010)

(1)  Pharmaceutical products ordered under Federal Supply Schedule (FSS) contracts are intended solely for the use of authorized ordering activities in carrying out their governmental missions; they are not intended for resale or barter.  Any transfer of FSS contract items that does not serve the ordering activity's defined mission, as well as any transfer for the purpose of generating a profit on the difference between FSS prices and commercial prices (such as "AWP"), is an improper diversion of government supplies.

(2)  The Contractor may require an ordering activity that is not listed in the appendices to GSA Adm. Order 4800.2E (and its later revisions) or a pharmaceutical prime vendor ordering on an activity's behalf to demonstrate its eligibility to place FSS orders.  The Contractor may also require an authorized ordering activity to disclose the intended use of ordered pharmaceuticals before commencing delivery.  The Contractor is not required to fill an FSS order (or that portion of an order) that investigational facts suggest are diverted into the commercial market or will otherwise be diverted from usage by authorized FSS ordering activities.  (An example of such facts might be the tripling of usual ordered quantities by an activity, coupled with its failure to demonstrate a corresponding increase in its institutional size or patient base.)  However, the Contractor may not unreasonably delay filling an FSS order, pending its investigation of the intended use of the items ordered.  Based on investigational facts that suggest that a pattern of diversion has occurred, a Contractor may elect not to fill indirect orders of an activity through an authorized Government PPV and, instead, to accept only direct orders.

(3)  If the Contractor refuses to fill an FSS order because of an expectation that some or all of the orders will be diverted or refuses to continue accepting indirect orders because of a perceived pattern of diversion, Contractor must notify the Schedule contracting officer (CO) of its decision within 48 hours and state the basis for the refusal.  The CO may instruct the Contractor to fill an executive-agency-level order and/or resume acceptance of executive agency indirect orders if the CO finds that there is no factual basis for the Contractor's decision.  No authorized FSS ordering activity may be suspended from eligibility under the Schedule by any Contractor, except on the written instruction of the Schedule CO issued after: a) full consideration of all evidence of diversion or other improper practices, and b) affording the ordering activity an opportunity to present its position on the claimed abuse of the Schedule.  An ordering activity suspended by the Schedule CO may appeal that decision in writing to the VA Deputy Assistant Secretary for Acquisition and Materiel Management, within 30 days of the CO's decision.

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

## AS 3030 LIMITATIONS ON SUBCONTRACTING
*Note: This clause applies to Proposal Line 6 and 8, if the conditions of 52.212-2, Paragraph(c)(1), Small Business Set-Aside on page 124 of this solicitation are met.*

(a) This clause applies to the set-aside portion of this solicitation only.

(b) By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in the performance of the contract, at least 51 percent of the functions and requirements required by the contract will be performed by the offeror.

## 52.209-9 UPDATES OF PUBLICLY AVAILABLE INFORMATION REGARDING RESPONSIBILITY MATTERS (JAN 2011)

   (a) The Contractor shall update the information in the Federal Awardee Performance and Integrity Information System (FAPIIS) on a semi-annual basis, throughout the life of the contract, by posting the required information in the Central Contractor Registration database at http://www.ccr.gov.

   (b)(1) The Contractor will receive notification when the Government posts new information to the Contractor's record.

      (2) The Contractor will have an opportunity to post comments regarding information that has been posted by the Government. The comments will be retained as long as the associated information is retained, i.e., for a total period of 6 years. Contractor comments will remain a part of the record unless the Contractor revises them.

      (3)(i) Public requests for system information posted prior to April 15, 2011, will be handled under Freedom of Information Act procedures, including, where appropriate, procedures promulgated under E.O. 12600.

         (ii) As required by section 3010 of Public Law 111-212, all information posted in FAPIIS on or after April 15, 2011, except past performance reviews, will be publicly available.

## 52.216-18  ORDERING  (OCT 1995)

   (a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from the effective date of the contract through the expiration date of the final option period exercised.

   (b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.216-18  ORDERING  (OCT 1995) (continued)**

   (c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

**52.216-19  ORDER LIMITATIONS  (OCT 1995)**

   (a) Minimum order.  When the Government requires supplies or services covered by this contract in an amount of less than $50.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

   (b) Maximum order.  The Contractor is not obligated to honor--

   (1) Any order for a single item in excess of $500,000.00.  For medical/surgical items the maximum order limitation is $3,000.00 per order.

   (2) Any order for a combination of items in excess of $2,500,000.00 for an individual facility; or, for CMOPs, $15,000,000.00 weekly or $50,000,000.00 monthly or

   (3) A series of orders from the same ordering office within one day that together call for quantities exceeding the limitation in paragraph (b)(1) or (2) of this section.

   (c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

   (d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within one day after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons.  Upon receiving this notice, the Government may acquire the supplies or services from another source.

**52.216-21  REQUIREMENTS  (OCT 1995)**

**(Note:  This clause does not apply to the purchase of Medical Surgical Items and WBPG Pharmaceuticals.)**

   (a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract.  Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.216-21  REQUIREMENTS  (OCT 1995) (continued)**

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause.  Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause.  The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(d) The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract.

(e) If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.

(f) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order.  The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after .

**52.217-9  OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000)**

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed eight years.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

### 52.204-4  PRINTED OR COPIED DOUBLE-SIDED ON RECYCLED PAPER (AUG 2000)

(a) Definitions. As used in this clause--

"Postconsumer material" means a material or finished product that has served its intended use and has been discarded for disposal or recovery, having completed its life as a consumer item. Postconsumer material is a part of the broader category of "recovered material." For paper and paper products, postconsumer material means "postconsumer fiber" defined by the U.S. Environmental Protection Agency (EPA) as--

(1) Paper, paperboard, and fibrous materials from retail stores, office buildings, homes, and so forth, after they have passed through their end-usage as a consumer item, including: used corrugated boxes; old newspapers; old magazines; mixed waste paper; tabulating cards; and used cordage; or

(2) All paper, paperboard, and fibrous materials that enter and are collected from municipal solid waste; but not

(3) Fiber derived from printers' over-runs, converters' scrap, and over-issue publications.

"Printed or copied double-sided" means printing or reproducing a document so that information is on both sides of a sheet of paper.

"Recovered material," for paper and paper products, is defined by EPA in its Comprehensive Procurement Guideline as "recovered fiber" and means the following materials:

(1) Postconsumer fiber; and

(2) Manufacturing wastes such as--

(i) Dry paper and paperboard waste generated after completion of the papermaking process (that is, those manufacturing operations up to and including the cutting and trimming of the paper machine reel into smaller rolls or rough sheets) including: envelope cuttings, bindery trimmings, and other paper and paperboard waste resulting from printing, cutting, forming, and other converting operations; bag, box, and carton manufacturing wastes; and butt rolls, mill wrappers, and rejected unused stock; and

(ii) Repulped finished paper and paperboard from obsolete inventories of paper and paperboard manufacturers, merchants, wholesalers, dealers, printers, converters, or others.

(b) In accordance with Section 101 of Executive Order 13101 of September 14, 1998, Greening the Government through Waste Prevention, Recycling, and Federal Acquisition, the Contractor is encouraged to submit paper documents, such as offers, letters, or reports, that are printed or copied double-sided on recycled paper that meet minimum content standards specified in Section 505 of

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

## 52.204-4  PRINTED OR COPIED DOUBLE-SIDED ON RECYCLED PAPER (AUG 2000) (continued)

Executive Order 13101, when not using electronic commerce methods to submit information or data to the Government.

   (c) If the Contractor cannot purchase high-speed copier paper, offset paper, forms bond, computer printout paper, carbonless paper, file folders, white wove envelopes, writing and office paper, book paper, cotton fiber paper, and cover stock meeting the 30 percent postconsumer material standard for use in submitting paper documents to the Government, it should use paper containing no less than 20 percent postconsumer material. This lesser standard should be used only when paper meeting the 30 percent postconsumer material standard is not obtainable at a reasonable price or does not meet reasonable performance standards.

## 52.219-6  NOTICE OF TOTAL SMALL BUSINESS SET-ASIDE (JUNE 2003) ALTERNATE I (OCT 1995)  *Note: This clause will become operational for Proposal Line Items 6 and/or 8 if the conditions of* 52.212-2, Paragraph(c)(1), Small Business Set-Aside on page 124 of this solicitation are met.

   (a) Definition.  "Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

 (b) General.

   (1) Offers are solicited only from small business concerns.  Offers received from concerns that are not small business concerns shall be considered nonresponsive and will be rejected.

   (2) Any award resulting from this solicitation will be made to a small business concern.

## VAAR 852.203-70 COMMERCIAL ADVERTISING (JAN 2008)

   The bidder or offeror agrees that if a contract is awarded to him/her, as a result of this solicitation, he/she will not advertise the award of the contract in his/her commercial advertising in such a manner as to state or imply that the Department of Veterans Affairs endorses a product, project or commercial line of endeavor.

## VAAR 852.203-71  DISPLAY OF DEPARTMENT OF VETERAN AFFAIRS HOTLINE POSTER (DEC 1992)

   (a) Except as provided in paragraph (c) below, the Contractor shall display prominently, in common work areas within business segments performing work under VA contracts, Department of Veterans Affairs Hotline posters prepared by the VA Office of Inspector General.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**VAAR 852.203-71  DISPLAY OF DEPARTMENT OF VETERAN AFFAIRS HOTLINE POSTER (DEC 1992) (continued)**

   (b) Department of Veterans Affairs Hotline posters may be obtained from the VA Office of Inspector General (53E), P.O. Box 34647, Washington, DC 20043-4647.

   (c) The Contractor need not comply with paragraph (a) above if the Contractor has established a mechanism, such as a hotline, by which employees may report suspected instances of improper conduct, and instructions that encourage employees to make such reports.

**VAAR 852.273-76 ELECTRONIC INVOICE SUBMISSION (Interim - October 2008)**

   To improve the timeliness of payments and lower overall administrative costs, VA strongly encourages contractors to submit invoices using its electronic invoicing system.  At present, electronic submission is voluntary and any nominal registration fees will be the responsibility of the contractor.  VA intends to mandate electronic invoice submission, subject to completion of the federal rulemaking process.  At present, VA is using a 3rd party agent to contact contractors regarding this service.  During the voluntary period, contractors interested in registering for the electronic system should contact the VA's Financial Services Center at http://www.fsc.va.gov/einvoice.asp.

**52.252-2  CLAUSES INCORPORATED BY REFERENCE  (FEB 1998)**

   This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

   http://www.acquisition.gov/far/index.html
   http://www.va.gov/oamm/oa/ars/policyreg/vaar/index.cfm

   52.204-9          PERSONAL IDENTITY VERIFICATION OF          JAN 2011
                     CONTRACTOR PERSONNEL

**VAAR 852.252-70  SOLICITATION PROVISIONS OR CLAUSES INCORPORATED BY REFERENCE (JAN 2008)**

   The following provisions or clauses incorporated by reference in this solicitation must be completed by the offeror or prospective contractor and submitted with the quotation or offer. Copies of these provisions or clauses are available on the Internet at the Web sites provided in the provision at FAR 52.252-1, Solicitation Provisions Incorporated by Reference, or the clause at FAR 52.252-2, Clauses Incorporated by Reference. Copies may also be obtained from the contracting officer.

   852.246-71          INSPECTION          JAN 2008

PHARMACEUTICAL PRIME VENDOR CONTRACT
VA797P-12-D-0001

**The following clauses (Added by Amendment 6) are applicable to the Medical/Surgical items and the WBPG Pharmaceuticals.**

GUARANTEED MINIMUM:  The minimum dollar value that the Government agrees to order under the WBPG and Medical Surgical categories is $2,500.00.  If the Contractor receives total orders for less than the minimum amounts, the Government will pay the difference between the amount ordered and the minimum dollar value. The Government's obligation for the minimum amount only applies to the base period of each awarded contract.

(1)  Payment of any amount due under this requirement shall be contingent upon the Contractor's timely submission of sales reports during the period of the contract.

(2)  The guaranteed minimum applies only if the contract expires or contract is terminated for the convenience of the Government.  The guaranteed minimum does not apply if the contract is terminated for cause or the contractor agrees to a "no cost" termination.

b)  MAXIMUM QUANTITY:  The maximum annual amount to be ordered under any resulting contract is $365,000,000.00.

**52.216-22  INDEFINITE QUANTITY  (OCT 1995)**

  (a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule.  The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

  (b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause.  The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

  (c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued.  The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

  (d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order.  The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract *after the expiration of the final contract option period exercised under the contract .*

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## 52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERICAL ITEMS (APR 2011)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

___Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(2) 52.233-3, Protest After Award (Aug 1996) (31 U.S.C. 3553).

(3) 52.233-4, Applicable Law for Breach of Contract Claim (Oct 2004) (Pub. L. 108-77, 108-78).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[_X_ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 253g and 10 U.S.C. 2402).

_X_ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).

__ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (June 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)

_X_ (4) 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards (Jul 2010) (Pub. L. 109-282) (31 U.S.C. 6101 note).

__ (5) 52.204-11, American Recovery and Reinvestment Act—Reporting Requirements (Jul 2010) (Pub. L. 111-5).

_X_ (6) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment (DEC 2010) (31 U.S.C. 6101 note). (Applies to contracts over $30,000). (Not applicable to subcontracts for the acquisition of commercially available off-the-shelf items).

__ (7) 52.219-3, Notice of Total HUBZone Set-Aside or Sole-Source Award (Jan 2011) (15 U.S.C. 657a).

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERCIAL ITEMS (APR 2011) (continued)**

   _*X_ (8) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (JAN 2011) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).
*Note: This provision is not applicable to offers for proposal line items 6 and/or 8, if the conditions of 52.212-2, Paragraph(c)(1), Small Business Set-Aside on page 124 of this solicitation are met.*

   __ (9) [Reserved]

   __ (10)(i)  52.219-6, Notice of Total Small Business Set-Aside (June 2003) (15 U.S.C. 644).

      __ (ii) Alternate I (Oct 1995) of 52.219-6.

      __ (iii) Alternate II (Mar 2004) of 52.219-6.

      __ (11)(i)  52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).

      __ (ii) Alternate I (Oct 1995) of 52.219-7.

      __ (iii) Alternate II (Mar 2004) of 52.219-7.

   _X_ (12) 52.219-8, Utilization of Small Business Concerns (Jan 2011) (15 U.S.C. 637(d)(2) and (3)).

      __ (13)(i)  52.219-9, Small Business Subcontracting Plan (Jan 2011) (15 U.S.C. 637(d)(4)).

      __ (ii) Alternate I (Oct 2001) of 52.219-9.

      _X_ (iii) Alternate II (Oct 2001) of 52.219-9.

      __ (iv) Alternate III (Jul 2010) of 52.219-9.

   _*X_ (14) 52.219-14, Limitations on Subcontracting (Dec 1996) (15 U.S.C. 637(a)(14)).
   **(Please refer to Clause AS 3030 listed in Part II).**
   *Note: This provision is applicable to offers for proposal line items 6 and/or 8, if the conditions of 52.212-2, Paragraph(c)(1), Small Business Set-Aside on page 124 of this solicitation are met.*

   _X_ (15) 52.219-16, Liquidated Damages—Subcontracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT**
**REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERCIAL ITEMS (APR 2011)**
**(continued)**

__ (16)(i)  52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (OCT 2008) (10 U.S.C. 2323) (if the offeror elects to waive the adjustment, it shall so indicate in its offer).

__ (ii) Alternate I (June 2003) of 52.219-23.

_*X_  (17) 52.219-25, Small Disadvantaged Business Participation Program—Disadvantaged Status and Reporting (Dec 2010) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).
   ***Note: This provision is not applicable to proposal line items 6 and/or 8 if the conditions in 52.212-2, Paragraph(c)(1), Small Business Set-Aside on page 124 of this solicitation are met.***

__ (18) 52.219-26, Small Disadvantaged Business Participation Program—Incentive Subcontracting (Oct 2000) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

__ (19) 52.219-27, Notice of Total Service-Disabled Veteran-Owned Small Business Set-Aside (May 2004) (15 U.S.C. 657 f).

_X_ (20) 52.219-28, Post Award Small Business Program Representation (Apr 2009) (15 U.S.C. 632(a)(2)).

__ (21) 52.219-29 Notice of Total Set-Aside for Economically Disadvantaged Women-Owned Small Business (EDWOSB) Concerns (Apr 2011).

__ (22) 52.219-30 Notice of Total Set-Aside for Women-Owned Small Business (WOSB) Concerns Eligible Under the WOSB Program (Apr 2011).

_X_ (23) 52.222-3, Convict Labor (June 2003) (E.O. 11755).

_X_ (24) 52.222-19, Child Labor—Cooperation with Authorities and Remedies (Jul 2010) (E.O. 13126).

_X_ (25) 52.222-21, Prohibition of Segregated Facilities (Feb 1999).

_X_ (26) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

_X_ (27) 52.222-35, Equal Opportunity for Veterans (Sep 2010)(38 U.S.C. 4212).

_X_ (28) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010) (29 U.S.C. 793).

_X_ (29) 52.222-37, Employment Reports on Veterans (SEP 2010) (38 U.S.C. 4212).

89

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERICAL ITEMS (APR 2011) (continued)**

_X_ (30) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496).

__ (31) 52.222-54, Employment Eligibility Verification (JAN 2009). (Executive Order 12989. (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

__ (32)(i)  52.223-9, Estimate of Percentage of Recovered Material Content for EPA–Designated Items (May 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (ii) Alternate I (May 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (33) 52.223-15, Energy Efficiency in Energy-Consuming Products (DEC 2007) (42 U.S.C. 8259b).

__ (34)(i)  52.223-16, IEEE 1680 Standard for the Environmental Assessment of Personal Computer Products (DEC 2007) (E.O. 13423).

__ (ii) Alternate I (DEC 2007) of 52.223-16.

_X_ (35) 52.223-18, Contractor Policy to Ban Text Messaging While Driving (SEP 2010) (E.O. 13513).

__ (36) 52.225-1, Buy American Act—Supplies (Feb 2009) (41 U.S.C. 10a-10d).

__ (37)(i)  52.225-3, Buy American Act—Free Trade Agreements—Israeli Trade Act (June 2009) (41 U.S.C. 10a-10d, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, Pub. L. 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, and 110-138).

__ (ii) Alternate I (Jan 2004) of 52.225-3.

__ (iii) Alternate II (Jan 2004) of 52.225-3.

_X_ (38) 52.225-5, Trade Agreements (AUG 2009) (19 U.S.C. 2501, _et seq._, 19 U.S.C. 3301 note).

_X_ (39) 52.225-13, Restrictions on Certain Foreign Purchases (June 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERICAL ITEMS (APR 2011)** (continued)

___ (40) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

___ (41) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

___ (42) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

___ (43) 52.232-30, Installment Payments for Commercial Items (Oct 1995) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

___ (44) 52.232-33, Payment by Electronic Funds Transfer—Central Contractor Registration (Oct 2003) (31 U.S.C. 3332).

_X_ (45) 52.232-34, Payment by Electronic Funds Transfer—Other than Central Contractor Registration (May 1999) (31 U.S.C. 3332).

_X_ (46) 52.232-36, Payment by Third Party (Feb 2010) (31 U.S.C. 3332).

___ (47) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).

___ (48)(i)  52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).

___ (ii) Alternate I (Apr 2003) of 52.247-64.

  (c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

___ (1) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, *et seq*.).

___ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (May 1989) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq*.).

___ (3) 52.222-43, Fair Labor Standards Act and Service Contract Act—Price Adjustment (Multiple Year and Option Contracts) (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq*.).

___ (4) 52.222-44, Fair Labor Standards Act and Service Contract Act—Price Adjustment (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq*.).

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## 52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERICAL ITEMS (APR 2011) (continued)

___ (5) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (Nov 2007) (41 351, *et seq.*).

__ (6) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services—Requirements (Feb 2009) (41 U.S.C. 351, *et seq.*).

__ (7) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247).

__ (8) 52.237-11, Accepting and Dispensing of $1 Coin (Sept 2008) (31 U.S.C. 5112(p)(1)).

  (d)  *Comptroller General Examination of Record*. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records—Negotiation.

  (1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

  (2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

  (3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

  (e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

  (i) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERICAL ITEMS (APR 2011) (continued)**

(ii) 52.219-8, Utilization of Small Business Concerns (Dec 2010) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(iii) [Reserved]

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(v) 52.222-35, Equal Opportunity for Veterans (Sep 2010) (38 U.S.C. 4212).

(vi) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010) (29 U.S.C. 793).

(vii) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(viii) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, *et seq.*).

(ix) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

___Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(x) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (Nov 2007) (41 U.S.C. 351, *et seq.*).

(xi) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services-Requirements (Feb 2009) (41 U.S.C. 351, *et seq.*).

(xii) 52.222-54, Employment Eligibility Verification (Jan 2009).

(xiii) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(xiv) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERICAL ITEMS (APR 2011) (continued)**

(2) While not required, the contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

*Alternate I (Feb 2000).* As prescribed in 12.301(b)(4)(i), delete paragraph (d) from the basic clause, redesignate paragraph (e) as paragraph (d), and revise the reference to "paragraphs (a), (b), (c), or (d) of this clause" in the redesignated paragraph (d) to read "paragraphs (a), (b), and (c) of this clause."

*Alternate II (Dec 2010).* As prescribed in 12.301(b)(4)(ii), substitute the following paragraphs (d)(1) and (e)(1) for paragraphs (d)(1) and (e)(1) of the basic clause as follows:

(d)(1) The Comptroller General of the United States, an appropriate Inspector General appointed under section 3 or 8G of the Inspector General Act of 1978 (5 U.S.C. App.), or an authorized representative of either of the foregoing officials shall have access to and right to—

(i) Examine any of the Contractor's or any subcontractors' records that pertain to, and involve transactions relating to, this contract; and

(ii) Interview any officer or employee regarding such transactions.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), and (c), of this clause, the Contractor is not required to flow down any FAR clause in a subcontract for commercial items, other than—

(i) *Paragraph (d) of this clause*. This paragraph flows down to all subcontracts, except the authority of the Inspector General under paragraph (d)(1)(ii) does not flow down; and

(ii) *Those clauses listed in this paragraph (e)(1)*. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

(A) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI,  Chapter  1 (41 U.S.C. 251 note)).

(B) 52.203-15, Whistleblower Protections Under the American Recovery and Reinvestment Act of 2009 (June 2010) (Section 1553 of Pub. L. 111-5).

(C) 52.219-8, Utilization of Small Business Concerns (Dec 2010) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

### 52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT REQUIRED STATUTES OR EXECUTIVE ORDERS—COMMERICAL ITEMS (APR 2011) (continued)

(D) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(E) 52.222-35, Equal Opportunity for Veterans (Sep 2010) (38 U.S.C. 4212).

(F) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010) (29 U.S.C. 793).

(G) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(H) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, *et seq.*).

(I) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

(J) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (Nov 2007) (41 U.S.C. 351, *et seq.*).

(K) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services—Requirements (Feb 2009) (41 U.S.C. 351, *et seq.*).

(L) 52.222-54, Employment Eligibility Verification (Jan 2009).

(M) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations. (Mar 2009) (Pub. L. 110-247). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(N) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause

### MANDATORY WRITTEN DISCLOSURES

Mandatory written disclosures required by FAR clause 52.203-13 to the Department of Veterans Affairs, Office of Inspector General (OIG) must be made electronically through the VA OIG Hotline at http://www.va.gov/oig/contacts/hotline.asp and clicking on "FAR clause 52.203-13 Reporting." If you experience difficulty accessing the website, call the Hotline at 1-800-488-8244 for further instructions.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## 52.232-19  AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR

Funds are not presently available for performance under this contract beyond the fiscal year. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond the fiscal year, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

## 52.242-13  BANKRUPTCY (JULY 1995)

In the event the contractor enters into proceedings relating to bankruptcy, whether voluntary or involuntary, the contractor agrees to furnish, by certified mail or electronic commerce method authorized by the contract, written notification of the bankruptcy to the contracting officer responsible for administering the contract. This notification shall be furnished within five days of the initiation of the proceedings relating to bankruptcy filing. This notification shall include the date on which the bankruptcy petition was filed, the identity of the court in which the bankruptcy petition was filed, and a listing of government contract numbers and contracting offices for all government contracts against which final payment has not been made. This obligation remains in effect until final payment under this contract.

## 52.247-34  F.O.B. DESTINATION (NOV 1991)

(a) The term "f.o.b. destination," as used in this clause, means—

(1) Free of expense to the Government, on board the carrier's conveyance, at a specified delivery point where the consignee's facility (plant, warehouse, store, lot, or other location to which shipment can be made) is located; and

(2) Supplies shall be delivered to the destination consignee's wharf (if destination is a port city and supplies are for export), warehouse unloading platform, or receiving dock, at the expense of the Contractor. The Government shall not be liable for any delivery, storage, demurrage, accessorial, or other charges involved before the actual delivery (or "constructive placement" as defined in carrier tariffs) of the supplies to the destination, unless such charges are caused by an act or order of the Government acting in its contractual capacity. If rail carrier is used, supplies shall be delivered to the specified unloading platform of the consignee. If motor carrier (including "piggyback") is used, supplies shall be delivered to truck tailgate at the unloading platform of the consignee, except when the supplies delivered meet the requirements of Item 568 of the National Motor Freight Classification for "heavy or bulky freight." When supplies meeting the requirements of the referenced Item 568 are delivered, unloading (including movement to the tailgate) shall be performed by the consignee, with assistance from the truck driver, if requested. If

96

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.247-34  F.O.B. DESTINATION (NOV 1991) (continued)**

the contractor uses rail carrier or freight forwarded for less than carload shipments, the contractor shall ensure that the carrier will furnish tailgate delivery, when required, if transfer to truck is required to complete delivery to consignee.

  (b) The Contractor shall—

    (1)(i) Pack and mark the shipment to comply with contract specifications; or

        (ii) In the absence of specifications, prepare the shipment in conformance with carrier requirements;

    (2) Prepare and distribute commercial bills of lading;

    (3) Deliver the shipment in good order and condition to the point of delivery specified in the contract;

    (4) Be responsible for any loss of and/or damage to the goods occurring before receipt of the shipment by the consignee at the delivery point specified in the contract;

    (5) Furnish a delivery schedule and designate the mode of delivering carrier; and

    (6) Pay and bear all charges to the specified point of delivery.

**52.247-35  F.O.B. DESTINATION WITHIN CONSIGNEE'S PREMISES (APR 1984)**

  (a) The term "f.o.b. destination, within consignee's premises," as used in this clause, means free of expense to the Government delivered and laid down within the doors of the consignee's premises, including delivery to specific rooms within a building if so specified.

  (b) The Contractor shall—

    (1)(i) Pack and mark the shipment to comply with contract specifications; or

        (ii) In the absence of specifications, prepare the shipment in conformance with carrier requirements;

    (2) Prepare and distribute commercial bills of lading;

    (3) Deliver the shipment in good order and condition to the point of delivery specified in the contract;

    (4) Be responsible for any loss of and/or damage to the goods occurring before receipt of the shipment by the consignee at the delivery point specified in the contract;

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.247-35  F.O.B. DESTINATION WITHIN CONSIGNEE'S PREMISES (APR 1984)**
**(continued)**

(5) Furnish a delivery schedule and designate the mode of delivering carrier; and

(6) Pay and bear all charges to the specified point of delivery.

**AS 1108  CONTACT FOR CONTRACT ADMINISTRATION  (MAY 1992)**

Offerors are requested to designate a person to be contacted for prompt contract administration.

NAME:       Lori White

TITLE :      Vice President, Government and National Accounts

ADDRESS:    1220 Senlac Drive
            Carrollton, TX 75006

PHONE NO:  (972) 446-5758          FAX NO:  972-446-5795

E-MAIL:      lori.white@mckesson.com

**AS1502 CONTACT FOR CONTRACT PRICING  (APRIL 1998)**

Offerors are also requested to designate a person(s) responsible for ensuring product pricing.

NAME:       Erica Russell

TITLE:       Contract Administration Manager

ADDRESS:  1220 Senlac Drive
          Carrollton, TX 75006

PHONE NO:  (972) 446-3386          FAX NO:       (972) 267-6161

E-MAIL:      Erica.russell@mckesson.com

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

**52.233-2  SERVICE OF PROTEST  (SEP 2006)**

(a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the Government Accountability Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

Hand-Carried /Mailing Address:

German Arcibal (001AL-A2-3b-PPV)
Department of Veterans Affairs
OA&L / National Acquisition Center
Building 37
1st Avenue, One Block North of Cermak Road
Hines IL  60141

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

**VAAR 852-219-9  VA SMALL BUSINESS SUBCONTRACTING PLAN MINIMUM REQUIREMENTS (DEC 2009)**

(a) This clause does not apply to small business concerns

(b) If the offeror is required to submit a individual subcontracting plan, the minimum goals for award of subcontracts to service-disabled veteran-owned small business concerns and veteran-owned small business concerns shall be at least commensurate with the Department's annual service-disabled veteran-owned small business and veteran-owned small business prime contracting goals for the total dollars planned to be subcontracted.

(c) For a commercial plan, the minimum goals for award of subcontracts to service-disabled veteran-owned small business concerns and veteran-owned small businesses shall be at least commensurate with the Department's annual service-disabled veteran-owned small business and veteran-owned small business prime contracting goals for the total value of projected subcontracts to support the sales for the commercial plan.

(d) To be credited toward goal achievements, businesses must be verified as eligible in the Vendor Information Pages database.  The contractor shall annually submit a listing of service-disabled veteran-owned small businesses and veteran-owned small businesses for which credit toward goal achievement is to be applied for the review of personnel in the Office of Small and Disadvantaged Business Utilization.

(e) The contractor may appeal any businesses determined not eligible for crediting toward goal achievements by following the procedures contained in 819-407.

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## VAAR 852.219-71  VA MENTOR-PROTÉGÉ PROGRAM (DEC 2009)

(a) Large businesses are encouraged to participate in the VA Mentor-Protégé Program for the purpose of providing developmental assistance to eligible service-disabled veteran-owned small businesses and veteran-owned small businesses to enhance the small businesses' capabilities and increase their participation as VA prime contractors and as subcontractors.

(b) The program consists of:

(1) Mentor firms, which are contractors capable of providing developmental assistance;

(2) Protégé firms, which are service-disabled veteran-owned small business concerns or veteran-owned small business concerns; and

(3) Mentor-Protégé Agreements approved by the VA Office of Small and Disadvantaged Business Utilization.

(c) Mentor participation in the program means providing business developmental assistance to aid protégés in developing the requisite expertise to effectively compete for and successfully perform VA prime contracts and subcontracts.

## VAAR 852.219-71  VA MENTOR-PROTÉGÉ PROGRAM (DEC 2009) (continued)

(d) Large business prime contractors serving as mentors in the VA Mentor-Protégé Program are eligible for an incentive for subcontracting plan credit. VA will recognize the costs incurred by a mentor firm in providing assistance to a protégé firm and apply those costs for purposes of determining whether the mentor firm attains its subcontracting plan participation goals under a VA contract. The amount of credit given to a mentor firm for these protégé developmental assistance costs shall be calculated on a dollar-for-dollar basis and reported by the large business prime contractor via the Electronic Subcontracting Reporting System (eSRS).

(e) Contractors interested in participating in the program are encouraged to contact the VA Office of Small and Disadvantaged Business Utilization for more information.

## VAAR 852.233-70  PROTEST CONTENT/ALTERNATIVE DISPUTE RESOLUTION (JAN 2008)

(a) Any protest filed by an interested party shall:

(1) Include the name, address, fax number, and telephone number of the protester;

(2) Identify the solicitation and/or contract number;

(3) Include an original signed by the protester or the protester's representative and at least one copy;

100

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## VAAR 852.233-70  PROTEST CONTENT/ALTERNATIVE DISPUTE RESOLUTION
(JAN 2008)

 (4) Set forth a detailed statement of the legal and factual grounds of the protest, including a description of resulting prejudice to the protester, and provide copies of relevant documents;

   (5) Specifically request a ruling of the individual upon whom the protest is served;

   (6) State the form of relief requested; and

   (7) Provide all information establishing the timeliness of the protest.

   (b) Failure to comply with the above may result in dismissal of the protest without further consideration.

   (c) Bidders/offerors and contracting officers are encouraged to use alternative dispute resolution (ADR) procedures to resolve protests at any stage in the protest process. If ADR is used, the Department of Veterans Affairs will not furnish any documentation in an ADR proceeding beyond what is allowed by the Federal Acquisition Regulation.

## VAAR 852.233-71  ALTERNATE PROTEST PROCEDURE (JAN 1998)

   As an alternative to filing a protest with the contracting officer, an interested party may file a protest with the Deputy Assistant Secretary for Acquisition and Materiel Management, Acquisition Administration Team, Department of Veterans Affairs, 810 Vermont Avenue, NW., Washington, DC 20420, or for solicitations issued by the Office of Construction and Facilities Management, the Director, Office of Construction and Facilities Management, 810 Vermont Avenue, NW., Washington, DC 20420. The protest will not be considered if the interested party has a protest on the same or similar issues pending with the contracting officer.

   PLEASE NOTE: The correct mailing information for filing alternate protests is as follows:

        Deputy Assistant Secretary for Acquisition and Logistics,
        Risk Management Team, Department of Veterans Affairs
        810 Vermont Avenue, N.W.
        Washington, DC 20420

Or for solicitations issued by the Office of Construction and Facilities Management:

        Director, Office of Construction and Facilities Management
        811 Vermont Avenue, N.W.
        Washington, DC 20420

**PHARMACEUTICAL PRIME VENDOR CONTRACT**
**VA797P-12-D-0001**

## <u>VAAR 852.270-1  REPRESENTATIVES OF CONTRACTING OFFICERS (JAN 2008)</u>

   The contracting officer reserves the right to designate representatives to act for him/her in furnishing technical guidance and advice or generally monitor the work to be performed under this contract.  Such designation will be in writing and will define the scope and limitation of the designee's authority.  A copy of the designation shall be furnished to the contractor.